IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| McNEIL NUTRITIONALS, LLC, | ) | **<u>REDACTED PUBLIC VERSION</u>** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-069-GMS |
| | ) | |
| THE SUGAR ASSOCIATION, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN**
**<u>OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

ASHBY & GEDDES
Steven J. Balick (#2114)
John G. Day (#2403)
222 Delaware Avenue, 17th Floor
Wilmington, Delaware 19801
(302) 654-1888
sbalick@ashby-geddess.com
jday@ashby-geddess.com

*Attorneys for Plaintiff*

*Of Counsel:*

Steven A. Zalesin
Clay J. Pierce
PATTERSON, BELKNAP, WEBB & TYLER, LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000
Facsimile: (212) 336-2222

Donna Malin
JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, New Jersey 08933

Date: July 29, 2005
159959.1

# Table of Contents

Page

Table of Authorities ............................................................................................. iii

Preliminary Statement ............................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 3

ARGUMENT ......................................................................................................... 11

I.     VENUE IS PROPER IN DELAWARE ..................................................... 11

       A.     The Two Actions Raise Different Factual and Legal Issues ........... 12

       B.     Some of the Parties in this Action May Not Be Subject to Jurisdiction in California ............................................................................................. 13

II.    THE *NOERR-PENNINGTON* DOCTRINE DOES NOT IMMUNIZE DEFENDANTS FROM SUIT ........................................................................................... 15

       A.     The Statements on the Website Are Not Petitioning Activities and Do Not Implicate *Noerr* ...................................................................... 15

              1.     The First Amendment Right To Petition Applies Only to Petitions to the Government, and Does Not Immunize False Advertising Aimed at Consumers ........................................................................... 16

              2.     Neither the *Noerr* Doctrine Nor the First Amendment Right To Petition Shields Trade Libel ........................................................ 16

       B.     The Sugar Association's So-Called "Petitioning Activities" Are Nothing More Than a Sham and Are Not Entitled to Protection Under *Noerr* ........................................................................................... 17

       C.     Defendants Are Not Entitled to Dismissal on the Basis of the Mere Assertion of "*Noerr* Immunity" ........................................................ 19

III.   UNDER THE LAW OF THIS CIRCUIT, MCNEIL HAS STANDING TO SUE DEFENDANTS WITH WHICH IT DOES NOT COMPETE ............... 20

Table of Contents
(continued)

Page

IV.    THE COURT MAY EXERCISE PERSONAL JURISDICTION OVER ALL
       DEFENDANTS IN THIS ACTION ................................................................................22

       A.     Specific Jurisdiction ......................................................................................24

              1.     The Court May Exercise Jurisdiction Over Defendants Because They
                     Directed Their Misconduct at Delaware and McNeil Suffered Injury
                     Here ...................................................................................................24

                     a.     The Delaware Long-Arm Statute ...........................................24

                     b.     Due Process Clause ................................................................26

              2.     The Court May Exercise Jurisdiction Over Defendants Because They
                     Maintain an Interactive Website in Delaware ....................................28

       B.     General Jurisdiction .......................................................................................30

       C.     Qorvis's Contacts With Delaware ..................................................................34

V.     DEFENDANTS ARE NOT ENTITLED TO DISMISSAL OF MCNEIL'S DELAWARE
       STATE LAW CLAIMS .................................................................................................35

CONCLUSION ........................................................................................................................37

**Table of Authorities**

**CASES**                                                                                      Page(s)

Allied Tube & Conduit Corp. v. Indian Head, Inc.,
    486 U.S. 492 (1988) .......................................................................................... 20

Applied Biosystems, Inc. v. Cruachem, Ltd.,
    772 F. Supp. 1458 (D. Del. 1991) ........................................................... 22, 25, 26

Bell Helicopter Textron, Inc. v. C&C Helicopter Sales, Inc.,
    295 F. Supp. 2d 400 (D. Del. 2002) .............................................................. 24, 27

Borough of Lansdale v. Philadelphia Electric Co.,
    517 F. Supp. 218 (E.D. Pa. 1981) .................................................................... 20

Brownsville Golden Age Nursing Home, Inc. v. Wells,
    839 F.2d 155 (3rd Cir. 1988) .......................................................................... 19

Calder v. Jones,
    465 U.S. 783 (1984) .................................................................................. 26, 27

Cardtoons, L.C. v. Major League Baseball Players Association,
    208 F.3d 885 (10th Cir. 2000) ........................................................................ 16

Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau,
    690 F.2d 1240 (9th Cir. 1982) ........................................................................ 20

Clontech Laboratories, Inc. v. Invitrogen Corp.,
    263 F. Supp. 2d 780 (D. Del. 2003) ................................................................ 36

Compaq Computer Corp. v. Packard Bell Electronics, Inc.,
    948 F. Supp. 338 (D. Del. 1996) .................................................................... 25

Conte Brothers Automotive, Inc. v. Quaker State-Slick 50, Inc.,
    165 F.3d 221 (3d Cir. 1998) .......................................................................... 21

Continental Ore Co. v. Union Carbide & Carbon Corp.,
    370 U.S. 690, 82 S. Ct. 1404 (1962) ............................................................... 16

Delaware Solid Waste Authority v. Eastern Shore Environmental, Inc.,
    C.A. No. 1472-K, 2002 WL 537691 (Del. Ch. Mar. 28, 2002) ........................... 36

Eastern R. R. Presidents Conference v. Noerr Motor Freight, Inc.,
    365 U.S. 127 (1961) ............................................................................. *passim*

## Table of Authorities

**CASES**                                                                              Page(s)

Grand Ventures, Inc. v. Whaley,
    632 A.2d 63 (Del. 1993) ......................................................................................36

In re Elonex Phase II Power Management Litigation,
    C.A. No. 01-082-GMS, 2003 WL 21026758 (D. Del. May 6, 2003) ...................31

In re IBP Confidential Business Documents Litigation,
    755 F.2d 1300 (8th Cir. 1985) ...........................................................................17

IMO Industrial, Inc. v. Kiekert AG,
    155 F.3d 254 (3d Cir. 1998) ........................................................................27, 28

eSpeed, Inc. v. BrokerTec USA, LLC,
    No. Civ. A. 03-612-KAJ, 2004 WL 2346137 (D. Del. Sept. 13, 2004) ..............29

Jarrow Formulas, Inc. v. Nutrition Now, Inc.,
    304 F.3d 829 (9th Cir. 2002) ................................................................................7

Joint Stock Society v. UDV North America, Inc.,
    266 F.3d 164 (3d Cir. 2001) ...............................................................................21

Keeton v. Hustler Magazine, Inc.,
    465 U.S. 770 (1984) ...........................................................................25, 27, 28

LaNuova D & B, S.p.A. v. Bowe Co. Inc.,
    513 A.2d 764 (Del. 1986) .............................................................................22, 26

Magid v. Marcal Paper Mills, Inc.,
    517 F. Supp. 1125 (D. Del. 1981) .......................................................................24

Maybelline Co. v. Noxell Corp.,
    643 F. Supp. 294 (E.D. Ark. 1986),
    *rev'd on other grounds*, 813 F.2d 901 (8th Cir. 1987) .....................................35

McDonald v. Smith,
    472 U.S. 479 (1985) ...........................................................................................17

McNeil-PPC, Inc. v. Merisant Co.,
    Civ. No. 04-1090 (JAG), 2004 WL 3316380 (D.P.R. July 29, 2004) ...................3

Metropolitan Opera Ass'n, Inc. v. Local 100,
Hotel Employees and Restaurant Employees Int'l Union,
    No. 00 Civ. 3613(LAP), 2004 WL 1943099 (S.D.N.Y. Aug. 27, 2004) .............17

**Table of Authorities**

## CASES

Page(s)

Motorola, Inc. v. PC-TEL, Inc.,
    58 F. Supp. 2d 349 (D. Del. 1999) ..................................................................................26, 31

Padcom, Inc. v. NetMotion Wireless, Inc.,
    No. Civ. 03-983-SLR, 2004 WL 1192641 (D.Del. May 24, 2004) ................................29, 30

Remick v. Manfredy,
    238 F.3d 248 (3d Cir. 2001) .........................................................................................27

Serbin v. Ziebart International Corp., Inc.,
    11 F.3d 1163 (3d Cir. 1993) .........................................................................................21

Tambrands, Inc. v. Warner-Lambert Co.,
    673 F. Supp. 1190 (S.D.N.Y. 1987) ............................................................................35

Thorn v. Reliance Van Co.,
    736 F.2d 929 (3d Cir. 1984) .....................................................................................20-21

Toys "R" Us, Inc. v. Step Two, S.A.,
    318 F.3d 446 (3d Cir. 2003) ....................................................................................29, 30

U-Haul Intern., Inc. v. Jartran, Inc.,
    522 F. Supp. 1238 (D. Ariz. 1981), *aff'd*, 681 F.2d 1159 (9th Cir. 1982) ......................35

United Mine Workers of America v. Pennington,
    381 U.S. 657 (1965) ....................................................................................................15

Versatile Plastics, Inc. v. Sknowbest! Inc.,
    247 F. Supp. 2d 1098 (E.D. Wis. 2003) ...................................................................18-19

World-Wide Volkswagen Corp. v. Woodson,
    444 U.S. 286 (1980) ....................................................................................................28

Xerox Corp. v. SCM Corp.,
    576 F.2d 1057 (3d Cir. 1978) .....................................................................................12

## STATUTES

21 C.F.R. § 10.30 ...............................................................................................................18

Fed. R. Civ. P. 13(a) ....................................................................................................2, 13, 14

## Table of Authorities

6 Del. C. § 2532(b)...................................................................................................................3, 35

10 Del. C. § 3104(c)....................................................................................................................*passim*

**OTHER**                                                                                  Page(s)

3-13 Moore's Federal Practice - Civil § 13.16[2] ......................................................................14

6 Charles Alan Wright & Arthur R. Miller,
    Federal Practice and Procedure § 1411.................................................................................14

4 Callmann on Unfair Comp., Tr. & Mono. §23:12 (4th Ed.).....................................................35

Rich Kurnit, Advertising and Marketing Communications,
    SJ075 A.L.I.-A.B.A. 359, 401 (2004)....................................................................................35

Plaintiff McNeil Nutritionals, LLC ("McNeil") respectfully submits this memorandum of law in opposition to Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), (2), (3) & (6).

### Preliminary Statement

This case focuses on Defendants' unlawful attempts to mislead the public and undermine consumer confidence in McNeil's best selling no-calorie sweetener product, Splenda®.

Since its introduction in September 2000, Splenda has enjoyed tremendous success with consumers due to its outstanding taste qualities and the fact that, unlike other no-calorie sweeteners, it can be used in cooking and baking and thus constitutes the first all purpose no-calorie substitute for sugar. In contrast, the sugar industry has suffered a steady decline in sales during this period – due to both increased competition from artificial sweeteners and growing public concern about sugar's relationship to obesity, diabetes and other health issues. In January 2005, as part of a wider strategy to reverse this trend and increase consumption of sugar in the United States, defendant the Sugar Association and its member companies created the "truthaboutsplenda" website, which falsely portrays Splenda as an untested and unsafe product that threatens the health of consumers. As set forth in McNeil's Complaint, the false and misleading claims included in the website and other statements published by Defendants violate both the Lanham Act and Delaware state law.

Defendants' motion to dismiss presents a grab bag of arguments, all aimed at avoiding the merits of McNeil's claims. Specifically, Defendants argue that this suit should have been brought in a different forum (California), that their false and malicious statements are somehow protected by the First Amendment pursuant to the *Noerr-Pennington* doctrine, that McNeil lacks standing to sue its non-competitors, that the Court does not have personal jurisdiction over certain defendants, and that McNeil has failed adequately to plead claims under Delaware statutory and common law. As set forth below, Defendants' arguments have no support in fact or law and this case should proceed, in this Court, against all of the named Defendants.

**First,** Defendants' motion to dismiss on venue grounds is without merit in light of the fact that: (i) this case and the competing California action focus on separate facts and legal issues; (ii) only one of the Defendants (the Sugar Association) is a party to the California action, the others having refused to join that case as plaintiffs; and (iii) most of the claims in the California action have already been dismissed on the pleadings, and the sole claim that remains is subject to dismissal on a summary judgment motion now being briefed. For these reasons, transfer to California would be contrary to both Fed. R. Civ. P. 13(a) and considerations of judicial economy.

**Second,** Defendants' conduct enjoys no protection under the *Noerr-Pennington* doctrine. The clear purpose of the Defendants' website is not to petition governmental authorities – the category of speech protected under *Noerr* – but rather to tarnish Splenda's image with consumers and thereby eliminate a potential competitor to the sugar industry. The few instances where the website does purport to encourage contacts between the public and the government are clear examples of "sham" petitioning, and therefore fall outside *Noerr's* protection. Even if Defendants' argument had any merit (and it does not), dismissal at this stage, prior to any discovery, is not warranted.

**Third,** McNeil unquestionably has standing to sue the Sugar Association, the American Sugarbeet Growers Association, and Qorvis for violations of the Lanham Act. Defendants' contrary argument that McNeil lacks standing to sue non-competitors under the Lanham Act has been rejected repeatedly by the Third Circuit in circumstances where, as here, the plaintiff alleges an injury that falls within the scope of the statute and the defendants are directly responsible for such harm.

**Fourth,** this Court enjoys jurisdiction over all Defendants on multiple grounds. Each of the Defendants is responsible for: (i) an attack by a Delaware corporation (the Sugar Association); (ii) against another Delaware company (McNeil); (iii) via an interactive website that undisputedly is directed at, and accessible by, Delaware residents.

**Finally,** Defendants' challenges to McNeil's Delaware state law claims are without merit. Although Defendants contend that McNeil is barred from suing parties under the Delaware Uniform Deceptive Trade Practices Act that are not competitors, the law is clear that "a complainant need not prove competition between the parties" in order to proceed under the statute. 6 DEL. C. § 2532(b). Likewise, Defendants cannot legitimately argue that McNeil has failed to allege "wrongful" conduct under Delaware law, as required for its trade disparagement and unfair competition claims.

At bottom, Defendants' motion is a classic stalling tactic designed to delay resolution of the merits of McNeil's claims. It should be denied.

## STATEMENT OF FACTS

### Background

Since its launch in September 2000, Splenda has eclipsed all competition to become the leading no-calorie sweetener in the United States. *See McNeil-PPC, Inc. v. Merisant Co.*, Civ. No. 04-1090 (JAG), 2004 WL 3316380 (D.P.R. July 29, 2004) (Exhibit A hereto) (hereinafter, "*McNeil*"). The sweetening ingredient in Splenda, called sucralose, is created through a multi-stage patented process that takes sucrose, *i.e.*, sugar, and modifies it by replacing three hydrogen-oxygen groups on the sucrose molecule with three tightly (covalently) bound chlorine atoms. *See* Complaint ¶ 29. The resulting sucralose compound mimics the sweet taste of sugar but is not metabolized for energy by the body, so it has no calories. *Id.* at ¶ 31. Unlike some artificial sweeteners, sucralose is extremely stable and heat resistant, so consumers are free to cook and bake with it. *See McNeil*, 2004 WL 3316380, at *1. Further, studies have confirmed that the flavor profile of sucralose closely resembles that of

sucrose, and that sucralose tastes at least as similar to sucrose as any of the other low calorie

sweeteners, with no unpleasant aftertaste. *See* Complaint at ¶ 30. Based on these intrinsic benefits,

annual sales of Splenda "soared from about $32 million in 2001 to more than $200 million in 2003."

*Id.* at *2.

      The sudden emergence of Splenda as the nation's best-selling branded sweetener has caused

panic throughout the sugar industry. Sales of sugar in the United States have floundered in recent

years.[1] Not only has the industry faced increased competition from artificial sweeteners such as

Splenda, Sweet'N Low® and Equal®, it has struggled to combat a growing aversion on the part of diet-

conscious Americans leery of the calories and carbohydrates found in additive sugars.[2] Now, for the

first time, sugar producers must compete with a no-calorie sweetener that not only tastes like sugar,

but can be used for cooking and baking almost anywhere that sugar can be used.

      In a recent speech at an industry gathering, Sugar Association President Andrew Briscoe laid

bare the competitive threat that Splenda poses to the country's sugar business. As the unwary

members of the audience finished their lunches and ate their desserts, Mr. Briscoe revealed:

> Now, I want to insert [] something here. Everybody, have you all
> eaten your dessert? Are you ok with that? Was it good? Pretty good.
> Did anybody notice any difference? No. No different. How many of
> you noticed the difference? One guy. One guy. Nobody noticed the
> difference.
>
> Well, here is the straight truth, you have been duped. Half of your
> dessert was made with real sugar. The other half was made with
> Splenda. So, now the question is, which was which? Mark you want

---

[1] *See, e.g.,* Exhibit 3 to accompanying Declaration of Steven A. Zalesin ("Zalesin Decl.") (Melanie Warner, Splenda, the Artificial Sweetener, Adds a Brown Sugar Blend, N.Y. Times, April 4, 2005), at C6 (noting that sales of both brown and white sugar have declined 10 percent since 1999); Ex. 4 to Zalesin Decl. (Sonia Reyes, Sugar Seeks to Sweeten Sales, Brandweek, May 16, 2005), at 22 (noting plans by the Sugar Association to launch a new marketing campaign in an effort "to reverse a decline in sugar sales for the last three years, down 4.9% to $981 million while sales in sugar substitutes are up 6.1% to $339 million").

[2] *See, e.g.,* Ex. 5 to Zalesin Decl. (Category Performance: Sugar, Supermarket News, August 9, 2004), at 71 (noting that "it's no surprise" that sugar sales have been declining for several years, as "[a]bundant sugar intake has been linked to poor health for many years").

to tell us?  Which one was made with Splenda?  Oh, he really is
astounded here.

. . . Anybody else want to take a guess?  No. . . .

**Now, what's the point?  The point, folks, the competition is tough.
The competition is tougher than ever before.  And you just
proved it.  You just proved it.** . . .

*See* Ex. 2 to accompanying Declaration of Nancy Gavin ("Gavin Decl.") (attaching program and

transcript of speech entitled "Strategies to Influence Sugar Consumption – Confronting Splenda,

Promoting Sugar, and Striving for Accuracy in Labeling") at 22-23 (emphasis added).

   Confronted with a competitor the likes of which it has never before faced, the sugar industry

has expressly embraced the adage that "offense is the best defense."  *See id.* at 40-41.  Its assault has

been two-pronged.  First, in late 2004, the Sugar Association filed a strategic lawsuit in which it

challenged for the first time the Splenda marketing claims that had been used continuously for more

than four years since the product was introduced.  Among the claims the Association alleged were

"false" was the well-accepted notion that Splenda "tastes like sugar" – the very proposition that the

Association's president himself "proved" in the quoted speech.  Most of the Association's claims in

that case have already been dismissed on the pleadings, and the one claim that remains is subject to the

entry of summary judgment against the Sugar Association, based upon its inexcusable delay in filing

suit.

**The Truthaboutsplenda Website**

   Second, on or about January 10, 2005, Defendants launched a high-profile smear campaign

against Splenda, the centerpiece of which is the "truthaboutsplenda" website, accessible at

www.truthaboutsplenda.com.  The core message of the website, which Defendants widely promote

and make available to consumers nationwide, is that Splenda is untested, unsafe, and represents a

health threat to consumers.  For example, in the "Fact vs. *FICTION*" portion of the site, Defendants

characterize as "FICTION" the following statements:

   (i)    "Splenda is safe to eat, even for children."

(ii)    "Splenda has been thoroughly tested."

(iii)    "Products made with Splenda do not need warning labels."

(iv)    "Once eaten, Splenda simply passes through the body."

(iv)    "The chlorine found in Splenda is similar to that found in other foods we eat." *See* Complaint ¶¶ 49-50.

The website's characterization of each of these statements as "FICTION" is knowingly false and misleading to consumers.  In point of fact, (a) sucralose *is* safe for adults and children alike, as demonstrated by significant scientific research and as FDA and numerous other independent regulatory agencies have found; (b) sucralose *has* been thoroughly tested; (c) FDA requires *no* warning labels for any Splenda products; (d) sucralose passes through the body without being metabolized (that is, broken down for energy); only a small amount (roughly 15 percent) is passively (and harmlessly) absorbed by the gastrointestinal tract and eventually is excreted in the urine without having been broken down; and (e) the chorine atoms bound to the sucralose molecule are commonly found in nature, are safe for human consumption and pose *no* health risk of any kind.  *Id*.  Privately, Defendants concede that their assault on the safety of Splenda is baseless.  In his recent speech to industry colleagues, Sugar Association President Mr. Briscoe acknowledged that "we are not saying [Splenda] is unhealthy."  *See* Ex. 2 to Gavin Decl., at 16.

**Procedural History of This Case**

McNeil filed the Complaint in this action on February 8, 2005.  On March 25, 2005, Defendants filed the instant motion to dismiss.  In response to Defendants' motion, McNeil requested that it be afforded the opportunity to take jurisdictional discovery.  On April 8, 2005, McNeil filed a motion requesting an enlargement of the briefing schedule that would permit such discovery.  The Court granted that motion on April 29, 2005.  On June 3, 2005, Defendants withdrew one of the arguments they had asserted in the original motion to dismiss – the contention that McNeil lacks standing to sue parties that allegedly took no part in the unlawful conduct complained of.

**The Sugar Association's California Action**

As noted above, prior to the launch of the truthaboutsplenda website or the filing of McNeil's

complaint herein, the Sugar Association commenced an action against McNeil in the U.S. District

Court for the Central District of California -- a forum that has no particular connection to the claims

alleged -- challenging McNeil's advertising claim that Splenda is "made from sugar so it tastes like

sugar." Unlike this case, which involves Defendants' bogus attack on the safety of Splenda, the Sugar

Association's lawsuit (the "California Action") focuses on allegations that McNeil's advertising

supposedly misleads the public into believing that Splenda is a "natural product" and "contains real

sugar." *See* Ex. 6 to Zalesin Decl. (attaching California Action Complaint). Notably, the Sugar

Association refused McNeil's request that it join as co-plaintiffs in the California Action its member

companies, all of whom have been named as Defendants in this matter. *See* Ex. 7 to Zalesin Decl.

(attaching letters between counsel for McNeil and the Sugar Association).

On April 13, 2005, the court in the California Action dismissed the Sugar Association's claims

for monetary damages under the Lanham Act and California common law, finding that the Sugar

Association does not have standing to seek such relief on its own behalf. *See* Ex. 8 to Zalesin Decl.

(attaching April 13 Order). The Court also declined to exercise supplemental jurisdiction over

plaintiff's statutory claims under California's Unfair Competition and False Advertising Laws. *See Id.*

at 13. On July 18, 2005, McNeil informed the Sugar Association that it intends to file a motion for

summary judgment on the one remaining claim in the California Action based on the doctrine of

laches. *See* Ex. 9 to Zalesin Decl. (attaching notice). The motion is based on the Sugar Association's

failure to take any action regarding McNeil's allegedly improper advertising claims for more than four

years -- a period that exceeds the analogous state law statute of limitations. *See Jarrow Formulas, Inc.*

*v. Nutrition Now, Inc.*, 304 F. 3d 829 (9th Cir. 2002) (failure to bring Lanham Act suit within the

analogous state law limitations period gives rise to presumption of laches). McNeil's motion will be

filed on or about August 11, 2005, when the mandatory "meet and confer" period under the applicable local rule expires.

**Defendants' Contacts With Delaware**

Five of the Defendants (The Sugar Association, The Amalgamated Sugar Company, American Sugar Refining, Inc., Okeelanta Corporation, and United States Sugar Corporation) are Delaware companies and do not challenge the jurisdiction of this Court. Further, it is undisputed for purposes of this motion that all but one of the Defendants that *do* challenge personal jurisdiction (together, the "PJ Moving Defendants") are member companies of the Sugar Association and fund the truthaboutsplenda website and other attacks against McNeil Nutritionals, a Delaware company.[3] As set forth below, the website includes several interactive features that solicit communications and participation from all viewers, including those in Delaware. *See infra* at 29.

The PJ Moving Defendants have substantial contacts with Delaware in addition to their membership in the Sugar Association and their support for the truthaboutsplenda website. This is so because these Defendants, taken together, are responsible for producing, marketing and distributing the majority of sugar consumed in the United States. The PJ Moving Defendants' dominance of the sugar market is confirmed by the Defendants' websites and other publicly available documents,[4] which include the following representations:

1. American Crystal Sugar Company is "the largest beet sugar producer in the United States" and is one the four largest sugar beet processing companies, with 21% of the market.[5]

---

[3] Qorvis challenges personal jurisdiction and is not a member of the Sugar Association. Facts regarding its contacts with Delaware appear *infra* at 33-35.

[4] McNeil's reliance on information available on the internet is necessary due to defendants' pointed refusal to provide full and complete answers to McNeil's jurisdictional discovery requests.

[5] See Ex. 10 to Zalesin Decl. (attaching pages from http://www.crystalsugar.com/coopprofile /index.asp and http://www.agmrc.org/NR/rdonlyres/D5FDF006-9F4C-4E91-A1A6-3CBD4EE 26583/0/rockymountainsugar.pdf).

2.  Hawaiian Sugar and Transportation Cooperation has a ten year supply contract with C&H, which "produces cane sugar and molasses for a vast U.S. market."[6]

3.  Imperial Sugar Company is "one of the largest refiners of cane sugar and processors of beet sugar [and] produces a wide assortment of industrial products for sale throughout the United States."[7]  Imperial Sugar's largest customer is Wal-Mart, and its products are marketed nationally under the Imperial, Dixie Crystals, Spreckels, Holly and Wholesome Sweeteners brands.  One of these, Dixie Crystals, is "marketed primarily in the eastern half of the United States."[8]

4.  Michigan Sugar Company is the largest beet sugar processor east of the Mississippi River and third largest in the United States.  "Michigan Sugar Company produces sugar from beets under the brand name Pioneer Sugar for both industrial and consumer markets.  Our industrial sales reach as far west as Wisconsin, as far east as New York and south in Kentucky.  Look for Pioneer Sugar on your grocer's shelf."[9]

5.  Defendants Minn-Dak Farmers Cooperative, American Crystal Sugar Company, and United States Sugar Corporation are all members of United Sugar Corporation, the "largest marketer of industrial and consumer sugar in the U.S. – supplying . . . more than 30% of the country's total demand."[10]

6.  The Western Sugar Company is "one of the largest sugar refining and processing companies in the United States.  Western's annual sugar production is approximately 1 billion pounds."[11]

Defendants' moving brief goes to great lengths to establish that the PJ Moving Defendants do not sell sugar directly to purchasers in Delaware.  *See* Moving Brf. at 16-18.

---

[6] See Ex. 11 to Zalesin Decl. (attaching pages from http://sites.stockpoint.com/wpost/Quote.asp?Symbol=ALEX&Mode=EDGARDISPLAY&ReleaseDate=2004-12-31 and http://www.chsugar.com/Consumer/contact.html).

[7] See Ex. 12 to Zalesin Decl. (attaching pages from http://www.imperialholly.com/fw/main/default.asp?DOCID=255).

[8] See Ex. 13 to Zalesin Decl. (attaching pages from http://www.sec.gov/Archives/edgar/data/831327/000119312504209729/d10k.htm and http://phx.corporate-ir.net/phoenix.zhtml?c=113809&p=irol-homeProfile&t=&id=&).

[9] See Ex. 14 to Zalesin Decl. (attaching pages from http://www.michigansugar.com/).

[10] See Ex. 15 to Zalesin Decl. (attaching pages from http://www.unitedsugars.com/).

[11] See Ex. 9 to Zalesin Decl. (article entitled "The Rocky Mountain Sugar Growers Cooperative: 'Sweet' or 'Sugar-Coated' Visions of the Future?," at 6).

Publicly available documents indicate that two of these companies (Atlantic

Sugar Association and Osceola Farms Company) are subsidiaries of the Florida Crystals Corporation,

---

[12] See Exs. 17-30 to Zalesin Decl. (attaching PJ Moving Defendants' jurisdictional discovery responses).

whose products are offered for sale in Delaware.  *See* Ex. 15 to Zalesin Decl. (attaching article "The Politics of Sugar.  Sugar's First Family").

## ARGUMENT

## I.    VENUE IS PROPER IN DELAWARE

This lawsuit has significant connections to Delaware.  The plaintiff is a Delaware limited liability company.  The principal Defendant and vehicle through which the remaining Defendants perpetrated the harm that gave rise to the lawsuit – the Sugar Association – is a Delaware corporation.  Several of the Sugar Association's members, who are also defendants, are themselves Delaware corporations.[14]  The truthaboutsplenda website is accessible to consumers in Delaware and has been publicized in this state.[15]

Despite these Delaware connections (and despite the fact that no Defendant is a California entity and no event relevant to the claims in the Complaint took place in California), Defendants argue that McNeil should have brought this action in the Central District of California.  They maintain that the Court should dismiss the Complaint for improper venue because the claims it asserts were compulsory counterclaims in the California Action.  This argument fails for two reasons, both of which are explained below.

Preliminarily, however, it warrants mention that the California Action has diminished considerably in scope from the lawsuit it was when Defendants filed their motion to dismiss this action in March.  As noted above, the California court has dismissed all but one of the claims in the California Action.  McNeil will file a motion for summary judgment on the remaining claim on the

---

[14] Specifically, the Amalgamated Sugar Company, American Sugar Refining, Inc., Okeelanta Corporation, and the United States Sugar Corporation are members of the Sugar Association that are Delaware corporations.

[15] *See* ¶16 of the Declaration of Michael J. Petruzzello, submitted by defendants with their motion to dismiss, stating that "As part of the Sugar Association, Inc.'s national mailing of 5,000 to 10,000 postcards, one (1) postcard regarding sucralose was sent by Qorvis to a health reporter in New Castle, Delaware for the Wilmington News Journal."

basis of the equitable doctrine of laches on August 11, 2005, once the "meet and confer" period required under the Central District of California's Local Rules has expired.  *See* Ex. 9 to Zalesin Decl. (July 18, 2005 notice of laches motion to counsel for Sugar Association).  Consequently, it is entirely possible that, by the time the Court decides this motion, there will no longer be any California Action.

### A.    The Two Actions Raise Different Factual and Legal Issues

The claims that McNeil asserts in this action were not compulsory counterclaims in the California Action because the two actions, though not *un*related, are factually and legally quite different.  Combining the actions into one suit thus would not necessarily prevent "substantial duplication of effort and time by the parties and the courts."  *Xerox Corp. v. SCM Corp.*, 576 F. 2d 1057, 1059 (3d Cir. 1978).

This action is primarily about Defendants' false assertions that Splenda contains dangerous chemicals and is *unsafe*, compared to sugar which is *safe*. *See, e.g.*, Complaint ¶ 1.  The California Action, on the other hand, is primarily about the sugar industry's contention that McNeil's advertising campaign for Splenda misleads consumers into thinking that Splenda contains real sugar, is natural, is healthy, and genuinely tastes like sugar.  *See, e.g.*, Ex. 6 to Zalesin Decl., at ¶ 11.  Resolution of the factual and legal issues raised by the instant litigation will require the Court to examine FDA submissions and hear testimony from medical experts.  Resolution of the factual and legal issues raised by the California Action, on the other hand, will require the Court there to examine consumer confusion surveys.

Myriad other factual issues arise in this action which are not involved in the California Action. For example, the questions of whether and how the various Defendants contributed to the truthaboutsplenda website, and whether the website has caused harm to McNeil, will be central to this action, and will not come before the court in the California Action.

For these reasons, dismissal of this case in favor of the California Action will not further judicial economy.  The questions that are before this Court are separate and apart from the those in the

California Action, and dismissing this case on venue grounds would serve only to reduce this Court's

workload at the expense of the California court – which would suffer a corresponding increase in its

workload.

**B.      Some of the Parties in this Action May Not Be Subject to Jurisdiction in California**

A second reason why the claims of this action were not compulsory counterclaims in the

California Action is that the Defendants named here who are not parties to the California Action may

not be subject to jurisdiction in California.  Defendants assert that McNeil "should have sued the

additional parties in a counterclaim by which they would have been 'made parties to the original

action' arising from the California Complaint."  Moving Brf. at 11.  Defendants rely on this argument

despite the fact that, in January 2005, the Sugar Association pointedly refused McNeil's request that

its member companies be joined as plaintiffs in the California Action.  *See* Ex. 7 to Zalesin Decl.

(attaching February 7, 2005 letter from counsel for Sugar Association to McNeil refusing to join

member companies to California Action).

Aside from being self-contradictory, Defendants' argument ignores the fact that, under FED.

R. CIV. P. 13(a), a counterclaim will be deemed compulsory *only* if it is clear that the court may

exercise personal jurisdiction over any new parties named as counterclaim-defendants that are not

already in the case as plaintiffs.  As that Rule states:

> A pleading shall state as a counterclaim any claim which at the time
> of serving the pleading the pleader has against any opposing party, if
> it arises out of the transaction or occurrence that is the subject matter
> of the opposing party's claim and does not require for its adjudication
> the *presence of third parties of whom the court cannot acquire
> jurisdiction.*

FED. R. CIV. P. 13(a) (emphasis added).[16]  Thus, McNeil's claims here are compulsory counterclaims in the California Action only if the California court could exercise personal jurisdiction over all of the Defendants named in this lawsuit.

McNeil's claim that defendants are subject to *specific* personal jurisdiction in Delaware because they are using a Delaware corporation to carry out unlawful attacks upon another Delaware company has no application in California, and could not supply a basis for personal jurisdiction in that forum.  And while some of McNeil's arguments why Defendants are subject to the *general* jurisdiction of this Court – for example, that

and that Defendants operate an interactive website through which they have interacted with Delaware residents – might be applicable in California as well in Delaware, Defendants hotly dispute these arguments and have not conceded that they establish personal jurisdiction in *any* court.  Because the record here does not establish that all parties named in this action would be subject to jurisdiction in the California court, there is no basis to deem McNeil's claims in this action "compulsory counterclaims" in California.  Venue is proper in Delaware.

---

[16] *See also* 6 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1411 ("Rule 13(a) specifically states that a counterclaim is not compulsory if 'the presence of third parties of whom the court cannot acquire jurisdiction' is required for its adjudication.  The reason for this clause is obvious: it would be self-defeating to force a party to assert a counterclaim or run the risk of it being barred in a later action in a situation in which the claim could not be adjudicated because of the absence of a required third party.  A counterclaim falls within this exception . . . if the third parties who must be added are beyond the jurisdictional reach of the court."); 3-13 MOORE'S FEDERAL PRACTICE - CIVIL § 13.16[2] ("A pleader is not required to assert a compulsory counterclaim which requires for its adjudication the presence of third parties over whom the court is unable to obtain jurisdiction. . . . This [rule] is dictated by basic considerations of fairness, since a party should not be required to litigate its counterclaim in a forum in which it cannot bring in indispensable parties.  Inability to join indispensable parties could arise [because] . . . personal jurisdiction cannot be obtained over them").

## II.    THE *NOERR-PENNINGTON* DOCTRINE DOES NOT IMMUNIZE DEFENDANTS FROM SUIT

Defendants next contend that McNeil's claims are barred by the *Noerr-Pennington* doctrine because their dissemination of falsehoods through the truthaboutsplenda website constitutes protected "petitioning activity." This argument fails on multiple grounds.

First, the website is not "petitioning activity." It is an advertising vehicle intended to mislead and frighten consumers into believing that Splenda is unsafe. *Noerr* does not protect such conduct, and Defendants have cited no authority for their argument that an advertiser that directs false and misleading claims at *consumers* (as opposed to the government) is immune from suit under *Noerr*.

Second, insofar as the website purports to encourage consumers to contact the FTC and FDA to express concerns about Splenda, such activity is not true petitioning activity intended to influence legislative or administrative action. Rather, it is textbook "sham" petitioning, a blatant attempt to hide behind *Noerr*. As the Supreme Court recognized in *Noerr* itself, "a publicity campaign, ostensibly directed toward influencing governmental action, [that is instead] a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor" is not entitled to protection. Such is the case here.

Finally, even if there were some apparent basis for Defendants' contention that the website may implicate *Noerr*, there would be no grounds to dismiss the Complaint at this stage of the proceedings. At a minimum, McNeil is entitled to develop facts to show that the website constitutes mere sham petitioning not entitled to *Noerr* protection.

### A.    The Statements on the Website Are Not Petitioning Activities and Do Not Implicate *Noerr*

The *Noerr-Pennington* doctrine was first recognized in two antitrust cases: *Eastern R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965). The doctrine provides a defense from liability for *bona fide* acts of constitutionally-protected "petitioning" of legislative bodies, administrative agencies, and

courts. Thus, in *Noerr*, the Supreme Court held that there could be no antitrust liability for activities that "comprised mere solicitation of governmental action with respect to the passage and enforcement of laws." *Noerr*, 365 U.S. at 138.

While the Supreme Court has never applied *Noerr* outside the antitrust context, a number of Circuits have held that, where the right to petition is implicated, *Noerr* may apply to such claims. *See, e.g., Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 889 (10th Cir. 2000) ("To the extent that Supreme Court precedent can be read to extend *Noerr-Pennington* outside of the antitrust context, it does so solely on the basis of the right to petition.").

### 1.    The First Amendment Right To Petition Applies Only to Petitions to the Government, and Does Not Immunize False Advertising Aimed at Consumers

It is well established that *Noerr* does not apply to private commercial activities, such as advertising. *See, e.g., Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707, 82 S. Ct. 1404, 1414 (1962) (*Noerr-Pennington* doctrine was "plainly inapposite" where a company was "engaged in private commercial activity, no element of which involved seeking to procure the passage or enforcement of laws"). Accordingly, *Noerr* does not provide a shield for false and misleading advertising or trade libel aimed at *consumers*. The truthaboutsplenda website spreads false and misleading information to consumers, in an attempt to frighten and discourage them from purchasing Splenda. It is business, not petitioning conduct. *See, e.g., Cardtoons*, 208 F.3d at 892 (*Noerr* does not apply to protect communications between private parties even when incidental to petitioning activity such as litigation; "[t]he plain language of the First Amendment protects only those petitions which are made to 'the Government'"). The right to petition is not implicated by Defendants' actions, and Defendants cannot invoke *Noerr* to shield their false statements.

### 2.    Neither the *Noerr* Doctrine Nor the First Amendment Right To Petition Shields Trade Libel

Moreover, the First Amendment right to petition, upon which *Noerr* is premised, does not protect libel. Such statements do not fall within the constitutional right to petition that forms the basis

for a *Noerr* defense.  In *McDonald v. Smith*, 472 U.S. 479 (1985), the Supreme Court refused to

dismiss, on First Amendment grounds, a libel action against a defendant who had mailed letters to

public officials opposing plaintiff's appointment as a United States Attorney.  *Id.* at 482.  The letters

allegedly falsely accused plaintiff of numerous wrongful and illegal actions.  The plaintiff sued for

libel and the defendant moved for judgment on the pleadings, asserting that his letters to public

officials were protected "petitioning activity."  The Supreme Court disagreed, noting that "[t]he right

to petition is guaranteed; the right to commit libel with impunity is not," and that "we are not prepared

to conclude… that the Framers of the First Amendment understood the right to petition to include an

unqualified right to express damaging falsehoods in exercise of that right."  *Id.* at 484-485; *see also In*

*re IBP Confidential Business Documents Litigation*, 755 F.2d 1300, 1313 (8th Cir. 1985) ("*Noerr-*

*Pennington* does not necessarily and absolutely preclude liability for damages resulting from

defamatory statements made in the course of petitioning the government"); *Metropolitan Opera Ass'n,*

*Inc. v. Local 100, Hotel Employees and Restaurant Employees Int'l Union*, No. 00 Civ. 3613(LAP),

2004 WL 1943099 (S.D.N.Y. Aug. 27, 2004) (Exhibit B hereto) (holding that *Noerr* did not immunize

defamatory statements made by the defendant in petition to the New York City Council).

     Here, Defendants have designed a website whose fundamental purpose is to disparage Splenda

and spread false rumors that Splenda is unsafe.  Such statements to consumers, which are designed to

increase sugar consumption and not to influence government action, are not protected by *Noerr*.

**B.**    **The Sugar Association's So-Called "Petitioning Activities" Are Nothing More Than a Sham and Are Not Entitled to Protection Under *Noerr***

     As the Supreme Court expressly recognized in *Noerr*, a defendant who carries out a publicity

campaign directed at harming a competitor's business cannot hide behind the "petitioning" doctrine

when the activity in question is a "mere sham":

> [t]here may be situations in which a publicity campaign, ostensibly
> directed toward influencing governmental action, is a mere sham to
> cover what is actually nothing more than an attempt to interfere
> directly with the business relationships of a competitor and the
> application of the Sherman Act would be justified.

*Noerr*, 365 U.S. at 144.

As set forth above and in McNeil's Complaint, the "truthaboutsplenda" website contains numerous false and misleading statements designed to frighten consumers away from Splenda, and to encourage them to use Defendants' sugar products instead. These statements make up the bulk of the content of the website, and are clearly aimed at influencing consumers – not at petitioning a government agency.

Nevertheless, Defendants have sprinkled throughout their website a handful of words and phrases that they now point to in support of their purported *Noerr* defense. For example, the website's "Fact vs. *FICTION*" page includes a link that encourages consumers to send letters to the FTC that repeat Defendants' false allegations. In a similar vein, the site contains a link that purports to encourage consumers to notify FDA of "adverse reaction[s]" allegedly caused by Splenda.

Such unfounded suggestions to consumers are not *bona fide* "petitioning" activities – they are an obvious sham. There are well-known administrative and governmental procedures in place, such as the filing of a Citizen's Petition, by which a competitor (or anyone, for that matter) may request formal review of the safety or labeling of an approved product. *See* 21 C.F.R. § 10.30. Defendants have not invoked these procedures because they have no grounds to do so. Indeed, as Sugar Association president Andrew Briscoe acknowledged in a recent speech to industry colleagues, Splenda is not "unhealthy." *See* Ex. 2 to Gavin Decl. at 22-23.

Because of their sham nature, the various "write your congressperson"-type statements scattered throughout the Defendants' website do not immunize the balance of the site from legal attack. As one court has aptly noted:

> No one would seriously argue that any act of petitioning the government, and the marketplace notification attendant to it... is *ipso facto* immune from any claims that may arise from such acts. *Were that the case, trade libel could occur and be immunized merely because the libelous statements were styled as a patent infringement notice, regardless of whether there was any good faith belief that infringement was occurring.* Likewise, one could tortiously interfere with business relationships merely by attacking a competitor in a

> public letter to one's local state representative. *Thus, just as the First*
> *Amendment does not protect libelous or fraudulent speech, neither*
> *does it protect bad faith, or "sham" petitions to the government.*

*Versatile Plastics, Inc. v. Sknowbest! Inc.*, 247 F. Supp. 2d 1098, 1105 (E.D. Wis. 2003) (emphasis

added); *see also Noerr*, 365 U.S. at 144.

     *Brownsville Golden Age Nursing Home, Inc. v. Wells,* 839 F.2d 155 (3rd Cir. 1988), cited by

Defendants, is inapposite.  In that case, a nursing home that had lost its certification in a state court

proceeding sued two individuals and a Senator in federal court, alleging that they had engaged in a

"civil conspiracy" by initiating regulatory proceedings against the home, resulting in the loss of its

license.  The court held that the actions were protected because "there can be no tortious action or

impropriety when private citizens or public officials exercise their rights to notify the appropriate

agencies or mobilize public opinion about a serious violation of the law." *Id*. at 159.  The *Brownsville*

defendants had nothing to gain and no financial interest in the outcome of the regulatory proceedings;

their letter-writing campaign was not intended to harm competition or convince consumers to purchase

their competing products or services.  In other words, there was no possible claim that the disputed

activities were a sham.

     In contrast, Defendants' goal here is to influence consumers, not public officials, so that the

sugar industry can better compete with Splenda.  This was confirmed by Sugar Association President

Andrew Briscoe in his February 3, 2005 speech, in which he implored his audience to assist with the

Association's efforts to get "people to come to this website so that they will get more information . . .

[that] opens your eyes to the real issues about Splenda." "The point, folks, the competition is tough.

The competition is tougher than ever before."  Ex. 2 to Gavin Decl. at 10-12, 23.

    **C.**    **Defendants Are Not Entitled to Dismissal on the Basis of the Mere**
            **Assertion of "*Noerr* Immunity"**

     Even if this Court were to find plausible Defendants' argument that some aspects of their

website contain statements that implicate the right to petition, Defendants' contention that *Noerr*

entitles them to "immunity" from suit – and therefore dismissal of this action at the pleadings stage –

would have no merit. To the contrary, McNeil is entitled to develop facts to show that Defendants'

actions do not constitute *bona fide* petitioning and that such actions are actually a sham.

"Whether something is a genuine effort to influence governmental action, or a mere sham, is a

question of fact." *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau*, 690 F.2d 1240, 1253

(9th Cir. 1982); *Borough of Lansdale v. Philadelphia Elec. Co.*, 517 F. Supp. 218, 222 (E.D. Pa. 1981)

("the issue of whether an exception to the Noerr-Pennington immunity applies is a question of fact").

Such factual questions cannot be resolved at this preliminary stage of the proceedings. Courts have

recognized that the analysis of the applicability of *Noerr* is nuanced and complex. *See Allied Tube &*

*Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 493-504 (1988) ("The [*Noerr-Pennington*] doctrine

does not immunize every concerted activity that is genuinely intended to influence governmental

action. . . . [Rather,] the *Noerr* immunity of anticompetitive activity intended to influence the

government *depends not only on its impact, but also on the context and nature of the activity*.")

(emphasis added). Such questions are not subject to resolution on a motion to dismiss. In short, there

is no merit to Defendants' assertion that they are entitled to dismissal of this action based upon alleged

petitioning "immunity."

## III.    UNDER THE LAW OF THIS CIRCUIT, MCNEIL HAS STANDING TO SUE DEFENDANTS WITH WHICH IT DOES NOT COMPETE

In a rather surprising misstatement of the applicable law, Defendants the Sugar Association,

the Sugarbeet Growers Association and Qorvis argue that the Court must dismiss this action for lack

of standing because, so they argue, Lanham Act claims may only be brought by parties who are in

direct competition with the defendants. This is not the law of the Third Circuit, which has repeatedly

held that a claimant does *not* have to be in competition with the defendant in order to have "prudential"

standing under the Lanham Act.[17] *See Thorn v. Reliance Van Co.*, 736 F.2d 929, 933 (3d Cir. 1984)

("[T]he mere fact that Thorn [was] not a competitor of [the defendant] d[id] not, in and of itself,

preclude him from bringing suit under section 43(a)" of the Lanham Act); *accord Conte Bros.*

*Automotive, Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221 (3d Cir. 1998) (following *Thorn*).

Rather, the appropriate inquiry is "whether the party has a *reasonable interest* to be protected against

false advertising." *See Conte* at 230 (emphasis added).[18]

       Under the Third Circuit's decision in *Conte-Bros. Automotive, Inc. v. Quaker State-Slick 50,*

*Inc., supra*, a party satisfies the "reasonable interest" test where:

1.  the plaintiff's injury is of the type that Congress sought to redress in establishing a remedy for violation of the applicable statute;

2.  plaintiff's injury is direct;

3.  plaintiff's injury was proximately caused by the defendants' alleged conduct;

4.  damages are not speculative; and

5.  there is no risk of duplicate awards or other issues affecting the apportionment of damages.

       McNeil's claims against the Sugar Association, the Sugarbeet Growers Association and

Qorvis easily satisfy the above factors. First, the injury alleged by McNeil – harm to its good will and

reputation through false and misleading advertising – is precisely the type that Congress intended to

redress through the Lanham Act. The second and third factors are also easily satisfied, since McNeil

is being directly harmed by Defendants' website, which falsely attacks the safety of Splenda with the

---

[17] Defendants do not (and cannot) argue that McNeil fails the more liberal test for "Constitutional" standing, which requires only that: (i) plaintiff suffered an injury in fact; (ii) there is a causal nexus between that injury and the conduct complained of, and (iii) the injury likely will be redressed by a favorable judicial decision. *See Joint Stock Society v. UDV North America, Inc.*, 266 F.3d 164, 175 (3d Cir. 2001).

[18] In support of its standing argument, Defendants rely on *Serbin v. Ziebart Int'l Corp., Inc.*, 11 F.3d 1163, 1174 (3d Cir. 1993), in which the Third Circuit held that consumers (rather than commercial entities) do not have standing to bring Lanham Act claims. Critically, *Serbin* does not address Defendants' argument here which, again, was considered and rejected by the Third Circuit in both *Thorn* and *Conte*.

purpose and direct effect of damaging McNeil's business. The final two factors, whether damages are speculative or would be difficult to apportion, also favor McNeil, as the damages alleged – loss of sales due to Defendants' false statements – are no different from those in any Lanham Act case.

Accordingly, the Court should deny Defendants' motion to dismiss for lack of standing.[19]

## IV.    THE COURT MAY EXERCISE PERSONAL JURISDICTION OVER ALL DEFENDANTS IN THIS ACTION

The PJ Moving Defendants assert that this action should be dismissed as to them because they are not subject to personal jurisdiction in this District. Personal jurisdiction involves a two-step analysis. First, the Court must consider whether the language of the Delaware Long-Arm Statute, 10 DEL. C., § 3104(c), reaches the PJ Moving Defendants. If it does, then the Court must evaluate whether subjecting those Defendants to jurisdiction in Delaware would comport with the Due Process Clause of the Fourteenth Amendment. *See, e.g., LaNuova D & B, S.p.A. v. Bowe Co. Inc.*, 513 A.2d 764, 768 (Del. 1986).

To support its assertion that this Court enjoys jurisdiction over the Defendants, McNeil "need only establish a *prima facie* case with the record viewed in the light most favorable to" it. In making its assessment, the Court "need not be blind to" materials produced during jurisdictional discovery. *Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F. Supp. 1458, 1462 (D. Del. 1991).

The Delaware Long-Arm Statute provides, in pertinent part, as follows:

> As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
>
> (1) Transacts any business or performs any character of work or service in the State . . .

---

[19] Relying on their standing argument, Defendants argue that McNeil's claims under Delaware law should be dismissed because there is no valid federal claim upon which this Court may base supplemental jurisdiction over state law causes of action. *See* Moving Brf. at 15. This argument is moot because, for the reasons set forth above, McNeil has standing as against all Defendants for its Lanham Act claim.

(3) Causes tortious injury in the State by an act or omission in this State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State;

10 Del. C. § 3104(c).

Delaware courts have interpreted §§3104(c)(1) and (c)(3) as specific jurisdiction provisions. Specific jurisdiction may be exercised when the plaintiff's claims arise out of acts or omissions that take place in Delaware. It is based on the relationship between the forum and the controversy. Delaware courts have interpreted §3104(c)(4) as a general jurisdiction provision. General jurisdiction may be exercised when the plaintiff's claims are unconnected to the defendant's activities. It is based, in other words, on the relationship between the forum and one of the parties; the forum's connection with the controversy is immaterial. The Due Process Clause of the Constitution allows the exercise of personal jurisdiction under both a specific jurisdiction and a general jurisdiction theory.

The PJ Moving Defendants are subject to both specific and general jurisdiction in this Court under Delaware's Long-Arm Statute, and the exercise of such jurisdiction comports with the requirements of the Due Process Clause. Each of the bases for personal jurisdiction discussed below is independently sufficient to establish jurisdiction over the PJ Moving Defendants.

A.    **Specific Jurisdiction**

1.    **The Court May Exercise Jurisdiction Over Defendants Because They Directed Their Misconduct at Delaware and McNeil Suffered Injury Here**

a.    **The Delaware Long-Arm Statute**

Acting through a Delaware corporation (the Sugar Association), the PJ Moving Defendants directed their tortious conduct at – and caused economic injury to – a Delaware company (McNeil). Consequently, these Defendants are subject to specific jurisdiction in Delaware under the Long-Arm Statute.

Section 3104(c)(3) permits a court to exercise jurisdiction over a nonresident defendant who "causes tortious injury in the State by an act or omission in this State." The section thus imposes three requirements: (1) that defendants have engaged in tortious activity, (2) that plaintiff has suffered injury in Delaware, and (3) that the act or omission which caused the injury occurred in Delaware. These requirements are fulfilled here.

First, Defendants' creation and dissemination of the website, which falsely disparages the safety of Splenda, is tortious. For the purposes of jurisdiction, a tortious act under §3104(c) is "any act . . . which involves a breach of duty to another and makes the one committing the act liable . . . in damages.'" *Magid v. Marcal Paper Mills, Inc.*, 517 F. Supp. 1125, 1130 (D. Del. 1981). This Court has held that trademark infringement in violation of the Lanham Act is a tort for purposes of the Delaware Long-Arm Statute. *See Bell Helicopter Textron, Inc. v. C&C Helicopter Sales, Inc.*, 295 F. Supp. 2d 400, 405 (D. Del. 2002) (trademark infringement). Violation of the Lanham Act through false advertising is likewise tortious, and McNeil's state law claims for common law unfair competition and product disparagement are classic "torts."

Second, McNeil has suffered tortious injury in Delaware. In fact, McNeil suffered injury *everywhere* its reputation and sales were adversely affected by the misinformation that appears on the truthaboutsplenda website. It suffered the harm more deeply, however, in the state of its formation,

Delaware. *See Applied Biosystems*, 772 F. Supp. at 1468 (situs of injury of corporation whose patent was infringed was the state of that corporation's residence, i.e., the state in which corporation was incorporated and had its principal place of business).

Finally, the act that caused McNeil's injury occurred in Delaware. "The tort of libel is generally held to occur wherever the offending material is circulated." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 777 (1984). Splenda was disparaged – and thus the torts of trade libel and product disparagement occurred – everywhere the truthaboutsplenda website was accessible.

In applying §3104(c)(3), Delaware courts historically have required the defendant to have been "physically present" in Delaware when it committed the tortious act. *See, e.g., Compaq Computer Corp. v. Packard Bell Electronics, Inc.*, 948 F. Supp. 338, 343 (D. Del. 1996). However, this Court should not do so here for several reasons. First, such a requirement – which notably does not appear in the text of the long-arm statute – is squarely at odds with the United States Supreme Court's analysis of where the tort of defamation "occurs." *See Keeton*, 465 U.S. at 777.

Second, a physical presence requirement is antiquated in the age of electronic torts. It *may* be plausible to assert that when a person defames a product orally in state X, and the statement is written down and published in State Y, the defamation "occurred" in State X rather than State Y. The disparaging statements in this action, however, were made for the first time on the Internet, and were thus published everywhere simultaneously. Therefore, though the defendants were not physically present in Delaware at the time, the disparaging statements were made for the first time (and thus the tort "occurred") "in this State."

Third, the justification that Delaware courts typically give for imposing a physical presence requirement does not apply on the facts of this case. Courts have stated that doing away with the physical presence requirement and "allowing the exercise of jurisdiction over a defendant merely because he caused tortious injury in Delaware would eviscerate the difference between §3104(c)(3) and §3104(c)(4), which does not require an act in Delaware." *See, e.g., Compaq*, 948 F. Supp. at 343;

*Applied Biosystems*, 772 F. Supp. at 1468. Here, this is not necessarily true. This Court could apply §3104(c)(3) to exercise jurisdiction over those Defendants who, though physically located outside Delaware, committed an intentional tortious act that had the purpose and effect of causing injury inside Delaware, and *at the same time* determine that these Defendants lacked the general contacts with Delaware required to exercise jurisdiction under §3104(c)(4).

Fourth, imposition of a physical presence requirement in a case such as this would make Delaware law inconsistent with – and far more restrictive than – that of most of its sister states. This would be at odds with the holdings of numerous cases in which Delaware courts have stated that the Delaware Long-Arm Statute "has been broadly construed to confer jurisdiction to the maximum extent possible under the due process clause." *See, e.g., LaNuova*, 513 A.2d at 768.

Finally, the Court should not impose the physical presence requirement here because the Due Process Clause imposes no such requirement and, as this Court has written, there is an "obligation to interpret the State's Long-Arm Statute as reaching as many extra-territorial defendants as the Due Process Clause will allow." *Motorola, Inc. v. PC-TEL, Inc.*, 58 F. Supp. 2d 349, 356 n.9 (D. Del. 1999).

### b.    Due Process Clause

The Court may exercise personal jurisdiction under the Due Process Clause for the same reasons it may do so under the Delaware Long-Arm Statute: because the PJ Moving Defendants targeted a Delaware company, which then experienced injury in this state. Having strategically deployed a Delaware corporation to publish their false claims concerning the products of another Delaware company, the PJ Moving Defendants had every reason to expect that they could be hailed into Court in Delaware, thus satisfying the core concerns underlying the Due Process Clause.

In *Calder v. Jones*, 465 U.S. 783 (1984), the U.S. Supreme Court held that, under the Constitution, the location in which a plaintiff experiences injury is significant to whether a court may exercise personal jurisdiction over that defendant. In *Calder,* celebrity Shirley Jones sued in

California court a *National Enquirer* editor and reporter who wrote an unflattering article about her. The defendants moved to dismiss for lack of personal jurisdiction because they lived and worked in Florida and had made only a very few contacts with California while writing and editing the article. The Supreme Court held unanimously that personal jurisdiction was proper in large part because the injury to plaintiff occurred in California. The Court noted that:

> petitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California. Petitioner South wrote and petitioner Calder edited an article that they knew would have a potentially devastating impact upon respondent, and they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the *National Enquirer* has its largest circulation. Under the circumstances, petitioners must "reasonably anticipate being haled into court there" to answer for the truth of the statements made in their article. An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California.

*Id.* at 789-90. *See also Bell Helicopter Textron*, 295 F. Supp. 2d at 410 ("the heart of the holding in *Calder* was that any tortious conduct intentionally directed at a party confers personal jurisdiction over the tortfeasor in the district where the victim resides"); *Keeton*, 465 U.S. at 780 ("Plaintiff's residence may well play an important role in determining the propriety of entertaining a suit against the defendant in the forum").

The Third Circuit has applied and refined the *Calder* "effects test" for personal jurisdiction, holding that, to fulfill the test, the plaintiff must show that:

1. the defendant committed an intentional tort;

2. the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and

3. the defendant expressly aimed his tortious conduct at the forum such that the forum can be said to the focal point of the tortious activity.

*IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265-66 (3d Cir. 1998). *See also Remick v. Manfredy*, 238 F.3d 248, 258 (3d Cir. 2001).

The test is fulfilled here. Defendants committed the intentional tort of product disparagement. For the reasons discussed above, McNeil suffered the "brunt" of the harm in Delaware. Finally, Defendants expressly aimed their tortious conduct at the forum. The *IMO* court held that, in the typical case, conduct that is "expressly aimed" at the forum will require "some type of 'entry' into the forum state by the defendant." *IMO*, 155 F. 3d at 265. Here, Defendants made "entry" into the forum by maintaining a website that is accessible in the forum.

Finally, in determining whether personal jurisdiction is consistent with the requirements of the Due Process Clause, the Court may consider factors other than Defendants' contacts with the forum. One such factor is the forum State's interest in adjudicating the dispute. *Keeton*, 465 U.S. at 776; *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). Here, Delaware has a significant and two-pronged interest. "False statements of fact harm both the subject of the falsehood *and* the readers of the statement." *Keeton*, 465 U.S. at 776. The subject of the falsehoods on the truthaboutsplenda website, as discussed above, is a Delaware resident. Additionally, the readers of those falsehoods include Delaware residents. *See id.* (holding that a New Hampshire court exercise personal jurisdiction over non-resident defendant Hustler magazine because the magazine was distributed in the state and New Hampshire residents who purchased it there were deceived by the libelous statements it contained). Delaware has an interest in adjudicating this lawsuit to protect both McNeil and in-state readers of the truthaboutsplenda website, all of whom are Delaware residents.

An exercise of personal jurisdiction over the PJ Moving Defendants would comport with both the Delaware Long-Arm Statute and the Due Process of the Constitution. The Court should thus reject the PJ Moving Defendants' motion to dismiss for lack of jurisdiction.

### 2. The Court May Exercise Jurisdiction Over Defendants Because They Maintain an Interactive Website in Delaware

Pursuant to §3104(c)(1), the Court may exercise jurisdiction over a defendant who "transacts any business or performs any character of work or service in the State." The Third Circuit has held that this requirement may be fulfilled when a defendant maintains an interactive website that is

accessible in Delaware and purposefully avails itself of the privilege of engaging in activity in the

state. *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446 (3d Cir. 2003).[20]

The PJ Moving Defendants fulfill these requirements based on the truthaboutsplenda website.

First, the website is not passive, as Defendants allege in their motion, Moving Brf. at 19, but rather is

interactive in the following ways:

- **Database:** The website invites visitors to "join the cause" by submitting their names,
  postal addresses and e-mail addresses. Once they have done this, those who maintain the
  website will "add [them] to [their] database of advocates and contact [them] to assist in
  future efforts to expose Splenda as a chlorinated artificial sweetener that consumers
  deserve to know is in foods they eat."
  [http://www.truthaboutsplenda.com/takeaction/cause.html]

- **E-Mail Update List:** The site invites visitors to submit their names and e-mail addresses
  in order "to receive the latest, most up-to-date information about Splenda, including future
  research studies, testimonials by nutritionists and toxicologists who have studied
  sucralose's effects on the human body, and relevant articles questioning the safety or
  marketing practices of Splenda."
  [http://www.truthaboutsplenda.com/takeaction/updates.html]

- **Comments & Questions:** The website invites visitors to submit their questions,
  comments, or testimonials about experience with Splenda
  [http://www.truthaboutsplenda.com/contact/index.html]

Defendants use the website to interact with consumers throughout the United States, including

Delaware. As of February 3, 2005, "about 90" consumers had submitted "comments" to the website.

*See* Ex. 2 to Gavin Decl., at 11-12. Individuals – including people in Delaware – who submit their

names and addresses to be added to the database and to receive e-mail updates periodically have

received messages from Defendants via the website. *See* Declaration of John G. Day, ¶¶ 5-7 and Ex.

---

[20] If a defendant fulfills these requirements, both the Constitutional test and the test under the
Delaware Long-Arm Statute are fulfilled. This is apparent because the *Toys "R" Us* court applied the
requirements it created within the context of the constitutional inquiry regarding specific personal
jurisdiction, and District Courts in Delaware have applied those requirements in the context of the
statutory inquiry, to determine whether §3104(c)(1) has been fulfilled. *See Padcom, Inc. v. NetMotion
Wireless, Inc.*, No. Civ. 03-983-SLR, 2004 WL 1192641 (D. Del. May 24, 2004) (Exhibit C hereto)
*and eSpeed, Inc. v. BrokerTec USA, LLC*, No. Civ. A. 03-612-KAJ, 2004 WL 2346137 (D. Del. Sept.
13, 2004) (Exhibit D hereto).

38 (attaching July 25, 2005 email sent by Defendants via truthaboutsplenda website to several Delaware residents). The Sugar Association and its members use the comments received by consumers via the truthaboutsplenda website – and presumably the e-mail distribution list of people likely to be open to their message – as "a real tool" in their effort to combat the competition that Splenda presents to the sugar industry, *see* Ex. 2 to Gavin Decl. at 7, 12, and to promote sugar.

These web-based contacts demonstrate that Defendants knowingly conducted business with consumers around the country, including in Delaware.[21] In so doing, the PJ Moving Defendants "purposefully avail[ed] [themselves] of the privilege of [engaging in] activit[y]" in Delaware. *Toys "R" Us*, 318 F.3d at 451. On this basis alone, Defendants are subject to personal jurisdiction in Delaware. *See id*. at 52 (jurisdiction proper where defendant "knowingly conducted business with forum state residents via [web]site."

**B.    General Jurisdiction**

Under section (c)(4) of the Delaware Long-Arm Statute, the Court may exercise personal jurisdiction over anyone who causes injury either inside or outside this State "by an act or omission outside the State" if that individual "regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services or things used or consumed in the State." 10 DEL. C. § 3104(c)(4). This Court has on more than one occasion found that the requirements of §3104(c)(4) are met where a company that does not sell its products directly in Delaware nonetheless sells to other companies, which in turn (1) resell the product in Delaware, or (2) incorporate the product into another product, which is then sold in Delaware. In so holding, this Court has endorsed the well-founded notion that a company that places its products into the stream of commerce in this way is subject to personal jurisdiction in Delaware.

---

[21] A defendant need not actually sell something via a website in order to have "knowingly conducted business" via the website. *See Padcom*, 2004 WL 1192641, at *5-6 (finding that defendants conducted business with Delaware residents where defendant had not sold anything to those residents).

In *In re Elonex Phase II Power Management Litigation*, C.A. No. 01-082-GMS, 2003 WL 21026758, at *3 (D. Del. May 6, 2003) (Sleet, J.) (Exhibit E hereto), the Court found that it could exercise personal jurisdiction over a Taiwanese computer monitor manufacturer under §3104(c)(4) because, though defendant made no direct sales to the United States, it sold monitors to companies that in turn sold the monitors to chain retailers (such as Best Buy and Office Depot) which had stores in Delaware. Similarly, In *Motorola, Inc. v. PC-Tel, Inc.*, *supra* this Court considered whether it could exercise jurisdiction over a company that sold software that was integrated into a variety of consumer electronics products manufactured by corporations such as Compaq and Sony, which were then (1) sold in stores such as Caldor, Circuit City and CompUSA that have outlets in Delaware, and (2) advertised nationally (including in Delaware). The Court found that jurisdiction was proper under §3104(c)(4) because the defendant company acted with the intermediary companies to place products containing its software into a "nation-wide distribution network" and, as a result, its software ended up in Delaware. *Motorola,* 58 F. Supp. 2d at 357.

Based on their own admissions, numerous of the PJ Moving Defendants are subject to personal jurisdiction under §3104(c)(4) for the same reasons the defendants in *Elonex* and *Motorola* were.

---

22

Even if the PJ Moving Defendants had not made these admissions, the Court would have

ample basis to exercise general jurisdiction over them based on publicly available information.  The PJ

Moving Defendants attempt to portray themselves as local companies whom it would be unjust to drag

all the way to Delaware to defend a lawsuit.  In reality, however, they are most of the major players in

_____

the nation's $8 billion sugar industry. See Ex. 31 to Zalesin Decl. (transcript from oral argument of McNeil's motion to dismiss the California Action), at 12. Sugar is a ubiquitous ingredient. The District of Delaware is undeniably full of sugar and foods that contain sugar.

In addition to these "stream of commerce" contacts with Delaware, the PJ Moving Defendants have several other contacts in Delaware that, while perhaps insufficient on their own to satisfy §3104(c)(4), in the aggregate help establish jurisdiction under that section. For example, the PJ Moving Defendants together maintain an interactive website (www.truthaboutsplenda.com) – and some of them independently maintain their own interactive websites[29] – that are available to Delaware residents. *See also* the contacts with Delaware that the PJ Moving Defendants concede on page 18 and in footnotes 5 and 6 of their brief in support of the motion to dismiss.

For all of these reasons, the PJ Moving Defendants are subject to general jurisdiction in Delaware under §3104(c)(4).

---

[28]

---

[29] *See, e.g.,* http://www.floridacrystals.com (the website the Sugar Association lists for Atlantic Sugar Association and Osceola Corporation from which visitors may purchase sugar products); http://www.imperialsugar.com/fw/main/default.asp (Imperial Sugar Company's website from which visitors may sign up to receive "new recipes, fun baking ideas for [their] family and lots of other information about [their] favorite products;" http://www.michigansugar.com/ (Michigan Sugar Company's website from which visitors may send e-mail to the company); http://www.mdf.coop/ (Minn-Dak Farmers' Cooperative's website from which visitors may contact the cooperative); http://www.smbsc.com/ (Southern Minnesota Beet Sugar Cooperative from which visitors may contact the cooperative); http://www.scgc.org/ (Sugar Cane Growers Cooperative of Florida's website from which visitors may contact the cooperative); and http://www.westernsugar.com/ (Western Sugar Cooperative's website from which visitors may view products available and contact the company).

### C.    Qorvis's Contacts With Delaware

Additional facts support this Court's jurisdiction over Qorvis.  First, as the Court noted in its April 29, 2005 Order, Qorvis has significant contacts with Delaware.  *See* D.I. 38 (April 29 Order), at 7.  The affidavit of Qorvis Managing Partner Michael J. Petruzzello, which Qorvis submitted with the motion to dismiss, indicates that (1) Qorvis created and maintains the truthaboutsplenda website (which is accessible in Delaware) for a Delaware corporation, ¶19; (2) Qorvis employees have on at least three occasions traveled to Delaware to meet with Delaware's Insurance Commissioner, ¶6; (3) Qorvis sent information regarding sucralose to a Delaware reporter, ¶16; and (4) Qorvis maintains a website that is accessible to Delaware residents, ¶17.

Moreover, as Mr. Petruzzello's affidavit failed to acknowledge but the Court pointed out in its Order, the truthaboutsplenda website contains this invitation: "For more information about the 'Truth About Splenda' campaign or to get involved, please contact Rich Masters at Qorvis Communications." The website goes on to offer Mr. Masters' contact information.  Qorvis thus holds "itself out as a point of contact for anyone interested in learning about or becoming involved with the campaign of a Delaware corporation."  See D.I. 38 (April 29 Order), at 7.

---

[30] As the Court will note, the vast majority of the 37 pages of documents Qorvis produced to McNeil were redacted.

Finally, Qorvis is subject to jurisdiction in Delaware because it can be found contributorily liable for the website.[31] The Sugar Association is a Delaware corporation that is undeniably subject to jurisdiction in Delaware. The public relations agency that the Association hired to create the website is likewise subject to the Court's jurisdiction.

## V.    DEFENDANTS ARE NOT ENTITLED TO DISMISSAL OF MCNEIL'S DELAWARE STATE LAW CLAIMS

Defendants' final argument is that McNeil has failed to state claims under the Delaware Uniform Deceptive Trade Practices Act ("DUDTPA") or Delaware common law concerning "product disparagement" and "unfair competition." Like the rest of Defendants' motion, these contentions have no support in the law.

With regard to the statutory claim, Defendants repeat the mistakes of their Lanham Act standing argument and contend that McNeil cannot sue parties under DUDTPA that are not direct competitors.[32] In fact, "a complainant need not prove competition between the parties" in order to proceed under the statute. 6 DEL. C. § 2532(b). As the Delaware Supreme Court has held, "a litigant

---

[31] Courts have in many cases permitted a plaintiff to bring a Lanham Act false advertising claim against an advertising agency that assisted the primary defendant in creating the challenged ads. *See* 4 CALLMANN ON UNFAIR COMP., TR. & MONO. §23:12 (4th Ed.)("An advertising agency will be held responsible for its client's misleading advertising when, in the judgment of the trier of fact, the agency actually participated in the deception; it also must know or have reason to know of the falsity of the advertising") (quotations omitted); Rich Kurnit, *Advertising and Marketing Communications*, SJ075 A.L.I.-A.B.A. 359, 401 (2004) ("the [advertising] agency may also be held liable in false advertising claims by the advertiser's competitors where the agency participated in the creation and propagation with knowledge of falsity"). *See also, e.g., Tambrands, Inc. v. Warner-Lambert Co.*, 673 F. Supp. 1190 (S.D.N.Y. 1987); *Maybelline Co. v. Noxell Corp.*, 643 F. Supp. 294 (E.D. Ark. 1986), *rev'd on other grounds*, 813 F.2d 901 (8th Cir. 1987); *U-Haul Intern., Inc. v. Jartran, Inc.*, 522 F. Supp. 1238 (D. Ariz. 1981), *aff'd*, 681 F.2d 1159 (9th Cir. 1982).

[32] Defendant members of the Sugar Association also claim – in footnote 7 of the Moving Brief – that McNeil lacks standing to bring DUDTPA claims against them for the same reasons they had argued McNeil lacks standing to bring Lanham Act claims against them, (i.e., because, they alleged, McNeil is unable to establish a causal relationship between the alleged injury and conduct by the member companies). This argument fails in light of Defendants' withdrawal of their "contributory standing" argument. *See supra* at 6.

has standing under the DTPA . . . when such person has a business or trade interest at stake which is the subject of interference by the unfair or deceptive trade practices of another." *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 70 (Del. 1993). For the reasons discussed in Section III *supra*, McNeil has such interests in this matter and is therefore permitted to bring a claim under DUDTPA.[33]

Defendants' arguments concerning Delaware common law are equally flawed. Citing *Delaware Solid Waste Auth. v. Eastern Shore Environmental, Inc.*, C.A. No. 1472-K, 2002 WL 537691 (Del. Ch. Mar. 28, 2002) (Exhibit F hereto), Defendants argue that the Court should dismiss McNeil's common law claims for product disparagement and unfair competition because McNeil failed to allege that Defendants' conduct was "wrongful." That case makes plain, however, that product disparagement *always* constitutes "wrongful" interference:

> Only wrongful interferences will satisfy the tort, as some interferences are seen as justified or privileged under the aegis of competition. . . . Unfair competition, which is not privileged, includes fraud, intimidation, or disparagement.

*Delaware Solid Waste*, 2002 WL 537691, at *6 (internal citations omitted). Thus, by making detailed allegations of product disparagement, McNeil has *by definition* alleged "wrongful" interference with its business interests. Further, the "essential test" for unfair competition is "a likelihood of public deception." *Id.* at *6 (internal citations omitted). McNeil has alleged that Defendants have deceived the public by making false or misleading statements about its product, and has thereby pled a a classic claim for unfair competition.

---

[33] Defendants cite *Clontech Laboratories, Inc. v. Invitrogen Corp.*, 263 F. Supp. 2d 780 (D. Del. 2003) for the proposition that a plaintiff has standing under DUDPTA "only" if the parties are competitors. *See* Moving Brf., at 19. The case says nothing of the sort. On the contrary, it specifically states that DUDPTA "makes unnecessary proof of competition between the parties, monetary damages or intent to deceive." *Id.* at 795 (quoting *Grand Ventures*, 632 A.2d at 65) (emphasis added).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss the Complaint in all respects.

ASHBY & GEDDES

Steven J. Balick (#2114)
John G. Day (#2403)
222 Delaware Avenue, 17th Floor
Wilmington, Delaware 19801
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com

*Attorneys for Plaintiff McNeil Nutritionals, LLC*

*Of Counsel:*

Steven A. Zalesin
Clay J. Pierce
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
212-336-2000

Donna Malin
JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, New Jersey 08933

Dated: July 29, 2005
159959.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of August, 2005, the attached **REDACTED PUBLIC VERSION OF PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** was served upon the below-named counsel of record at the address and in the manner indicated:

Richard L. Horwitz, Esq.                                    <u>HAND DELIVERY</u>
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19801

James P. Murphy, Esq.                                     <u>VIA ELECTRONIC MAIL</u>
Squire, Sanders & Dempsey LLP
1201 Pennsylvania Avenue, N.W.
Suite 500
Washington, DC  20004

Adam R. Fox, Esq.                                         <u>VIA ELECTRONIC MAIL</u>
Squire, Sanders & Dempsey LLP
801 South Figueroa Street
Suite 1400
Los Angeles, CA  90017

Charles Tobin, Esq.                                        <u>VIA ELECTRONIC MAIL</u>
Leo Rydzewski, Esq.
Holland & Knight LLP
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, DC  20006

*/s/ John G. Day*
_____
John G. Day