# EXHIBIT 3

4/4/05 N.Y. Times C6
2005 WLNR 5218762

New York Times (NY)
Copyright (c) 2005 The New York Times. All rights reserved.

**April 4, 2005**

Section: C

Splenda, the Artificial Sweetener, Adds a Brown Sugar Blend

**MELANIE WARNER**

McNeil Nutritionals, Johnson & Johnson unit, is releasing version of its artificial sweetener Splenda that can be used as brown sugar replacement (M)

Splenda, the popular artificial sweetener, is going brown.

The manufacturer of Splenda, the brand name given to the chemical sweetener sucralose, is releasing a version that can be used as a replacement for brown sugar. It will be called **Splenda Brown** Sugar Blend.

"People can use it for baking their favorite recipe or sprinkle it on top of cereal the same way they would use brown sugar," said John Leahy, marketing director for Splenda at McNeil Nutritionals, the division of Johnson & Johnson that sells and markets the sweetener.

Made from a blend of regular brown sugar and sucralose that has been colored brown, **Splenda's brown** sugar will give consumers a 50 percent reduction in calories because a smaller amount will be needed for baking and other purposes.

For instance, if a recipe calls for one cup of brown sugar, Mr. Leahy said, only a half-cup of **Splenda brown** sugar will be necessary. **Splenda brown** sugar will come in one-pound and two-pound bags when sales start in September.

The popularity of Splenda took its manufacturers by surprise last year. In November, Tate & Lyle, the British ingredients company that makes sucralose, told its customers that its supply of sweetener would have to be rationed because of high demand. McNeil markets Splenda in the United States under a contract with Tate & Lyle.

Over the last year and a half, nearly every major food company has incorporated sucralose into one or more of its products. Both PepsiCo and Coca-Cola have opted to use the sweetener for new colas. This month, for example, Pepsi is introducing PepsiOne with Splenda and Coke will make a new version of Diet Coke sweetened with Splenda that will be in stores in several months.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Splenda brown** sugar is likely to add to the legal debate brewing over Splenda's marketing campaign. The Sugar Association, which represents the sugar industry; Merisant, the maker of the aspartame-based artificial sweetener NutraSweet; and a lawyer in San Diego have filed lawsuits against McNeil contending that Splenda's marketing misleads consumers.

"The average consumer assumes that Splenda is related to sugar," said Howard M. Rubinstein, the San Diego lawyer. "They're exploiting the fear some people have around other artificial sweeteners like NutraSweet and presenting this as a more natural alternative."

Mr. Leahy said that its marketing for the new brown sugar product would "remain consistent with Splenda's existing brand communication."

Neither the Sugar Association, based in Washington, nor Merisant, which is based in Chicago, would comment. If **Splenda brown** sugar catches on with consumers, it is likely to accelerate the decline of old-fashioned sugar. Sales of both white and brown sugar in the United States have been declining for years. Sales have dropped 10 percent since 1999, Mintel International, a research firm based in Chicago, has reported.

---- INDEX REFERENCES ----

COMPANY: PEPSICO INC; JOHNSON AND JOHNSON

INDUSTRY: (Sugars & Sweeteners (1SU55); Ingredients (1IN93); Food Processing (1FO99); Food Additives (1FO25); Food & Beverage Production (1FO79); Agriculture, Food & Beverage (1AG53))

REGION: (USA (1US73); Americas (1AM92); Illinois (1IL01); North America (1NO39))

Language: EN

OTHER INDEXING: (Warner, Melanie) (ARTIFICIAL SWEETENER; COCA COLA; JOHNSON JOHNSON; MERISANT; MINTEL INTL; NUTRASWEET; PEPSICO; **SPLENDA BROWN** SUGAR; SUGAR ASSOCIATION) (Coke; Howard M. Rubinstein; John Leahy; Leahy; Made; McNeil; McNeil Nutritionals; Pepsi; Splenda; Tate Lyle) (Sweeteners, Artificial)

COMPANY TERMS: MCNEIL NUTRITIONALS; JOHNSON AND JOHNSON INC

EDITION: Late Edition - Final

Word Count: 573
4/4/05 NYT C6

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw. The New York Times
4/4/05 NYT C6 Page 3

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

5/16/05 **Brandweek** 22
2005 WLNR 8048406

**Brandweek**
COPYRIGHT 2005 VNU Business Media
**May 16, 2005**

Volume 46; Issue 20

Sugar seeks to **sweeten sales**: integrated campaign aims to boost image of pure, all-natural product.(advertising)(Brief Article)

Reyes, Sonia

Sugar seeks to **sweeten sales**: integrated campaign aims to boost image of pure, all-natural product.(advertising)

THE SUGAR ASSOCIATION, in an effort to counteract the onslaught of anti-sugar diets and alternative sweeteners, will break the first integrated campaign that aims to dispel myths about sugar and tout its positive benefits. The effort, via Marriner Marketing, Columbia, Md., rolls this week with TV spots tagged, "Sugar: Sweet by nature," that explores special family moments and how using pure, all-natural sugar makes them more special. Radio supports; spend was not given.

One spot shows a grandmother and her grandchildren icing a cake. The family dog runs to the front door followed by the kids. The door opens to reveal only the uniformed legs of a soldier. When the soldier bends down to hug them, it's revealed that she's the kids' mom. She's given the cake with "Welcome Home Mom" written on top.

"(The campaign) presents positive messages about sugar and sugar products," said group representative Melanie Miller. She said the group supports the new USDA consumer food guidelines with regards to eating more fruit, veggies, grains and healthy fats, but disagrees with its advice to limit sugar intake. "It's unfair and inappropriate for them to blame the obesity issue on one ingredient," said Miller.

The effort also seeks to reverse a decline in sugar sales for the last three years, down 4.9% to $981 million while sales in sugar substitutes are up 6.1% to $339 million, for the year ending April 16, per ACNielsen.

---- INDEX REFERENCES ----

Language: EN

OTHER INDEXING: (MARRINER MARKETING; SUGAR ASSOCIATION; TV; USDA) (Melanie Miller; Miller; Radio) (Sugar Association (Advertising); Sugar industry (Industry sales and revenue)) (Television advertising) (Trade; Brief Article) (Advertising, marketing and public relations (ADV); Business (BUSN); Retail industry (RETL)) (Sales & consumption

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

 (650); Advertising (242)) (United States (1USA))

PRODUCT: Television Advertising; Radio, TV, publisher representatives; Sugarcane and sugar beets; Sugar and Confectionery Products; Media Representatives7313200

SIC: 7313; 0133; 2060

NAICS CODE: 54184

Word Count: 308
5/16/05 **BRANDWEEK** 22

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

8/9/04 **Supermarket News** 71
2004 WLNR 14854641

**Supermarket News**

COPYRIGHT 2004 Fairchild Publications, Inc.

**August 9, 2004**

**CATEGORY PERFORMANCE**: **SUGAR**.(Brief Article)

Dollar Sales $996,370,400 % Change From Last Year -3.49

Sales of **sugar** (white and other forms) have been slipping for several years. **Sugar** saw a drop of 3.8% to just over $1 billion in the food, drug and mass channels combined for the 52 weeks ended June 13. Supermarkets, where consumers often go for healthy eating guidance, felt the pinch the most. In that channel, **sugar** sales dropped by 3.5% to $996.4 million.

In the drug store channel, where grocery shopping is still a fill-in convenience for many, **sugar** sales grew by 3.8% during the same time frame. Yet these sales still accounted for just $5.4 million of total category sales.

Abundant **sugar** intake has been linked to poor health for many years. Therefore, it's no surprise that the category's sales took a hit during a period when consumers were inundated with instructions on how to best manage their diets. White, granulated **sugar**, which makes up the bulk of the category, saw sales decline by 3.8% to $830.3 million. Sales of brown, powdered and flavored **sugars** -- forms most often used for baking -- dropped at a slower pace than the traditional white, dipping by 2% and accounting for $166.1 million in sales in supermarkets.

Subcategories: 52-week sales; % change

WHITE GRANULATED **SUGAR**: $830,284,800; -3.79

BROWN/POWDER/ FLAVORED **SUGAR**: $166,085,600; -1.97

Latest 52 weeks ending June 13, 2004.

Dollar Sales Latest 52 Weeks Ended June 13, 2004; % Change; Dollar Sales Calendar Year Ended Dec. 28, 2003; % Change; Dollar Sales Calendar Year Ended Dec. 29, 2002; % Change

Supermarkets: $996,370,400; -3.49; $1,019,762,000; -0.85; $1,028,510,000; -3.34

Drug: $5,376,595; 3.80; $5,295,636; -8.32; $5,776,059; -8.92

F/D/MX: $1,010,468,000; -3.79; $1,034,419,000; -1.36; $1,048,701,000; -3.23

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

---- INDEX REFERENCES ----

NEWS SUBJECT: (Sales (1SA20); Business Management (1BU42); Sales Management (1SA51))

INDUSTRY: (Agriculture (1AG63); Agriculture, Food & Beverage (1AG53))

Language: EN

OTHER INDEXING: (Abundant; BROWN; CATEGORY; Dollar; Dollar Sales; Latest; Sales Calendar; Sales Latest; Subcategories; WHITE) (Sales (Growth); Supermarkets (Industry sales and revenue); **Sugar** (Prices and rates)) (Trade) (Business (BUSN); Food and beverage industries (FOOD); Retail industry (RETL)) (Commodity & service prices (740); Sales & consumption (650)) (United States (1USA))

PRODUCT: Supermarkets; Grocery stores; Supermarkets and Other Grocery (except Convenience) Stores5411100

SIC: 5411

NAICS CODE: 44511

Word Count: 353
8/9/04 SPRMKTNWS 71

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

FILED

2004 DEC 10 PM 12: 27

CLERK U.S. DISTRICT COURT CENTRAL DIST. OF CALIF. LOS ANGELES

BY

Adam R. Fox (State Bar No. 220584)
Mark Hurvitz (State Bar No. 222981)
SQUIRE, SANDERS & DEMPSEY L.L.P.
801 South Figueroa Street, 14th Floor
Los Angeles, CA 90017-5554
Telephone: (213) 624-2500
Facsimile: (213) 623-4581

Attorneys for Plaintiff
THE SUGAR ASSOCIATION, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

THE SUGAR ASSOCIATION, INC., a Delaware corporation,

Plaintiff,

vs.

McNEIL-PPC, INC., a New Jersey corporation, McNEIL NUTRITIONALS, LLC, a Delaware Limited Liability Company, and DOES 1 through 10,

Defendants.

Case No. CV 04 10077 DSF (RZx)

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF ARISING OUT OF:**

1. **False Advertising – 15 U.S.C. § 1125(a); and**

2. **Unfair Competition – Cal. Bus. & Prof. Code §§ 17200 and 17500 *et seq.* and California Common Law**

**DEMAND FOR JURY TRIAL**

Plaintiff, The Sugar Association, Inc. (the "Sugar Association") hereby complains and alleges as follows:

I.

**JURISDICTION AND VENUE**

1. This Court enjoys jurisdiction over the subject matter presented by this Complaint because it includes a claim of false advertising that arises under the Lanham Act, 15 U.S.C. §§ 1051, et seq., which explicitly provides for the jurisdiction of the federal courts pursuant to 15 U.S.C. § 1121, an authority that is also endowed pursuant to 28 U.S.C. §§ 1331 and 1338. The Court's jurisdiction extends beyond the Lanham Act claim to the additional state law claims asserted in

this Complaint because they arise from the same nucleus of operative facts as the federal claim, and 28 U.S.C. § 1367 authorizes the exercise of supplemental jurisdiction over all other claims that are so related.

2. Venue in this district is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the Sugar Association's claims occurred in this district and because defendants are subject to personal jurisdiction in this district.

## II.

## PARTIES

3. The Sugar Association is a corporation that is organized under the laws of the State of Delaware, having a principal place of business at 1101 15th Street, NW, Suite 600, Washington, DC 20005. The Sugar Association was founded by members of the United States sugar industry in 1943, when it was then called the Sugar Research Foundation. It assumed its current name in 1947. The mission of the Sugar Association is to promote the consumption of sugar as part of a healthy diet and lifestyle through the use of sound science and research. The Sugar Association's seventeen (17) member companies are producers and growers of sugar in the United States. Its Board of Directors is comprised of decision-making representatives from each of those companies or organizations. The Sugar Association's members include The Amalgamated Sugar Company, 3184 Elder Street, Boise, ID 83705, Minn-Dak Farmers Cooperative, 7525 Red River Road, Wahpeton, ND 58075, American Crystal Sugar Company, 101 North Third Street, Moorhead, MN 56560, Okeelanta Corporation, 1 North Clematis Street, Suite 200, West Palm Beach, FL 33402, American Sugar Cane League, 206 East Bayou Road, Thibodaux, LA 70302, Osceola Farms Company, PO Box 1059, Palm Beach, FL 33480, American Sugar Refining, Inc., 1 Federal Street, Yonkers, NY 10702, Rio Grande Valley Sugar Growers, Inc., 2 1/2 Miles West Highway 107, Santa Rosa, TX 78593, Atlantic Sugar Association, 1 North Clematis Street, Suite 200, West

Palm Beach, FL 33402, Southern Minnesota Beet Sugar Cooperative, 83550 County Road 21 - Box 500, Renville, MN 56284, Hawaiian Sugar & Transportation Cooperative, c/o Gay & Robinson, Inc., 1 Kaumakani Avenue, Kaumakani, Kauai HI 96747, Sugar Cane Growers Cooperative of Florida, 1500 Sugarhouse Road, Belle Glade, FL 33430, Imperial Sugar Company, 8016 Hwy 90A, Sugar Land, TX 77482, United States Sugar Corporation, 111 Ponce de Leon Avenue, Clewiston, FL 33440, Michigan Sugar Company, 4800 Fashion Square Boulevard, Suite 300, Saginaw, MI 48604, Western Sugar Cooperative, 7555 East Hampden Avenue, Suite 600, Denver, CO 80231, and Wyoming Sugar, 500 Hillcrest Drive, Worland, WY 82401 (collectively the "Members").

4. Defendant McNeil-PPC, Inc., is a corporation that is organized under the laws of the State of New Jersey, having a principal place of business at 199 Grandview Road, Skillman, NJ 08558.

5. Defendant McNeil Nutritionals, LLC, is a limited liability company organized under the laws of the State of Delaware, having its principal place of business at 7050 Camp Hill Road, Fort Washington, PA 19034.

6. Defendants McNeil-PPC, Inc., acting through its operating divisions McNeil Nutritionals and McNeil Specialty Products Company, as well as McNeil Nutritionals, LLC (collectively "McNeil"), among other things, have been engaged in the business of manufacturing, distributing and selling an artificial food additive used as a sweetener and marketed under the brand name Splenda® in a variety of products that employ the identical brand name (collectively "Splenda").

7. The Sugar Association does not know the true names and capacities of the defendants sued as DOES 1 through 10, inclusive, and, therefore, sues these defendants by such fictitious names. The Sugar Association will amend this Complaint to allege the true names and capacities of DOES 1 through 10, inclusive, when ascertained. For purposes of this Complaint, wherever McNeil is mentioned it is intended that DOES 1 through 10 be mentioned as well.

II.

**FACTS COMMON TO ALL CLAIMS FOR RELIEF**

**A. Introduction**

8. This case concerns the false, deceptive and/or misleading representations made by McNeil about Splenda in order to attract customers to purchase and consume that product, and to divert those customers away from their purchase and consumption of sugar.

9. This is a recent development for the producer of Splenda. McNeil had initially positioned its product as a competitor only in the market for artificial, purportedly no-calorie, sweeteners ("Artificial Sweetener Market"). In the Artificial Sweetener Market, the products against which Splenda principally competes are Sweet'N Low® ("Sweet'N Low"), a brand that employs the sweetening ingredient saccharin, and Equal® ("Equal"), a brand that employs the sweetening ingredient aspartame. Only recently, after gaining a significant foothold in the Artificial Sweetener Market—on information and belief, more than Sweet'N Low and Equal combined—has McNeil positioned Splenda to compete in the market for wholesome, natural sweeteners, like sugar, molasses and honey ("Natural Sweetener Market").

10. McNeil has entered Splenda into the Natural Sweetener Market by overtly changing the character of its representations to consumers so that it is no longer perceived as a mere "packet" sweetener, and is now regarded as a "pantry staple food." To achieve this objective, McNeil has, among other things, acted just in the last year to introduce a new Splenda-branded product that its president, Colin Watts ("McNeil's President"), publicly proclaimed this September, is "really changing the way people think about sugar" and that "offer[s] a true sugar baking replacement." Splenda's website even openly touts that as of August 2004, it "is growing at the expense of sugar" with sales now "ahead of both Domino and C&H Sugar." This comparison is significant, as one of the Sugar Association's

Members, American Sugar Refining, Inc., owns the Domino® sugar brand, and another Member, Hawaiian Sugar & Transportation Cooperative, which is comprised by all the major sugarcane growers in Hawaii, recently ended a ten-year supply contract that required C&H Sugar Company, Inc. to purchase substantially all the raw sugar produced in Hawaii.

11. The problem with Splenda's entry into the Natural Sweetener Market and its growth at the expense of sugar and the Members of the Sugar Association in particular is that Splenda is *not* a natural sweetener. Splenda instead attributes its sweet taste to a manufactured, synthetic compound that was not even known to the world scientific community until 1976. This fact has not stopped McNeil from engaging in an advertising campaign that includes both literally false claims as well as misleading statements that falsely imply that Splenda (a) contains real sugar, (b) is some sort of natural, no-calorie, form of sugar, (c) is healthy to consume simply because it carries with it no calories, as the sucralose purportedly passes through the body without being broken down and (d) genuinely tastes like sugar. Because McNeil's literally false, deceptive and/or misleading statements in these regards are being aimed directly at natural sugar producers who compete in the Natural Sweetener Market—in contradistinction to those companies that compete in the Artificial Sweetener Market—the Sugar Association has filed this action for judicial relief.

**B. Splenda Unfairly Competes In The Artificial Sweetener Market**

12. Since at least September 2000, when McNeil first offered Splenda for sale in retail stores in the United States, Splenda has attempted to gain a competitive advantage in the Artificial Sweetener Market by explicitly and implicitly distinguishing itself from its competitors by representing to the public that Splenda is a *natural* food product. Among other things, it has described its product with the following tag line: "Made from sugar, so it tastes like sugar." In addition, McNeil has employed a variety of techniques to persuade consumers in

the Artificial Sweetener Market that it is inherently different from the other artificial sweeteners by, among other things, running television advertisements falsely implying that Splenda is wholesome and pure. For example, one Splenda advertisement answers the question "What are little girls made of?" with the misleading associational phrase, "Splenda and spice and everything nice." More directly, through its spokesperson, Monica Neufang ("McNeil's Spokesperson"), McNeil has publicly characterized its representation that Splenda is made from sugar so it tastes like sugar as "a declarative fact."

13. The truth is that Splenda is actually manufactured by synthesizing a small amount of a man-made compound called 4,1',6'-trichloro-4,1',6'-trideoxygalactosucrose, misleadingly named sucralose. Sucralose is chemically achieved through a multi-step patented process that dramatically alters the molecular structure of sucrose by substituting its naturally occurring hydroxyl groups with chlorine, and then combining this artificial substance with large amounts of dextrose, maltodextrin or both, to bulk up the amalgamation and dilute the unnatural, high-intensity sweetness exhibited by sucralose. Additionally, the molecular structure of sucralose so differs from sucrose that the two compounds interact differently with the taste buds on the human tongue. Studies indicate that the potency of sucralose—although high at low levels of concentration—diminishes as its concentration increases such that it can never even achieve the sweetness potency of sugar beyond certain concentration levels. The temporal profile of sucralose also differs from sugar such that the taste effect of sucralose has a longer onset and slower rate of sweetness decay than sugar. Even the "mouth feel" of sucralose differs from sugar due to the dissimilar viscosity of each in the concentrations actually used in their food applications. These factors, among others, render literally false, deceptive and/or misleading the assertion that Splenda's purported relationship to sugar makes it taste like sugar.

14.    McNeil has also employed its marketing campaign to explicitly and implicitly represent to the public that Splenda is a *healthy* food product, which among other things, "the body does not recognize . . . as a carbohydrate," and its key sweetening ingredient sucralose "passes through the body without being broken down," so it has "no calories."

15.    The truth, according to the "Final Rule" report of the United States Food and Drug Administration ("FDA") that served as the basis for the FDA's 1999 authorization of Splenda's use as a general purpose sweetener, and which collects data reported to the FDA by McNeil itself, is that between 11 and 27 percent of sucralose is actually absorbed in humans following ingestion, and between 20 and 30 percent of that absorbed sucralose is then metabolized. The FDA reported that what remains unabsorbed and unmetabolized is excreted in the feces and urine.    Moreover, the bulking and dilutive ingredients of dextrose and maltodextrin are both carbohydrates that are also metabolized.  The consequences of the metabolized sucralose have not been adequately tested, rendering its notions of healthfulness uncertain and dubious, at best.

16.    As the direct and proximate result of McNeil's false, deceptive and/or misleading misrepresentations, McNeil has publicly proclaimed that within one year of its introduction of Splenda into the Artificial Sweetener Market, it captured nearly 14 percent of that market share.  McNeil has also asserted that by January 2004, Splenda's share of the Artificial Sweetener Market had risen to more than 45 percent—more than Sweet'N Low and Equal combined.

**C.    McNeil Leverages Splenda's Growth In The Artificial Sweetener Market To Compete Unfairly In The Natural Sweetener Market Against The Members Of The Sugar Association**

17.    On information and belief, based upon its dramatic success at employing literally false, misleading and/or deceptive statements about the inherent qualities and effects of Splenda to compete and succeed in the Artificial Sweetener Market, McNeil hatched a plan to enter into the Natural Sweetener Market and

compete against sugar directly. Thus, in or about September 2003, Splenda introduced its "Granular Baker's Bag"—a 9.7 ounce re-sealable plastic pouch that purported to be equivalent in sweetness to the standard five-pound bag of sugar, which Johnson & Johnson, McNeil's ultimate parent company, called "conventional sugar" in its press release of the new product—deceptively implying that Splenda, while not "conventional" sugar, was sugar nonetheless.

18. Additionally, in June 2004, McNeil announced its plans to introduce a new product that McNeil's President touted as "offer[ing] a true sugar baking replacement" called the Splenda "Sugar Blend for Baking." This new product became available at retail stores in August 2004, and prompted McNeil to issue a press release this September touting the evolution of its Splenda-branded products from the days when Splenda was available in "packets" to United States consumers only over the Internet in 1999 (when Splenda was vying for a place in the Artificial Sweetener Market), to its 2004 release of the "Sugar Blend for Baking" and ostensible position among "pantry staple food brands" (when Splenda had made clear that it would audaciously promote its artificial product to compete for a place in the Natural Sweetener Market).

19. As a result of McNeil's literally false, misleading and/or deceptive representations about Splenda, it has obtained windfall profits that it would not otherwise have obtained. McNeil's misrepresentations have caused and continue to cause a diversion of business and customers from the members of the Sugar Association, each of which is a direct competitor of McNeil in the sweetener industry. Evidence of the diversion of business exists on McNeil's own website for Splenda, where it proclaims that between August 2003 and August 2004 Splenda's sales were "ahead of both Domino and C&H Sugar," that Splenda "[wa]s growing at the expense of sugar," and that "[f]ifty-one percent of the brand's volume growth [wa]s from the sugar category which declined 4 percent."

**D. Background Facts**

20. The Sugar Association was founded in 1943 by members of the United States sugar industry, including both beet and cane growers and sugar producers throughout the United States. The mission of the Sugar Association is to promote the consumption of sugar as part of a healthy diet and lifestyle through the use of sound science and research. The Sugar Association's Members produce and grow a product that is all natural and refined through a purification process that separates 99.95 percent pure sucrose from the plant matter of sugarcanes and/or sugar beets.

21. Historically, sugar was the predominantly consumed sweetener in the United States and throughout the world, although honey and molasses were also used with some degree of frequency. Over the past two decades, many new sweeteners have been developed including corn syrup, fructose, glucose, high fructose corn syrup, and maltose, as well as artificial sweeteners such as saccharin, aspartame, and sucralose—the sweetening ingredient of Splenda.

22. Some of these new sweeteners replaced sugar as the sweetener used in foods and beverages, especially processed and convenience foods. For example, since the early 1980s most soft drinks have been manufactured with high fructose corn syrup rather than sugar. High fructose corn syrup is also used in fruit juices, drinks and ades. Concurrent with the introduction and increased availability and production of the sweeteners other than sugar, during the past twenty years, obesity has risen dramatically throughout the United States.

23. Since approximately September 2003, when McNeil released its Granular Baker's Bag to compete against the standard five-pound bag of sugar, McNeil's product Splenda has been a principal competitor with the growers and producers of natural sugar represented by the Sugar Association for consumers in the Natural Sweetener Market. Indeed, McNeil's Spokesperson publicly declared this year that Splenda is the chief competitor of sugar, proclaiming, "Splenda is the No. 1 branded sweetener in the U.S. based on dollar sales, which means that the

sales are ahead of both Domino and C&H Sugar." Moreover, McNeil has touted on its website for Splenda its assertion that this artificial product is "growing at the expense of sugar" and that "[f]ifty-one percent of the brand's volume growth is from the sugar category which declined 4 percent in the most recent year."

24. The Members of the Sugar Association now compete daily with McNeil to attract new and retain existing customers, including both entities within the food and beverage industry that employ naturally occurring sugars and added sugars or other natural sweeteners in their products, and the end-users who consume those products or who purchase sugar or one of its natural substitutes for use in their own recipes. This competition extends beyond food quality and taste to such attributes as healthfulness and wholesomeness.

25. The Members of the Sugar Association devote substantial resources to advertising and promoting their respective brands. Such advertising appears in virtually every form of media, including television, radio and print. Additionally, the Sugar Association indirectly expends substantial resources of the Members to educate both consumer and professional audiences about the consumption of pure, natural sugar, the health threat of obesity and the health benefits of physical activity.

**E. The Scope Of McNeil's Deceptive Advertising**

26. Although McNeil has since at least September 2000 offered consumers in the Artificial Sweetener Market in the United States with Splenda, an artificial sweetener that alone among artificial sweeteners, as described above, falsely advertises itself in a manner designed to imply that it is natural, healthy and shares sugar's sweet taste, since approximately September 2003, McNeil has also touted Splenda as a true alternative to sugar—a "pantry staple food" that is healthy, tastes like sugar and is made from "conventional" sugar.

27. Upon information and belief, McNeil has made these literally false, misleading and/or deceptive statements with the aim of diverting customers away

from real sugar and to encourage the purchase and use of Splenda instead, thereby generating for McNeil greater sales, customer loyalty and market share.

28. The promotion of Splenda as a natural product that is "[m]ade from sugar, so it tastes like sugar" and a healthy product that has "no calories," among other things, has been an important and material part of McNeil's advertising strategy. Because customers desire the opportunity to eat natural, healthy foods without increasing their daily caloric intake, McNeil's promotions of Splenda have produced a substantial amount of revenue to McNeil over and above the normal expected revenue stream.

29. Exemplary of the effect of McNeil's tactics are their influence on the rapidly growing California retail chain Jamba Juice, which now uses Splenda in certain of its drinks. Jamba Juice has a stated "commitment to providing nutritious, vibrant foods," and an "environmentally conscious" orientation. Although Jamba Juice now uses Splenda in some of its drinks, it still proclaims that its "blends are 100% natural" and that it does "not add any processed sugar or flavor-enhancing additives to [its] juices." Jamba Juice has explained on its website its decision to use Splenda by repeating McNeil's two favorite deceptions about the product: (1) "it doesn't act like sugar because the body does not recognize it as a carbohydrate," and (2) "[t]he difference between Splenda (sucralose), Sweet 'N Low (saccharin), Equal® (aspartame) and other sweeteners on the market is that Splenda is the only sweetener that is made from sugar so it tastes like sugar."

**F. The Willfulness Of McNeil's Misrepresentations**

30. The key sweetening ingredient of Splenda, sucralose, was first discovered in 1976. Johnson & Johnson later formed McNeil in order to, among other things, commercialize sucralose. By 1991, Canada had become the first nation to approve the use of sucralose. In April 1998, the FDA first approved the limited use of sucralose in the United States, and expanded that approval in 1999. Sucralose received approval in the European Union in January 2004, and has also

been approved for use in Brazil, China, Japan and in various Latin American, Asian, Caribbean, and Middle Eastern countries.

31. In order to gain from the FDA approval to sell sucralose for human consumption in the United States, McNeil petitioned the FDA in the late 1980s to propose an amendment to the federal food additive regulations. The submission to the FDA made by McNeil included data and information garnered from toxicity studies in several animal species, other tests in animals and information gained from clinical tests in human volunteers. The human clinical testing addressed the pharmacokinetics and metabolism of sucralose as well as its potential effects on carbohydrate metabolism. These studies specifically disclosed and McNeil reported to the FDA that humans absorbed between 11 and 27 percent of ingested sucralose, and that between 20 and 30 percent of the absorbed sucralose would be metabolized.

32. Despite knowledge of these facts, and of the synthetic molecular structure of sucralose that makes it differ from sugar, and interact with taste buds on the human tongue differently from sugar, McNeil has advertised and promoted Splenda in the Natural Sweetener Market as though its consumers would not metabolize the product and as though it was a natural product that tastes like sugar. Such representations are all literally false, misleading and/or deceptive.

## III.

## THE SUGAR ASSOCIATION'S CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Violations of Section 43(a) of the Lanham Act – False Advertising)**

33. The Sugar Association realleges and incorporates herein by this reference each and every allegation contained in Paragraphs 1 through 32, inclusive, of this Complaint as though set forth in full.

34. McNeil has used and continues to use false, deceptive and/or misleading descriptions of fact and/or misrepresentations of fact in commercial

advertising and/or promotion regarding the nature, taste and healthfulness of Splenda and its constituent parts. These advertisements have actually deceived, continue to deceive and/or have the tendency to deceive a substantial part of the audience for McNeil's messages in the Natural Sweetener Market.

35. McNeil is engaged in making these false, deceptive and/or misleading descriptions of fact and/or misrepresentations of fact in commercial advertising and/or promotion in California and in this district, and the effects of McNeil's acts throughout the United States are intended to and do fall upon Members of the Sugar Association in California and in this district.

36. McNeil's misrepresentations concern and have concerned McNeil's products, services and/or commercial activities, specifically its products sold under the brand Splenda.

37. The misrepresentations are and were material to McNeil's customers' decisions to purchase Splenda branded products and/or products in which Splenda is used as an ingredient or additive.

38. McNeil's knowledge about the synthetic manner in which sucralose is manufactured, the fact that hydrolysis occurs at low pH in products that include Splenda, and its absorption and metabolic processing after ingestion by humans, all of which McNeil investigated and reported to the FDA, render its decisions to market and promote Splenda as described above conscious and/or willful and/or knowingly reckless with regard to the truth. This misconduct, above and beyond the conduct required for liability under § 43(a) of the Lanham Act, should subject McNeil to treble damages.

39. All such misrepresentations took place in interstate commerce.

40. McNeil has earned a substantial windfall and unnatural profits as the direct and proximate result of falsely, misleadingly, and/or deceptively advertising and promoting the nature, taste and healthfulness of Splenda. An appropriate share of such profits to be demonstrated at trial should be returned to, and are lawfully

due to the Members of the Sugar Association, as competitors of McNeil in the Natural Sweetener Market.

41. The Sugar Association has been damaged as a result of McNeil's acts, in an amount to be demonstrated at trial. Specifically, McNeil's actions have caused, *inter alia*, a diversion of trade from the Members of the Sugar Association to McNeil, causing the Sugar Association to expend additional resources on advertising and education to inform the consuming public of the truth.

**SECOND CLAIM FOR RELIEF**

**(Violations of Cal. Bus. & Prof. Code §§ 17200 and 17500, *et seq.*, and California Common Law - Misleading Advertising)**

42. The Sugar Association realleges and incorporates herein by this reference each and every allegation contained in Paragraphs 1 through 41, inclusive, of this Complaint as though set forth in full.

43. McNeil has used and continues to use false, deceptive and/or misleading descriptions of fact and/or misrepresentations of fact in commercial advertising and/or promotion regarding the nature, taste and healthfulness of Splenda and its constituent parts. These advertisements have actually deceived, continue to deceive and/or have the tendency to deceive a substantial part of the audience for McNeil's messages.

44. McNeil is engaged in these unfair, unlawful and deceptive activities in California and in this district, and that the effects of McNeil's acts throughout the United States are intended to and do fall upon Members of the Sugar Association in California and in this district.

45. The Sugar Association has been damaged as a result of McNeil's acts, in an amount to be demonstrated at trial. Specifically, McNeil's actions have caused, *inter alia*, a diversion of trade from the Members of the Sugar Association

to McNeil, causing the Sugar Association to expend additional resources on advertising and education to inform the consuming public of the truth.

46. McNeil's wrongful acts described herein have also caused great harm to the general public and the marketplace. No legal remedy for the resulting injury is adequate compensation; only an injunctive order directing McNeil to stop the unfair conduct will suffice.

47. McNeil's knowledge about the synthetic manner in which sucralose is manufactured, and its absorption and metabolic processing after ingestion by humans, all of which McNeil investigated and reported to the FDA, render its decisions to market and promote Splenda as described above conscious and/or willful and/or knowingly reckless with regard to the truth.

## IV.

## PRAYER

WHEREFORE, the Sugar Association prays for judgment against defendants, and each of them, as follows for all claims:

a. That this Court enjoin McNeil from advertising, promoting and/or marketing Splenda in any manner for the purpose of acquiring, benefiting from or trading on the commercial reputation, success and goodwill of sugar;

b. That this Court order McNeil to pay damages to the Sugar Association, for the harms associated with McNeil's sales through false advertising, promotion and/or marketing;

c. That this Court award the Sugar Association treble the damages award pursuant to 15 U.S.C. § 35;

d. That this case be found to be exceptional within the meaning of 15 U.S.C. § 1117;

e. That this Court award the Sugar Association the costs and expenses, including all reasonable attorneys' fees, incurred by it;

f. That this Court award the Sugar Association pre-judgment and post-judgment interest; and

g. That this Court grant the Sugar Association, such other and further relief as the Court deems just and proper.

Dated: December 10, 2004

SQUIRE, SANDERS & DEMPSEY L.L.P.

By: ______________________
Adam R. Fox
Mark N. Hurvitz
Attorneys for Plaintiff
THE SUGAR ASSOCIATION, INC.

SQUIRE, SANDERS & DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

LosAngeles/166422.1

- 16 -

COMPLAINT

**DEMAND FOR JURY TRIAL**

The Sugar Association, Inc. hereby demands a trial by jury as to all issues so triable.

Dated: December 10, 2004

SQUIRE, SANDERS & DEMPSEY L.L.P.

By: ______________________
Adam R. Fox
Mark N. Hurvitz
Attorneys for Plaintiff
THE SUGAR ASSOCIATION, INC.

# EXHIBIT 7

SQUIRE SANDERS | LEGAL COUNSEL WORLDWIDE

SQUIRE, SANDERS & DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, California 90017-5554
Office: +1.213.624.2500
Fax: +1.213.623.4581

Direct: +1.213.689.5166
afox@ssd.com

February 7, 2005

VIA FACSIMILE

Diana M. Torres, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071

Re: The Sugar Assoc., Inc. v. McNeil-PPC, Inc. And McNeil Nutritionals, LLC-04 CV 10077 DSF (RZX)

Dear Ms. Torres:

I have received and reviewed the correspondence that you faxed to my office this Saturday, February 5, 2005, and which I did not receive until this morning. Your letter includes several inaccuracies.

First, I categorically disagree with your characterization that we conducted a "meet-and-confer . . . this past Monday, January 31, 2005, in accordance with Local Rule 7-3." As you know, we had a brief telephonic discussion just two days before your clients' responsive pleading was due , during which we discussed the fact that you had failed to timely initiate a conference that would comply with the requirements of the referenced rule and permit your clients to file a motion to dismiss. This is presumably why your clients instead answered the Sugar Association's complaint.

Second, although it is true that during the referenced conversation you asked me whether the members of the Sugar Association would be joining the complaint as additional plaintiffs, at that time I advised you that I did not know, that I had not asked them and that if I were to ask them it might take some time to receive all of their responses. Contrary to the representation in your letter, at no time did I express any agreement to have the Sugar Association consider joining its members as additional plaintiffs. My communications with my client are confidential. Moreover, any decision about whether another party desires to join as a new

plaintiff in the Sugar Association's complaint is a decision that will have to be made by that other party.

Third, at no time did I agree to provide you with authority to support the Sugar Association's standing to bring the claims asserted in the complaint. To the contrary, I advised you that it was unfair for you to make such a request just two days before your clients' responsive pleading was due—effectively imposing an arbitrary and shortened deadline on me as because of your own delay. Moreover, my week was very busy and once your clients answered, I had thought that the issue was concluded. At the very least, it imposed upon you an obligation to act pursuant to Local Rule 7-3 if you are contemplating the filing of any other motions.

In that last regard, if you do desire for the Court to address the Sugar Association's standing to bring its claims by motion, I suggest that we meet and confer in person to discuss your bases for such a motion. We are more than happy to host such a meeting at our offices. I am currently available for such a meeting on the afternoon of February 9, and either the morning or afternoon any day next week. Please let me know what date works best for you.

Additionally, to date, the only legal authorities that I have received from you that purport to provide a basis for your motion are *Waits v. Frito-Lay, Inc.*, 978 F. 2d 1093 (9th Cir. 1992) and *Halicki v. United Artists Comm., Inc.*, 812 F. 2d 1213 (9th Cir. 1987). Neither of these cases addresses whether an association enjoys standing to bring claims in the place of its members, rendering each case inapposite. Indeed, it has long been held that an association, like the Sugar Association, enjoys standing to sue on behalf of its members. *See Automobile Workers Union v. Brock*, 477 U.S. 274 (1986); *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977).

I look forward to hearing from you.

Sincerely,

Adam R. Fox

ARF/cml

LosAngeles/170960.1
64552.00001



O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
IRVINE SPECTRUM
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

February 8, 2005

OUR FILE NUMBER
427892-053

WRITER'S DIRECT DIAL
(213) 430-6556

WRITER'S E-MAIL ADDRESS
dtorres@omm.com

Adam R. Fox
Squire, Sanders & Dempsey L.L.P.
801 South Figueroa Street, 14th floor
Los Angeles, CA 90017-5554

**Re:** ***The Sugar Assoc., Inc. v. McNeil-PPC, Inc. and McNeil Nutritionals, LLC* – 04 CV 10077 DSF (RZX)**

Dear Mr. Fox:

We are in receipt of your letter dated yesterday. Our client is unwilling to allow your client's member companies to continue their false and deceptive conduct and, in light of your position concerning their joinder in this case, our client has filed the enclosed complaint in federal district court in Delaware, where we believe each of the sugar companies is subject to jurisdiction.

We also disagree with your version of our telephone discussion and your position concerning your client's standing. Nonetheless, we are happy to meet with you at your offices tomorrow afternoon, Wednesday, February 9, 2005, at 1:30 p.m. Please note, however, that we consider this meeting to be a continuation of our meet-and-confer obligations and not their beginning.

Please let us know if the above mentioned time is agreeable to you.

Very truly yours,

Diana M. Torres /amf

Diana M. Torres
of O'Melveny & Myers LLP

LA2:750757.1

# EXHIBIT 8



ORIGINAL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE SUGAR ASSOCIATION, INC., Plaintiff, v. McNEIL-PPC, INC., et al., Defendants. | CASE NO. CV04-10077 DSF (RZx) ORDER GRANTING IN PART DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION |

ENTERED CLERK, U.S. DISTRICT COURT APR 14 2005 CENTRAL DISTRICT OF CALIFORNIA BY DEPUTY

## I. INTRODUCTION

By this Motion, Defendants challenge Plaintiff's Standing to bring this action.

The Notice of Motion and Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c) or, in the Alternative, for Partial Summary Judgment Pursuant to Fed. R. Civ. P. 56(c), and supporting Memorandum of Points and Authorities were filed on February 18, 2005. The [Proposed] Statement of Uncontroverted Facts and Conclusions of Law in Support of Defendants' Motion for Judgment on the Pleadings, or in the Alternative for Partial Summary Judgment for Lack of Standing was filed on February 18, 2005.

The Opposition to Defendants' Motion for Judgment on the Pleadings, or in the Alternative for Partial Summary Judgment ("Opp."); Plaintiff Sugar

DOCKETED ON CM APR 14 2005 BY 003

27

SERVED ON US BY MAIL 4/16/05

Association, Inc.'s General Objection to Defendants' [Proposed] Statement of Uncontroverted Facts and Conclusions of Law in Support of Defendants' Motion for Judgment on the Pleadings, or in the Alternative for Partial Summary Judgment, for Lack of Standing, and Plaintiff Sugar Association, Inc.'s Response to Defendants' Separate Statement of Uncontroverted Facts and Conclusions of Law in Support of Plaintiff's Opposition to Defendants' Motion for Judgment on the Pleadings, or in the Alternative for Partial Summary Judgment for Lack of Standing, were filed on March 14, 2005.

The Reply Memorandum of Points and Authorities in Support of Defendants' Motion for Judgment on the Pleadings, or in the Alternative for Partial Summary Judgment, for Lack of Standing was filed on March 28, 2005.

## II. FACTUAL BACKGROUND

The Sugar Association is a corporation founded by members of the United States sugar industry in 1943. Complaint ("Compl.") ¶ 3. The Association's mission is to promote the consumption of sugar as part of a healthy diet and lifestyle through the use of sound science and research. Id. ¶¶ 3, 20. Its 17 member companies are producers and growers of sugar in the United States, and its Board of Directors is comprised of decision-making representatives from each of those companies or organizations. Id. ¶ 3.

Defendant McNeil-PPC, Inc., acting through its operating divisions McNeil Nutritionals and McNeil Specialty Products Company, as well as McNeil Nutritionals, LLC (collectively "McNeil" or "Defendants") have been engaged in the business of manufacturing, distributing and selling an artificial food additive used as a sweetener and marketed under the brand name Splenda® in a variety of products that employ the identical brand name (collectively "Splenda"). Id. ¶ 6.

McNeil initially positioned the product as a competitor only in the market for artificial, purportedly no-calorie, sweeteners. Id. ¶ 9. Recently, after gaining a

significant foothold in the market for artificial sweeteners, McNeil positioned Splenda to compete in the market for wholesome, natural sweeteners, like sugar, molasses and honey. Id.

To compete with natural sweeteners, McNeil introduced a new Splenda-branded product. Id. ¶ 10. Splenda is not a natural sweetener. Id. ¶ 11. Instead, it attributes its taste to a manufactured, synthetic compound that was not known to the world scientific community until 1976. Id. McNeil has engaged in an advertising campaign that includes both literally false claims as well as misleading statements that falsely imply that Splenda (a) contains real sugar, (b) is some sort of natural, no-calorie, form of sugar, (c) is healthy to consume simply because it carries with it no calories, as the sucralose passes through the body without being broken down and, (d) genuinely tastes like sugar. Id.

Among other things, McNeil has described its product with the following tag line: "Made from sugar, so it tastes like sugar." Id. ¶ 12. In June 2004, McNeil announced its plans to introduce a new product that its president touted as "offer[ing] a true sugar baking replacement" called the Splenda "Sugar Blend for Baking." Id. ¶18.

As a result of McNeil's literally false, misleading or deceptive representations about Splenda, it has obtained windfall profits that it would not have otherwise obtained. Id. ¶19. McNeil's misrepresentations have caused and continue to cause a diversion of business and customers from the members of The Sugar Association, each of which is a direct competitor of McNeil in the sweetener industry. Id. Evidence of the diversion of business exists on McNeil's own website for Splenda, where it proclaims that between August 2003 and August 2004 Splenda's sales were "ahead of both Domino and C&H Sugar," that Splenda "[wa]s growing at the expense of sugar," and that "[f]ifty-one percent of the brand's volume growth [wa]s from the sugar category which declined 4 percent." Id.

The members of The Sugar Association devote substantial resources to advertising and promoting their respective brands. Id. ¶ 25. Such advertising appears in virtually every form of media, including television, radio and print. Id. Additionally, The Sugar Association indirectly expends substantial resources of the members to educate both consumer and professional audiences about the consumption of pure, natural sugar, the health threat of obesity and the health benefits of physical activity. Id.

The Sugar Association admitted at oral argument that not all U.S. sugar growers and producers are members.

## III. LEGAL STANDARD

### A. Motions for Judgment on the Pleadings

"[J]udgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and it is entitled to judgment as a matter of law." Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1550 (9th Cir. 1990). The standard applied to a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is "functionally identical" to the standard applied to motions under Rule 12(b)(6) for failure to state a claim. Dworkin v. Hustler Magazine Inc., 867 F.2d 1188, 1192 (9th Cir. 1989), cert. denied, 493 U.S. 812. Allegations by the non-moving party must be accepted as true, while allegations of the moving party that have been denied must be deemed false for the purpose of the motion. Hal Roach Studios, Inc., 896 F.2d at 1550.

Judgment on the pleadings may be granted as to fewer than all of the claims, or as to part of a claim. See Chi-Mil Corp. v. W.T. Grant Co., 70 F.R.D. 352, 358 (E.D. Wis. 1976) (analogizing to Rule 56).

### B. Standing to Allege False Advertising Under the Lanham Act

In order to establish standing, plaintiff has the burden of establishing three

elements. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the complained of conduct. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Id. at 560-61 (quotations and citations omitted).

In pertinent part, section 43(a) of the Lanham Act states:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

Plaintiffs claiming false advertising under the Lanham Act must allege commercial injury or competitive injury. See Barrus v. Sylvania, 55 F.3d 468, 470 (9th Cir. 1995) (affirming dismissal of Lanham Act claim for false advertising brought by consumer plaintiffs who alleged no competitive or commercial injury). To be actionable, conduct must not only be unfair, but must in some discernible

way be competitive. Halicki v. United Artists Communications, Inc., 812 F.2d 1213, 1214 (9th Cir. 1987). Explaining why, the Ninth Circuit stated: "If Section 43(a) is not confined to injury to a competitor in the case of a false designation, it becomes a federal statute creating the tort of misrepresentation . . . . As one treatise suggests, the Lanham Act would be similar to [the law in other countries] where, by virtue of a general code clause, in any suit in tort or contract the violation of good morals may become an issue." Halicki, 812 F.2d at 1214.

Determining whether two parties are competitors involves examining whether they "vie for the same dollars" from the same consumer group. See Kournikova v. Gen. Media Communications, Inc., 278 F. Supp. 2d 1111, 1117-18 (C.D. Cal. 2003) (finding that Anna Kournikova, famous tennis star and model, and General Media Communications, the publisher of Penthouse magazine, competed for the same dollars from the "same target audience – namely men"); Summit Tech., Inc. v. High-Line Med. Instruments, Co., 933 F. Supp. 918, 939 C.D. Cal. 1996) (competitors are persons "endeavoring to do the same thing and each offering to perform the act, furnish the merchandise, or render the service better or cheaper than his rival") (internal quotation and citation omitted).[1]

A competitive injury is an injury that takes away from a competitor's profit because of a misrepresentation concerning the suitability of the content of one of that competitor's products. See Waits, 978 F.2d at 1109.

## C. State Law Claims

### 1. Unfair Competition

As amended by Proposition 64, adopted by California voters on November

[1] Not all Lanham Act plaintiffs must demonstrate that they were competitors. A plaintiff who is not a competitor of the defendant may demonstrate a commercial injury caused by the defendant's conduct. See Waits v. Frito-Lay, Inc., 978 F.2d 1093, 1108 (9th Cir. 1992). Plaintiff admittedly does not allege such an injury.

2, 2004, section 17204 of the California Business and Professions Code, which governs actions for injunctions to prevent unfair competition, provides, in part:

> Actions [alleging a violation of unfair competition laws] shall be prosecuted exclusively in a court of competent jurisdiction by the Attorney General or any district attorney or by any county counsel . . . or by any person who has suffered injury in fact and has lost money or property as a result of such unfair competition.

Cal. Bus. & Prof. Code § 17204 (2005).

**2. False Advertising**

As amended by Proposition 64, adopted by California voters on November 2, 2004, section 17535 of the California Business and Professions Code, which governs actions for injunctive relief to prevent false advertising, provides, in part:

> Actions for injunction under this section may be prosecuted by the Attorney General or . . . by any person who has suffered injury in fact and has lost money or property as a result of a violation of this chapter. Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of this section and complies with Section 382 of the Code of Civil Procedure . . . .

Cal. Bus. & Prof. Code § 17535 (2005).

**D. Associational Standing**

Courts apply a three-part test to determine whether an association has standing to sue on behalf of its members. Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977). An association must demonstrate that: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested require the participation of individual members in the lawsuit. Id.

## IV. ANALYSIS

### A. The Sugar Association's Standing to Sue on Its Own Behalf

The Sugar Association does not allege that it competes with McNeil, or even that it sells anything at all. It concedes that the doctrine of associational standing dictates the result in this case.

### B. Associational Standing Under the Lanham Act[2]

#### 1. Plaintiff's Members Would Otherwise Have Standing

Plaintiff alleges that its members are "producers and growers of sugar" in the United States, Compl. ¶ 3, and that Defendants' "misrepresentations have caused and continue to cause a diversion of business and customers from [its members], each of which is a direct competitor of McNeil in the sweetener industry." Id. ¶ 19. Assuming the allegations to be true,[3] Plaintiff's members vie for the same dollars from the same consumer group, and Defendants' mislabeled product takes consumers away from the product sold by Plaintiff's members. See Waits, 978 F.2d at 1109; Kournikova, 278 F. Supp. 2d at 1117. Plaintiff's members would have standing.

#### 2. The Interests Plaintiff Seeks to Protect are Germane to its Purpose

Plaintiff asserts its mission is to "promote the consumption of sugar as part of a healthy diet and lifestyle through the use of sound science and research." Compl. ¶ 3. It also alleges that Defendants falsely imply that their product contains real sugar, id. at ¶ 11, and that their assertions of "healthfulness" are "uncertain and dubious, at best." Id. ¶ 15. Preventing the public from being

---

[2] The cases cited by Defendants do not support their argument that associational standing cannot be invoked by plaintiffs asserting Lanham Act claims.

[3] Defendants claim Plaintiff's members are not competitors. Plaintiff disputes this, and the Court must accept Plaintiff's allegations as true for the purposes of this Motion.

misinformed about sugar is germane to Plaintiff's purpose.

**3. The Claim Asserted and the Relief Requested Require the Participation of Individual Members**

Plaintiff provides no authority suggesting that associations may seek monetary relief on behalf of their members.[4] Indeed, precedent "has been understood to preclude associational standing when an organization seeks damages on behalf of its members." United Food and Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 554 (1996). See, e.g., United Union of Roofers, Waterproofers, and Allied Trades No. 40 v. Ins. Corp. of Am., 919 F.2d 1398, 1400 (9th Cir. 1990). Courts addressing this issue have "consistently held that claims for monetary relief necessarily involve individualized proof and thus the individual participation of association members, thereby running afoul of the third prong of the Hunt test." United Union, etc., 919 F.3d at 1400.

Plaintiff's citation to United Food and Commercial Workers Union is unavailing. There the Supreme Court found that the third prong of the test for associational standing is "prudential," not constitutionally mandated. The Court concluded that, in the Worker Adjustment and Retraining Notification Act ("WARN"), "Congress intended to abrogate th[e] otherwise applicable standing limitation so as to permit the union to sue for damages running to its workers . . . ." 517 U.S. at 546.

Plaintiff does not suggest that Congress had a similar intent in enacting the Lanham Act, or used the same or similar language, or that it addressed this issue in any way.

Plaintiff's alternative attempt to avoid the proscription of the third prong of the Hunt test also fails. Plaintiff argues that disgorgement of a defendant's profits,

---

[4] The Lanham Act cases cited by Plaintiff involved injunctive relief only.

allowable under 15 U.S.C. § 1117(a), unlike the recovery of lost profits, does not require individual participation because a plaintiff has the burden of proving only defendant's sales. Opp., 9:7-19. Plaintiff admits that its members are entitled at most only to "[a]n appropriate share of [Defendants'] profits" attributable to the allegedly false advertising.[5] Compl. ¶40. In an attempt to address this issue, Plaintiff offers a Joint Allocation Agreement ("Agreement")[6] specifying how Defendants' profits would be distributed among its members if The Sugar Association succeeds here. But Plaintiff's argument addresses only part of its problem.

Recent circuit court decisions hold that disgorgement requires that a plaintiff show either that the defendant gained additional sales due to the advertisement, or that plaintiff lost sales, or that plaintiff was required to lower the price of its own product. Logan v. Burgers Ozark Country Cured Hams, Inc., 263 F.3d 447, 464 (5th Cir. 2001) (Lanham Act damages should not impose a penalty but should be for the purpose of compensation), citing Balance Dynamics Corp. v.

---

[5] Plaintiff asserts: "To the extent that McNeil [argues] that the fewer than 20 members of the Sugar Association may not be assured of full recovery of an allocated share appropriate to each of them, [U-Haul Int'l, Inc. v. Jartran, Inc., 793 F.2d 1034 (9th Cir. 1986)] offers a solution that eliminates any need for their individualized participation in this lawsuit: ratification of the disgorgement award." Opp., 9 n.7. U-Haul, though, does not even mention disgorgement. The discussion of "ratification" in U-Haul arises in the context of an analysis of the "real party in interest" under Fed. R. Civ. P. 17, and a related analysis of "joinder of necessary parties" under Fed. R. Civ. P. 19. Id. at 1038. The court referred to the Lanham Act only to determine whether plaintiff was the "real party in interest with respect to the damages suffered by those other than itself," and found that the Lanham Act proved to be "none too helpful." Id. The Court referenced "ratification" because Rule 17(a) allows a party to obtain ratification from the real party in interest. U-Haul does not establish that associations can employ "ratification" as a means of establishing standing where it does not otherwise exist.

[6] On April 4, 2005, Plaintiff filed the Declaration of Mark N. Hurvitz, attaching a copy of the Agreement, entered into on March 24, 2005, signed by The Sugar Association and all 17 of its members.

Schmitt Indus., 204 F.3d 683, 689 (6th Cir. 2000), cert. denied, 531 U.S. 927 (principles of equity do not warrant disgorgement in the absence of proof of factors listed). In other words, in order to establish entitlement to any share of Defendants' profits, each member must show some form of injury. See also 15 U.S. C. § 1117(a) (the sum awarded by the court "shall constitute compensation and not a penalty").

Apparently Plaintiff and its members want the Court to assume that, because total sales of sugar have declined since the introduction of Splenda, each member of The Sugar Association has been injured by Splenda's conduct. The Court can make no such assumption.

Moreover, the Agreement does not address a method to determine the "appropriate share" of Defendants' profits to allocate to Plaintiffs' members vis-a-vis Defendants' other competitors. The discussion in U-Haul illustrates the problem here. As the Ninth Circuit noted: "To the extent that U-Haul is unable to get ratification from, or joinder of, all other System members, it is entitled only to that portion of the recovery that represents damages to U-Haul itself and those System members that do ratify or join." U-Haul, 793 F.3d at 1040. Plaintiff admits that there are non-member U.S. sugar producers and growers representing a substantial portion of the market, and that producers and growers are not Defendants' only competitors. Plaintiff has not offered a "joint allocation agreement" among all of Defendants' competitors. Thus, while the Agreement resolves potential disputes among Plaintiff's members, it does not address the dispute between Plaintiff's members collectively and Defendants as to what percentage of Defendants' profits, if any, would be disgorged to them. That dispute requires the members' individual participation to establish not only injury, but -- presumably -- market share.

In any event, Plaintiff's complaint also seeks damages for its members' lost profits, which Plaintiff has not offered -- nor shown authority to offer -- to waive.

The Lanham Act permits a plaintiff "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a) (emphasis added). Allowing Plaintiff to seek disgorgement of Defendants' profits in this action, while potentially leaving Defendants subject to a separate suit for the lost profits by one or more individual members would interfere with the Court's power and obligation to insure that the total recovery was equitable.

Moreover, section 1117(a) provides: "If the court shall find that the amount of recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." It is difficult to discern how this Court could appropriately perform such an analysis without detailed information about -- and the participation of -- each of Plaintiff's members.

The Sugar Association concedes that it is only able to seek disgorgement if the Court accepts the Agreement. The Agreement, however, highlights – rather than cures – Plaintiff's inability to satisfy the third prong of the Hunt test, which requires an associational plaintiff to demonstrate that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. 432 U.S. at 343.

The Court GRANTS Defendants' motion to dismiss the Lanham Act claim for monetary remedies. Because Plaintiff agreed at oral argument that it cannot state a claim for standing on its own behalf, even if given leave to amend its Complaint, the dismissal is with prejudice.

## C. State Law Claims

### 1. Common Law Claims

The Ninth Circuit has "consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are substantially congruent" to claims made under the Lanham Act.

Cleary v. News Corp., 30 F.3d 1255, 1262-63 (9th Cir. 1994) (internal quotation and citation omitted). Therefore, Plaintiff does not have standing to bring the state common law claims for damages.

**2. Statutory Claims**

The parties dispute the interpretation of these recently amended statutes and specifically whether associations have standing to sue.

District courts may decline to exercise supplemental jurisdiction over a claim under 28 U.S.C. § 1367(a) if the claim raises a novel or complex issue of state law. 28 U.S.C. § 1367(c)(1). Courts avoid needless decisions of state law as a matter of comity. United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966).

California courts are already in the process of deciding the meaning and scope of Proposition 64. See, e.g., Thornton v. Career Training Center, Inc., No. D044598, 2005 Cal. App. LEXIS 527 (Apr. 4, 2005); and Frey v. Trans Union Corp., No. G031928, 2005 Cal. App. LEXIS 401 (Mar. 24, 2005). The Court believes that the state courts are the proper forum for the resolution of this question regarding associational standing, a novel issue of state law. The Court declines to exercise supplemental jurisdiction.

## V. CONCLUSION

For the foregoing reasons, judgment is GRANTED in favor of Defendants on Plaintiff's Lanham Act and common law claims to the extent Plaintiff seeks monetary relief. The Court declines to exercise supplemental jurisdiction over the state law statutory claims.

IT IS SO ORDERED.

Dated: 4-13-05

Dale S. Fischer
Dale S. Fischer
United States District Judge