# EXHIBIT 9



# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

CENTURY CITY

HONG KONG

IRVINE SPECTRUM

LONDON

NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

TOKYO

WASHINGTON, D.C.

July 18, 2005

OUR FILE NUMBER
427892-053

WRITER'S DIRECT DIAL
(213) 430-7641

WRITER'S E-MAIL ADDRESS
clazatin@omm.com

**VIA FACSIMILE AND MAIL**

Adam Fox, Esq.
Squire, Sanders & Dempsey L.L.P.
801 South Figueroa Street, 14th floor
Los Angeles, CA 90017-5554

Re:  *The Sugar Ass'n, Inc. v. McNeil-PPC, Inc.*
     *and McNeil Nutritionals, LLC* – 04 CV 10077 DSF (RZX)

Dear Mr. Fox:

I am writing to you pursuant to Local Rule 7-3 to request a meet-and-confer to discuss the bases for a motion for summary judgment that our clients, McNeil-PPC, Inc. and McNeil Nutritionals, LLC (collectively, "McNeil") intend to file in the above-captioned matter.

McNeil's anticipated motion, which will be directed at the Sugar Association's ("Association") remaining claims in this action, will be brought on the grounds that those claims are barred by the equitable doctrine of laches. Under applicable authority in this Circuit, the doctrine of laches operates presumptively to bar a suit where plaintiff delays in filing his Lanham Act claims until after the limitations period for analogous state law claims has run. *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829 (9th Cir. 2002) (applying presumption to bar Lanham Act false advertising claims); *Miller v. Glen Miller Products*, 318 F. Supp. 2d 923 (C.D. Cal. 2004) (applying presumption to bar Lanham Act trademark claims). As the Association was no doubt aware, McNeil's advertising and marketing of Splenda have referenced Splenda's sugar-like taste and its origins in sugar since the product's nationwide launch in September 2000 in virtually the same way they do today. The Association's decision to delay over four years in bringing its suit against McNeil is thus both unreasonable and unjustified.

Moreover, McNeil stands to suffer substantial prejudice should the Association's suit be allowed to proceed. McNeil has invested considerable time, talent, and resources in building a successful brand identity based in large part on the five-year old marketing campaign that the Association now belatedly seeks to challenge. The economic prejudice and loss of goodwill that McNeil will suffer are more than sufficient to warrant judgment in McNeil's favor on the basis of laches.

O'MELVENY & MYERS LLP

Please contact me at your earliest convenience so that we may schedule a mutually convenient time for us to meet.

Very truly yours,

Carlos M. Lazatin
for O'Melveny & Myers LLP

LA2:768458.1

# EXHIBIT 10

# Growing Beets. Making Sugar. Tasting Sweet.



Employee Email Login

**American Crystal Sugar Company**

At 15 calories per teaspoon, our sugar is the pure sweetener you count on for great taste. It's also a naturally fat-free part of a healthy diet.

**Sugarbeet Agronomy**
- Gold Standards
- Ag Notes
- Ag Tools
- Beet Seed
- Classifieds
- Resources

**Cooperative Profile**
- Annual Reports
- Economics
- Facilities
- History
- Joint Ventures

**Products & Processing**
- Industrial
- Recipes
- Retail
- Sugar Facts
- Sugar Processing
- Agri Products

**Members Only**
- Shareholder Records
- Sugar Reports

Employment | Media & Environmental | Links | Talk to Us                    **Americans for Fair Trade**

**Note:** There have been a few changes to this site. The most notable is a name change to Ag Systems. It is now called Shareholder Records. Another name change that has occurred is that the Shareholder Access section is now called Members Only. This section is now categorized in the left hand navigation making it more organized and easier to find information.

**What's New:**
- House Passes CAFTA
- Sugar Farmers Work to Avoid Future CAFTAs
- Gator Excel Calculators
- RESOURCES: Ag Library
- GOLD STANDARDS - Harvest: Successful Sugarbeet Storage - (5.6MB pdf file)
- GOLD STANDARDS - Harvest: The Sugarbeet Harvest - (2.8MB pdf file)
- Ag Note 473 – Coping With Excess Rainfall

© American Crystal Sugar Company

American Crystal Sugar Company: Cooperative Profile                                    Page 1 of 1



Home | Employment | Media & Environmental | Links | Talk to Us | Search

| Sugarbeet Agronomy | Cooperative Profile | Products & Processing | Members Only |



Cooperative Profile

# Cooperative Profile

American Crystal Sugar Company is a world-class agricultural cooperative specializing in the production of sugar and related agri-products. American Crystal is owned by approximately 3,000 shareholders who raise 500,000 acres of sugarbeets in the Red River Valley of Minnesota and North Dakota. As the largest beet sugar producer in the United States, American Crystal utilizes innovative farming practices, low-cost production methods and sales and marketing leadership to produce about 15 percent of America's highest quality sugar. The Company operates sugar factories in Crookston, East Grand Forks and Moorhead, Minnesota; Drayton and Hillsboro, North Dakota; and in Sidney, Montana under the name Sidney Sugars Incorporated. American Crystal's technical services center and corporate headquarters are also located in Moorhead.

Located in Bloomington, Minnesota, United Sugars Corporation markets American Crystal's sugar to retail and industrial customers throughout the nation. Midwest Agri-Commodities Company, based in Corte Madera, California, globally markets American Crystal's agri-products such as sugarbeet pulp and molasses.

**Annual Reports**

**Economics**

**Facilities**

**Historical Timeline**

**Joint Ventures**



### The Rocky Mountain Sugar Growers Cooperative:
### "Sweet" or "Sugar-Coated" Visions of the Future?

*Gary W. Brester is a Professor in the Department of Agricultural Economics and Economics, Montana State University, Bozeman, MT, and Michael A. Boland is an Associate Professor in the Department of Agricultural Economics, Kansas State University, Manhattan, KS. The cooperation and contributions made by Rick Dorn, Kelly Brester, and members of the Rocky Mountain Sugar Growers Cooperative are greatly appreciated. This case was funded through the Agricultural Marketing Resource Center.

### Introduction

On a crisp, bright, late-September morning, Rick Dorn is harvesting sugarbeets near Hardin, Montana. Rick frowns as he punches the "End" button on his cell phone and tosses it to the side. His concern does not involve the skill needed to operate his John Deere tractor, nor the complicated feat of keeping his trailing, six-row sugarbeet harvester "in-the-row" while simultaneously coordinating "on-the-go" loading of the tandem-axle truck that is currently moving beside the harvester. After many years of performing this delicate balancing act, he enjoys the harvesting operations unique to sugarbeet production. Even his neck and shoulders are used to the demands of alternatively looking backward, sideways, and forward so that the harvester is properly operated. Furthermore, he has been pleased that the "early harvest" portion of this season has gone smoothly. Yields have been reasonable, and the current dry, cool conditions have made for an enjoyable start to this critical three-week harvest season.

His concern involves the just-completed cell phone call that has brought distressing news from a term-debt lender. In the aftermath of the September 11 terrorist attacks that have increased the riskiness of many venture-capital investment portfolios, the lender has informed him that they will not be able meet their verbal commitment to supply financing to the fledgling Rocky Mountain Sugar Growers Cooperative. The financing is critical for sugarbeet producers in the Rocky Mountain states to form a cooperative and purchase the sugarbeet processing assets of The Western Sugar Company being offered for sale by Tate & Lyle North American Sugars, Inc. After more than a year of work, negotiations, number-crunching, frustration, and soul-searching, the imminent purchase has been dismantled by a five-minute phone call.

As he motions to the truck driver indicating the truck is full, he muses about the way sugarbeets are harvested. Sugarbeet harvesters are pulled by tractors that also supply hydraulic, electrical, and mechanical power. Adjustments to each of these factors are frequently required as the harvester moves through a field. The harvester operator must also orchestrate the position of trucks as they are loaded "on-the-go." In addition, the harvester operator spends more time looking backwards at the six-row "digger" (so that horizontal and vertical hydraulic adjustments

can be made to avoid slicing beets and, thus, leaving them in the field) than looking forward. He wonders if sugarbeet producers in the Rocky Mountain region, and perhaps potential term-debt lenders, are similarly spending too much time looking backward -- and, given his recent cell phone call, if it is worth spending any additional time looking ahead.

**The U.S. Sugar Industry**

Sugar, or sucrose, is a carbohydrate that occurs naturally in every fruit and vegetable. It is the major product of photosynthesis, the process by which plants transform solar energy into food. Sugarbeets and sugarcane are two plants that photosynthesize significant quantities of sugar. Although refined sugar from each of these plants is indistinguishable, there are important and dramatic differences in the production of sugar from these two sources.

*Sugarbeet Production*

Sugarbeets are similar to red beets in shape, but have a larger white root and are inedible when harvested. Approximately 35 percent of world sugar production is produced from sugarbeets. As illustrated in Exhibit 1, sugarbeet production in the United States occurs primarily in the Upper Midwest (Minnesota and North Dakota), northern Great Plains (Colorado, Montana, Nebraska, and Wyoming), Great Lakes (Michigan and Ohio), and the Far West (California, Idaho, Oregon, and Washington). More than 25 million tons of sugarbeets are produced annually. The production cycle for sugarbeets generally begins with land preparation during late summer or early fall of the previous year. Moldboard plowing or heavy disking of land that had been planted to a non-sugarbeet crop (usually malting barley, wheat, or corn) for the previous two years usually occurs at this time. Roller harrowing, land leveling, and fertilizing are typical fall tillage practices. Many irrigated producers also ridge the soil in the fall in preparation for spring planting. Sugarbeets are generally planted in early April. The selection of seed variety and fertilizer application rates is critical in determining yields and beet quality.

Throughout the spring, several mechanical cultivation passes and as many as six chemical applications are used to control weeds. Some producers hire workers to pull weeds from fields. Additional fertilizer and chemical applications are used to provide nutrients and control insects and disease. Most sugarbeet acreage in the West is flood irrigated using either open ditches and siphon tubes or gated pipe. Some production occurs under center-pivot sprinklers. Each field is irrigated five to eight times. Irrigation is not used in the Upper Midwest region. Harvest begins either in late-September or early-October.

After harvest is completed, the land is generally disked or plowed in preparation for planting a non-sugarbeet crop the following spring. Because sugarbeet production is a labor, machinery, and input intensive process, variable production costs may exceed $500/acre. Landlords who rent land to sugarbeet producers on a crop-share basis generally receive between 20 and 25 percent of gross crop value from tenants.

*Sugarcane Production*

Sugarcane is a tropical grass native to Asia that grows in warm climates. Sugar is obtained from the stalks of the plants. Because of climatic conditions, U.S. production occurs in Florida, Louisiana, Texas, and Hawaii. Sugarcane planting occurs from late August through January. Sugarcane is harvested from October through March. Unless frost occurs, sugar yields are highest after January 1. However, some fields must be harvested before reaching maximum

sugar yields to accommodate cane milling schedules. Harvesting sugarcane requires that fields be burned to remove dead leaves that would otherwise impede harvest, interfere with milling machinery, and absorb sugar during the extraction process. In the past, most sugarcane was cut by hand using cane knives. Improvements in mechanical harvesters have resulted in a complete movement away from hand harvesting.

Machine-cut cane stalks are deposited directly into wagons by the harvester. Four-wheel drive tractors haul 16 tons of cane from fields with each four-wagon load. Using special ramps near cane fields, sugarcane is dumped from the wagons into truck trailers or rail cars for transport to mills. Rail cars carry 25 to 30 tons each and truck trailers carry 20 tons per load.

After a field has been harvested, weeds need to be controlled. A second crop of stalks, called ratoons, grow from the old plant stubble. The second crop is harvested about one year after the first harvest. Usually, about three annual crops are taken from one field before replanting. When production declines to an unacceptable level due to insect, disease, or mechanical damage, the old-growth cane plants are plowed under after harvest, and the land is prepared for replanting.

### Sugar Processing

Sugar extraction rates and sucrose contents of both cane and beets are critical determinants of processing profitability. Sugarcane and sugarbeets have similar raw material yields per acre, but sugarcane has a slightly lower extraction rate. Technology has helped increase extraction rates in recent years.

Once sugarcane and sugarbeets are harvested, the sugar content of sugarcane stalks and sugarbeet roots deteriorate. Thus, it is important to process the raw material as quickly as possible. Sugarbeets are harvested in the fall prior to the soil freezing and are stored in open piles. As long as temperatures remain below freezing and beets have been piled with relatively small amounts of residual mud, dirt, and vegetation, the sugar content of piled beets declines relatively slowly. However, unusually warm winters or early springs causes significant "pile losses." Thus, a typical processing plant operates between 180 and 240 days per year.

Sugarcane processing plants also operate seasonally. However, sugarcane is harvested "as needed" by processing plants because the temperate climates of sugarcane producing regions makes it unnecessary to inventory cane stalks. Rather, harvests are coordinated so harvested sugarcane is quickly processed and cane factories can continually operate during the harvest season.

During the refining process, sugar stored in cane stalks or beet roots is separated from the rest of the plant material. For sugarcane, this is accomplished by grinding cane stalks to extract juices, boiling extracted juice until a syrup is created and crystallized, and spinning the crystals in a centrifuge to produce brown raw sugar crystals. Raw sugar is shipped to separate refineries to be washed and filtered to produce white sugar. The "clean" material is then crystallized, dried, and packaged as granulated white sugar.

Sugarbeet processing occurs within a single processing plant. Sugarbeets are washed, sliced, and soaked in hot water to remove sugar-containing juices. The juice is purified, filtered,

concentrated, and dried in a series of steps similar to sugarcane processing. By-products created by this process include molasses and beet pulp, which is used as livestock feed. Sugar produced from sugarbeets and sugarcane is called refined sugar.

## Industry Structure

The largest sugarcane refining companies include Imperial Holly (38 percent market share), Tate & Lyle (36 percent), C&H (16 percent), and Refined Sugars (8 percent). The top four sugarbeet processing firms are Snake River Growers (24 percent market share), Tate & Lyle (23 percent), American Crystal Sugar Company (21 percent), and Imperial Holly (16 percent).

Pricing. Pricing is extremely competitive in the sugar industry. Production costs differ among regions, and sugarcane has production cost advantages over sugarbeets. U.S. domestic sugar prices have been supported above world prices through the use of import quotas and other trade policy measures. Nonetheless, sugar is difficult to differentiate. Hence, the ability to market sugar to domestic users at prices below other competitors is a huge competitive advantage.

Customers. There are two primary markets for refined sugar: industrial and non-industrial users. Industrial market segments include bakery and cereal, confectionery (candy), other food uses, dairy (primarily ice cream), beverage, and other non-food uses. This market has grown slowly over time. Non-industrial market segments include wholesalers, retailers, hotels, restaurants, and institutions. Similar to the industrial market, this market has grown slowly over time. Sugar quality is an important factor for customers in both market segments.

Suppliers. Many, but not all, sugarbeet processing firms are vertically integrated. Both producer-owned cooperatives and private firms own sugarbeet processing facilities. Private firms control most sugarcane production and processing assets. The percentage of sugar in sugarcane or sugarbeets is important for profitability, but varies from year to year depending upon weather, fertilizer applications, and choice of seed varieties.

## Principal Market Segments

Grocery Sales. Sugar is sold in granulated white, brown, and powdered forms through grocery stores in packages ranging from 1-pound boxes to 25-pound bags. Private-label packaged sugar is generally sold at prices lower than branded sugar.

Foodservice Sales (Including Sales of Non-Sugar Products). Numerous products are sold to foodservice customers and healthcare institutions. These products range from 50-pound bags of sugar to individual packets of sugar, salt, pepper, non-dairy creamer and plastic cutlery, nutritional dry mixes, sauces, seasonings, drink mixes, desserts and diet kits (packets of plastic cutlery with seasonings and other items). Foodservice is one of the most rapidly growing segments of the domestic food industry.

Industrial Sales. Refined sugar, molasses, and other ingredients are sold to industrial customers such as food manufacturers in bulk, packaged, or liquid form. Food manufacturers primarily purchase sugar for use in the preparation of confections, baked products, frozen desserts, canned goods and various other food products. Industrial sales generally provide lower margins than grocery or foodservice sales.

4

<u>Specialty Product Sales</u>.  Specialty sugar is sold to grocery, foodservice, and industrial customers.  Specialty sugar products include premium-priced, free-flowing brown sugar marketed primarily to industrial customers; liquid flavorings; edible molasses; syrups; sugar produced from organically grown sugarcane; and specialty sugars used in confections, fondants and icings.

### *Industry Trends*

Several major trends have emerged in the sugar industry including:  (1) increased demands for products obtained from corn sweeteners; (2) trade liberalization agreements with Mexico and Canada; (3) corn and sugarbeet acreage increases due to the 1996 Federal Agricultural Improvement and Reform Act; (4) consolidation of beet and cane sugar companies with corn sweetener firms; and (5) the U.S. Customs Service interpretation of rules governing "stuffed molasses" imports from Canada.

<u>Consumption</u>.  The United States Department of Agriculture estimates that the most popular high fructose corn syrup segment, (HFCS-55), grew approximately 4 to 4.5 percent annually since 1975.  Soft drink beverage companies drove much of this growth.  Thus, corn sweetener production has steadily increased over time.  By 1985, U.S. soft drink manufacturers had completely switched from sugar to HFCS.

<u>HFCS Trade with Mexico</u>.  The Mexican market offers opportunities for dramatic volume growth because of trade liberalization and the potential to substitute HFCS for sugar in beverages.  Mexico is a large producer of sugarcane, but has only a small HFCS industry.  Under NAFTA, Mexico's import tariff on United States HFCS fell to 9 percent in 1997, and was scheduled to decrease by 1.5 percent each year thereafter until 2003, at which time the tariff would be eliminated.  This represents a potentially huge growth opportunity for HFCS producers -- especially if real consumer incomes increase in Mexico.  Exports of HFCS from the United States increased after the signing of NAFTA.  It was expected that HFCS would displace some sugar consumption in Mexico.

<u>U.S. Farm Policy</u>.  Production of corn and sugarbeets increased in the 1990s as legislation provided farmers with increased planting flexibility.  Corn production replaced wheat production in some parts of the Upper Midwest.  With the elimination of marketing allotments, sugarbeet production increased as producers substituted away from lesser-valued crops.  Sugarcane acreage also expanded for similar reasons and yields increased due to varietal improvements.

<u>Consolidation</u>.  Since the 1980s, consolidation has occurred among sugarcane and sugarbeet processing companies.  The rationale for consolidation was that production and price risk caused by regional weather patterns could be better managed if a company owned both sugarbeet and sugarcane processing assets.  For example, Imperial Sugar, a sugarcane company based in Texas, acquired the Holly Sugar Corporation, a sugarbeet processor with factories in California, Texas, Wyoming, and Montana.  It then acquired Savannah Foods and Spreckels in 1998.  British-based Tate & Lyle owned sugarbeet factories in the EU and other parts of the world.  It also owned A.E. Staley, which was one of the largest HFCS companies in the United States.  Tate & Lyle acquired Domino Sugar Company, a sugarcane processor that refines U.S. sugarcane and imported raw sugar, and Western Sugar, a sugarbeet company with factories in Nebraska, Wyoming, Montana, and Colorado.

5

Stuffed Molasses. Over the past several years, a loophole in U.S. Customs rules enabled U.S. firms to import molasses syrup from Canada that had been "stuffed" with Brazilian sugar. The imported syrup was approximately 95 percent sugar and five percent molasses. U.S. firms extracted sugar from the molasses and then shipped the syrup back to Canada to be "restuffed" with additional sugar. This process accounted for about 125,000 metric tons of sugar imports annually. The loophole occurred because molasses was not classified as sugar by U.S. Customs. Although the intent of U.S. sugar policy regarding imports was being violated, the practice has only recently been stopped.

Molasses Desugarization. Because sugarbeet molasses is a low-value by-product, the extraction of additional sugar from molasses provides an opportunity to improve competitiveness. Remaining molasses and by-products obtained from molasses desugarization are marketed primarily to yeast manufacturers and feedlot operators.

**The Western Sugar Company**
The Western Sugar Company was formed in 1985 by Tate & Lyle, PLC, and is a wholly-owned subsidiary of Tate & Lyle. The Western Sugar Company is one of the largest sugar refining and processing companies in the United States. Western's annual sugar production is approximately 1 billion pounds, all of which is produced from sugarbeets. Sugar and sugar processing by-products are produced in Western's six factories located in Montana (Billings), Wyoming (Lovell), Colorado (Greeley and Fort Morgan), and Nebraska (Scottsbluff and Bayard). The Scottsbluff plant includes a desugarization unit.

Each plant was constructed between 1906 and 1917. In general, each factory contains pulp dryers and uses both coal and gas boilers. In addition, each has both silo and flat storage capacities and is located on functioning rail lines. Daily sugarbeet slicing capacity varies somewhat among the factories (Bayard, 2,900 tons; Lovell, 3,050 tons; Greeley, 4,000 tons; Billings, 4,600 tons; Scottsbluff, 4,700 tons; Fort Morgan, 5,800 tons). The company owns storage facilities in Colorado at Longmont, Sterling, and Rocky Ford, and in Nebraska at Mitchell and Gering. These facilities provide Western with 1.9 million hundredweight of silo storage in addition to that which exists at each factory.

Western's total slicing capacity is over 25,000 tons of sugarbeets per day with a total annual slicing capacity of more than 3.4 million tons. Western employs approximately 600 workers year-round and another 1,100 during the processing campaign. During the 2000-2001 season, Western contracted for delivery of approximately 186,000 acres of sugarbeets.
Western sells sugar primarily in the Rocky Mountain and Midwest regions of the United States. Approximately 26 percent of Western's sugar production is sold to wholesalers, distributors, or retailers. The remaining 74 percent is sold to industrial users (i.e, major food manufacturers). Refined sugar is sold in several forms: (1) consumer products such as powdered, brown, and granulated sugar, (2) food service products (primarily single-serve packets), (3) industrial packages (e.g., 50 and 100 pound bags of granulated, baker's special, and powdered sugar), and (4) bulk sugar (railcar, bulk truck, and tote bags). Western also produces by-products of sugar processing including beet pulp, beet pulp pellets, beet molasses, and molasses desugarization solubles -- all of which are used for livestock feed. These feed inputs are generally sold to local livestock and dairy operators in areas surrounding each factory.

Sugarbeet producers receive payment for sugarbeets based on both quantity and quality of beets produced. Samples are taken from every other truckload delivered by each grower on each parcel of contracted land as beets are piled at receiving stations. These samples are used to determine the quantity of "clean" weight beets being piled and the average sugar content of those beets. Growers generally receive four payments for sugarbeets throughout the year. In general, the first installment of approximately 70 percent of the expected total payment is received in November. Normally, another three installments are received throughout the subsequent 10-month period. The total amount received for each sugarbeet crop is not known until just before the harvesting of the next crop. Total payments are determined by total sugar revenues received by Western Sugar net of marketing costs. Growers also share in "pile losses," and each grower's total payment per ton is adjusted for quality. In general, a 1 percentage point increase in sugar content is worth approximately $3.00/ton. Unaudited financial statements are presented in Exhibits 2 and 3. Exhibit 4 presents detailed production information for the Western Sugar Company.

**The Rocky Mountain Sugar Growers Cooperative**
The Rocky Mountain Sugar Growers Cooperative is a cooperative corporation formed in June 2000 for the purpose of acquiring the Western Sugar Company. Cooperatives are business organizations whose members/owners are also users of the cooperative's business or services. Cooperatives may be able to avoid corporate income tax liabilities if profits are appropriately distributed to members. In recent years, cooperatives have often organized as "new generation" cooperatives. That is, once established, these cooperatives are closed to membership by others. Essentially, new members must purchase stock from existing members if they want to participate in the cooperative. New generation cooperatives have formed to reward investors who incur the greatest risk (generally, initial investors). This is an important factor for generating equity capital.

The owners of new generation cooperatives are voting members who control the cooperative, provide equity capital, and are patrons who receive the benefits of the cooperative including: (1) a market or buyer for their products, and (2) a share of the profits based on use or patronage. In the case of the Rocky Mountain Sugar Growers Cooperative, profits or net income would likely be distributed in the form of patronage refunds per ton of delivered sugarbeets.

The Rocky Mountain Sugar Growers Cooperative has negotiated with Tate & Lyle North America Sugars, Inc. to purchase their six sugarbeet factories and associated storage facilities. The Cooperative has agreed to purchase Western for $78 million contingent upon the acquisition of debt financing. The final amount could increase by as much as $25 million if the average bulk Midwest sugar price exceeds 21.75 cents/lb during the next three years. The Cooperative expects to raise approximately $34.335 million through equity investments by its members and approximately $50 million in term loan funds. In addition, it needs to secure an operating line of credit of between $50 million and $80 million. The Cooperative's financial projections are based upon the generation of annual gross profits of $16 million. Nonetheless, if has been difficult to attract term-debt financing at competitive rates because of the risk involved in the investment.

The Rocky Mountain Sugar Growers Cooperative is offering Common Stock and Patron Preferred Stock to sugarbeet farm operators. A prospective member may purchase Patron

Preferred Stock for $185/acre, which represents one share. In addition, each prospective member must purchase one share of Common Stock for $100, which represents a membership fee. Ownership of Common Stock entitles a member to one vote for the purposes of managing the cooperative. The Cooperative is authorized to offer 2,000 shares of Common Stock, each with a par value of $1, and 300,000 shares of Patron Preferred Stock, each with a par value of $100 per share. Stock can only be sold to those actually engaged in the production of agricultural products or to other cooperative associations. Landlords who lease land to tenants on a crop share basis are considered to be engaged in the production of agricultural products. Holders of Patron Preferred Stock are entitled and obligated to deliver the sugarbeets produced on one acre of land per share. If a holder of Patron Preferred Stock is unable to deliver sugarbeets from the subscribed acreage, that owner must arrange for another member to do so.

Rick Dorn is listed as the incorporator of the Cooperative and is the current Chairman of the Board. Nine other producers, with at least two directors of producer marketing associations from each of four states, constitute the rest of the Board of Directors. It is anticipated that the Board would retain Western Sugar's existing management personnel.

### *Sugarbeet Producer Concerns*

As Rick continues his harvesting operations, other producers are beginning preparations for October 2, which is the start of the "general" harvest season. Near Laurel, Montana, a sugarbeet producer is pulling his harvesting equipment out of a machine shed and performing scheduled maintenance. Kelly Brester is a typical sugarbeet producer in that he, along with his father, produces approximately 250 acres of sugarbeets per year. He is also one of 13 directors of the Mountain States Beet Growers Association of Montana, which is the bargaining association for sugarbeet producers living in an 80 mile radius of the Billings, Montana Western Sugar factory. Historically, the Association has represented growers in contract negotiations with Western Sugar and its predecessors.

Kelly is 47 and has been farming and producing sugarbeets since he was 18. Like many young farmers, Kelly started by working with his father and renting land on a crop share basis. He continues to rent land, but he has also been able to buy one farm and is currently making mortgage payments on a second farm. The replacement value of his investments in specialized sugarbeet equipment is approximately $150,000, although book and salvage values of these investments are quite low. He produces approximately 400 acres of malting barley as a rotation crop. His malting barley acreage is contracted annually with Busch Agricultural Resources, Inc. All of his land is flood irrigated either through the use of siphon tubes or gated pipe. In addition to family labor, he hires two or three men to drive trucks during the malting barley and sugarbeet harvest seasons.

At various times throughout Kelly's farming career, the future of sugarbeet production has been uncertain. For example, in 1984, the Mountain States Beet Growers Association was unable to secure a contract with the pre-Tate & Lyle owners of Western Sugar. That was the only year in the past 28 in which Kelly has not raised sugarbeets (and the only year in the past 60 that his father had not raised beets). Recently, this uncertainty has increased. Over the past two years, it has been apparent that Tate & Lyle has wanted to exit the industry. The opportunity for producers to buy their processing assets has surfaced during the past year.

8

Kelly has spent several months evaluating his options. Quantitative evaluations of cropping alternatives paint a relatively bleak picture. A decision based solely on a quantitative assessment hinges critically on selected discount rates and net income projections of the cooperative. If the combination of future sugarbeet prices and patronage refunds results in total sugarbeet prices similar to 1996-2000 average prices, then his investment will be worthwhile. Nonetheless, an investment in the cooperative adds risk to an already risky business. Based upon his quantitative assessments and a large dose of "hunch", Kelly decided to buy shares in the fledgling cooperative. However, not a day goes by that he doesn't worry about the investment. Nonetheless, he recognizes the importance of sugarbeet production on his ability to meet mortgage payments and generate enough net farm income to support his family. He does not see many options available to him at this time. Nonetheless, most agricultural producers are heavily invested in fixed costs. Owning shares in a seasonal processing plant increases those fixed costs and business risk.

As Kelly begins replacing a roller chain sprocket, he contemplates his farming alternatives in the event that sugarbeets are not grown next year. Although sugarbeets have been raised in southcentral Montana since World War I, crop production alternatives are generally limited in this area. Malting barley can be a good cash crop if it is contracted with a malting company. However, it appears that such companies are not interested in large expansions of contracted malt barley acreage. Alfalfa hay is an alternative crop that could be profitable in some years. However, large investments in equipment would be required. In addition, alfalfa hay is best grown under sprinkler irrigation rather than flood irrigation. Dry edible beans, corn for grain, and corn for silage are crops that can be grown, but often lack local markets. This is especially true for high-bulk forage crops. Prices for feed barley have been low for many years because of relatively large corn harvests in the Midwest. Irrigated wheat generally has low protein content, which often receives significant discounts. To date, soybeans have not been a viable crop alternative in Montana because of relatively short growing seasons.

In addition, if sugarbeets are not a production alternative, farm consolidation will likely occur. That is, alternative crops have smaller per acre margins than sugarbeets. Farm operations will have to get larger to generate sufficient net farm income to remain viable business entities. Therefore, some producers will exit farming and others will likely get larger. Kelly is uncertain if he wants to expand his production operation. Flood irrigation is highly labor intensive and, therefore, expansion of his farming operation would require additional labor resources. Given smaller margins associated with viable alternative crops in the area, he is uncertain if he wants to accept the added risks that go along with additional labor.

Perhaps the largest impact, however, is the effect of the loss of sugarbeet production on land values. It has been estimated that the loss of sugarbeet production could reduce irrigated agricultural land values in Montana sugarbeet producing counties by between 20 and 35 percent (Taylor). For landowners, the loss results in a paper loss of equity and, perhaps, reductions in borrowing capacity. However, for those who currently have land and machinery mortgages, the loss of sugarbeet production significantly reduces repayment capacities. In fact, many producers would be unable to continue making scheduled mortgage payments.

As Kelly finishes replacing a roller chain, he wonders if this is the last time that he will be performing such tasks given the uncertainty of sugarbeet production in Montana.

*Future Directions*

As an empty truck pulls even with Rick Dorn's moving John Deere tractor -- and the first of 15 tons of beets begin to thump into the truck -- Rick contemplates the Cooperative's options. Before any action can be taken, Rick knows that he must have a formal, written plan that can be used to interest alternative financing sources. The plan must:

1. Indicate whether the sugar industry is an attractive one to enter.
2. Discuss the importance of U.S. sugar policy.
3. Provide a list of advantages and disadvantages of investing in a cooperative.
4. Discuss the financial projections of the Cooperative.
5. Evaluate the long term feasibility of two sugar beet processing companies (Western Sugar and Imperial Holly) co-existing in the same geographic region.

The loud clattering of a "slip clutch" jolts Rick out of his melancholy and causes him to simultaneously motion to the truck driver, shift his tractor into neutral, and disengage the power to the harvester. He shuts off the tractor engine, climbs out of the tractor cab, jumps to the ground, and walks back to look for the rock that has likely been trapped in the digger causing the loud noise and halting its smooth operation. He wonders if the noise caused by his recent cell phone call has similarly halted the purchase of the Western Sugar Company and sugarbeet production in southcentral Montana.

**Comments from the Chairman of the Board**

Following the case presentation, the Chairman of the Board of the Rocky Mountain Sugar Growers Cooperative, Rick Dorn, spoke to one group of students in-person, and simultaneously to another group via an interactive video connection. Mr. Dorn responded to student comments, answered questions, and updated the group regarding some of the issues posed in the case.

Rick noted that sugar is an important food ingredient in that it serves as a sweetener, preservative, and bonding agent. More than 40 sugars and syrups are produced by the U.S. sugar industry, and quality is important to food processors. Nonetheless, selling bulk, un-branded sugar within the domestic market is a "street fight" with respect to price. Buyers are very sophisticated, and service is a critical factor for maintaining market share. Sugar processing by-products are important to processor success. Additional efforts have been made in recent years to add value to by-products and to extract additional sugar from molasses (desugarization) that is produced during the refining process.

Rick acknowledged that the purchase of sugar processing assets is risky. Most factories are quite old, and the business environment is very competitive and dependent upon federal legislation. Nonetheless, the loss of sugarbeet production could reduce regional land values by as much as 30 percent. In addition, growers have invested in developing a brand name for sugar produced by Western. In fact, growers already own 60 percent of Western's sugar packaging equipment and a large share of their sugar storage facilities. Although 60 to 70 percent of Western's sugar is sold in bulk form, Western can store a higher percentage of their sugar than other companies. Hence, they have a competitive advantage in responding to year-round sugar demands.

10

Through contractual arrangements, growers have historically shared in the costs of packaging, marketing, and selling sugar. Western's current labor and management human resource assets will continue to be employed by the Rocky Mountain Sugar Growers Cooperative. Irrigation offers an important competitive advantage to the region's growers. However, this is somewhat offset by lower operating costs of non-irrigated producers in the Upper Midwest region.

Finally, one might question the timing of the Western Sugar Company purchase. As Rick noted, "This is a perfect time in terms of purchasing these assets at the lowest possible price. Waiting until things are going great is a sure method of paying top dollar. In addition, opportunities do not always surface at perfect times." In fact, sugar prices have recently started to rise, and prospects for favorable sugar provisions in the new farm bill appear strong. Current negotiations are being held in which seller financing by Tate & Lyle is being pursued. Nonetheless, Rick noted that the presence of two sugar processing companies within the same region is not likely to be sustainable because that neither company will likely be able to contract enough acreage from regional growers to efficiently run all factories.

As a conclusion to the discussion, Rick asked for a show of hands of those who thought that producers should not purchase Western Sugar because of the riskiness of the venture. Approximately one-half of the students raised their hands. Rick smiled and noted that a similar percentage of producers would probably agree with the students.[1]

[1.] On April 30, 2002, the Rocky Mountain Sugar Growers Cooperative (whose name has since been changed to The Western Sugar Cooperative) acquired Tate & Lyle North America Sugars' Western Sugar Company division for a total amount of $185.5 million. The plant, property, and equipment component of the purchase totaled $57 million. Sugarbeet producers committed equity investments representing approximately 125,000 acres. The remaining portion of the sale was seller-financed over 8 years (with a balloon payment in year 6) at a 10 percent annual interest rate. Details of the acquisition are presented in a teaching note.

**For more information**

Benirschka, M., W.W. Koo, and J. Lou. *World Sugar Policy Simulation Model: Description and Computer Program Documentation.* Dept. Agr. Econ. Report No. 356, North Dakota State University, 1996.

Borrell, B., and R.C. Duncan. "A Survey of the Costs of World Sugar Policies." *The World Bank Research Observer* 7(1992):171-187.

Leu, G.-J.M., A. Schmitz, and R.D. Knutson. "Gains and Losses of Sugar Program Policy Options." *Amer. J. Agr. Econ.* 69(August 1987):591-602.

Lopez, R.A. "Political Economy of U.S. Sugar Policies." *Amer. J. Agr. Econ.* 71(February 1989):20-31.

Schmitz, A., R. Allen, and G.-J.M. Leu. "The U.S. Sugar Program and Its Effects." *Alternative Agricultural and Food Policies and the 1984 Farm Bill.* G. Rausser and K. Farrell, eds., Blaco Printers. 1984:237-259.

Taylor, M. "The Effects of Sugarbeet Production on Montana Land Values." M.S. Thesis. Dept. Agr. Econ. and Econ. Unpublished, Montana State University, 2001.

United States General Accounting Office. Supporting Sugar Prices Has Increased Users' Costs While Benefitting Producers. *Report to Congressional Requesters*, GAO/RCED-00-126. 2000.

Uri, N., and R. Boyd. "Assessing the Impact of the Sugar Programme on the U.S. Economy." *Food Policy*, 19,5(1994):443-457.

Exhibit 1. Sugarbeet and Sugarcane Harvested Acres Per Region (1,000 acres), 1985-2001.

| Year | Great Lakes[a] | Upper Midwest[b] | Great Plains[c] | Far West[d] | Total Sugarbeet | Total Sugarcane |
|---|---|---|---|---|---|---|
| 1985 | 131 | 420 | 185 | 367 | 1,103 | 830 |
| 1986 | 125 | 475 | 231 | 361 | 1,191 | 835 |
| 1987 | 158 | 471 | 231 | 392 | 1,252 | 840 |
| 1988 | 160 | 510 | 239 | 392 | 1,300 | 855 |
| 1989 | 162 | 521 | 249 | 361 | 1,293 | 870 |
| 1990 | 176 | 557 | 271 | 371 | 1,375 | 850 |
| 1991 | 185 | 557 | 272 | 372 | 1,385 | 873 |
| 1992 | 196 | 565 | 282 | 367 | 1,410 | 893 |
| 1993 | 205 | 570 | 277 | 355 | 1,407 | 914 |
| 1994 | 203 | 613 | 257 | 358 | 1,431 | 904 |
| 1995 | 203 | 624 | 250 | 329 | 1,420 | 882 |
| 1996 | 135 | 663 | 230 | 295 | 1,323 | 875 |
| 1997 | 161 | 674 | 263 | 331 | 1,428 | 830 |
| 1998 | 174 | 701 | 220 | 357 | 1,452 | 860 |
| 1999 | 192 | 717 | 254 | 365 | 1,527 | 888 |
| 2000 | 167 | 662 | 220 | 330 | 1,378 | 941 |
| 2001 | 174 | 711 | 188 | 258 | 1,331 | 970 |

[a]Michigan and Ohio
[b]Minnesota and North Dakota
[c]Montana, Nebraska, and Wyoming
[d]California, Idaho, Oregon, and Washington
Source: U.S. Department of Agriculture Sugar and Sweetener Outlook

13

Exhibit 2.  Western Sugar Company Balance Sheets, Crop Years Ending September 30
(in thousand dollars).

| Item | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Current Assets** | | | | | |
| Cash | n.a. | n.a. | n.a. | n.a. | n.a. |
| Accounts Receivable | 21,861 | 66,499 | 34,107 | 37,413 | 29,002 |
| Inventories | 57,842 | 29,358 | 37,503 | 59,936 | 26,094 |
| Prepaid Expenses | 12,096 | 25,166 | 25,049 | 24,130 | 26,290 |
| *Total Current Assets* | 91,799 | 121,023 | 96,659 | 121,479 | 81,386 |
| | | | | | |
| **Long Term Assets** | | | | | |
| Property & Equipment | 139,895 | 165,281 | 167,981 | 162,133 | 147,731 |
| *Total Assets* | 231,694 | 286,304 | 264,640 | 283,612 | 229,117 |
| | | | | | |
| **LIABILITIES** | | | | | |
| **Current Liabilities** | | | | | |
| Notes Payable | 53,891 | 75,261 | 73,067 | 85,665 | 57,786 |
| Accounts Payable | 60,104 | 40,322 | 36,558 | 38,934 | 26,652 |
| Income Taxes Payable | 13 | 10,583 | (3,948) | 500 | n.a. |
| *Total Current Liabilities* | 114,008 | 126,166 | 105,677 | 125,099 | 84,438 |
| | | | | | |
| **Non-Current Liabilities** | | | | | |
| Deferred Income Taxes | 18,996 | 27,762 | 30,900 | 27,785 | 28,716 |
| Other | 0 | 3,597 | 4,008 | 4,183 | 0 |
| *Total Non-Current Liabilities* | 18,996 | 31,359 | 34,908 | 31,968 | 28,716 |
| | | | | | |
| **TOTAL EQUITY** | 98,960 | 128,779 | 124,056 | 126,544 | 115,963 |

14

Exhibit 3.  Western Sugar Company Income Statements, Crop Years Ending September 30
(in thousand dollars).

| Item | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|
| Sales Revenue: Sugar and By Products | 232,706 | 268,532 | 223,431 | 209,705 | 261,933 |
| Sugarbeet Costs (est.) | 112,500 | 143,000 | 140,000 | 121,000 | 150,000 |
| Other Production Costs | 95,788 | 73,561 | 60,760 | 71,393 | 100,694 |
| Cost of Goods Sold | 208,288 | 216,561 | 200,760 | 192,393 | 250,694 |
| Gross Profit | 24,418 | 51,971 | 22,671 | 17,312 | 11,239 |
| Administrative/General Exp | 8,648 | 6,218 | 7,171 | 6,461 | 5,702 |
| Pretax Income Before Interest | 15,770 | 45,753 | 15,500 | 10,851 | 5,537 |
| Interest Expense | 4,389 | 5,993 | 6,859 | 6,985 | 9,169 |
| Pretax Income -- Operations | 11,381 | 39,760 | 8,641 | 3,866 | (3,632) |
| Income Tax Expense | 3,870 | 13,518 | 2,938 | 1,314 | (1,235) |
| Net Income | 7,511 | 26,242 | 5,703 | 2,552 | (2,397) |

Exhibit 4.  Summary of Sugarbeet Supply, Production, and Sales for the Western Sugar Company (in thousands except where noted), Crop Years Ending September 30.

| Item | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|
| Calendar Year Planted and Harvested | 1995 | 1996 | 1997 | 1998 | 1999 |
| Acres Harvested | 152.8 | 149.3 | 171.1 | 153.4 | 174.0 |
| Sugarbeets: | | | | | |
| Tons Purchased Per Acre | 18.5 | 20.0 | 20.2 | 21.3 | 21.4 |
| Total Tons Purchased | 2,821 | 2,980 | 3,455 | 3,275 | 3,716 |
| Total Tons Sliced | 2,666 | 2,816 | 3,265 | 3,095 | 3,512 |
| Shrinkage | 5.49% | 5.49% | 5.49% | 5.49% | 5.49% |
| Sugar Percentages: | | | | | |
| Sugar Content of Beets | 16.00% | 16.90% | 15.70% | 15.20% | 15.80% |
| Sugar Extraction Rate | 80.10% | 81.50% | 77.90% | 78.80% | 79.90% |
| Pounds of Sugar Extracted Per Ton of Sugarbeets | 256 | 275 | 245 | 240 | 252 |
| Hundredweights of Sugar Extracted Per Acre | 50.1 | 50.6 | 44.8 | 47.5 | 51.0 |
| Production for Crop Year: | | | | | |
| Sugar Hundredweights | 7,663 | 7,794 | 7,667 | 7,233 | 8,875 |
| Beet Pulp Tons (est.) | 140 | 142 | 140 | 132 | 162 |
| Molasses Tons (est.) | 53 | 54 | 53 | 50 | 61 |
| Net Beet Payment to Growers: | | | | | |
| Total (million dollars, est.) | 112,500 | 143,000 | 140,000 | 121,000 | 150,000 |
| Average Per Acre (dollars) | 738 | 962 | 818 | 786 | 865 |
| Average Per Ton (dollars) | 39.90 | 48.10 | 40.50 | 36.90 | 40.40 |

# EXHIBIT 11



► **Frequently Asked Questions**

► **Tips & Tools**

► **Explore Our Seven Varieties of Sugar**

► **What's New**

► **Family Fun**

► **Contact Us**

# Contact Us



**FIND A RECIPE**

All Categories 

KEYWORD:

Any Word  GO

► Register to Receive New Recipes

► Submit a Recipe

At C&H Sugar, we grow as a company by understanding and serving your needs.

Please share your ideas and suggestions with us! Although your questions can sometimes involve a few days of research, we promise to respond the moment we have an answer for you.

Give Us Your Opinion
Tell us how the recipes on our site are working for you. And don't hesitate to let us know how we can improve our products to make your baking experience the best ever.

Rate Our Web Site
Help us make our site better and easier to use. Let us know how satisfied you are with the information you found, and what you'd like to see in the future.

Other Concerns or Problems
If you have ideas, suggestions, or questions not covered elsewhere, please share them with us.

Consumer Affairs Contact: Connie Hunter

Write to Us at:
C&H Sugar Company, Inc.
Consumer Affairs
830 Loring Avenue
Crockett, CA 94525

For Media Professionals Only
Please use the contact information below for media inquiries only. For all other questions or concerns, please use the email addresses provided above.

Media Contact: Adam Matza
Office phone: (415) 956-1791 x221
Cell phone: (954) 554-8898

Register to Receive New Recipes

Unsubscribe to Our Recipe E-Mail

**Our History**
On March 10, 1906, the California and Hawaiian Sugar Refining Company began refining pure cane sugar in the small town of Crockett, California, near San Francisco. As cargo ships offloaded raw cane sugar from the Hawaiian Islands, the refinery employed 490 people and produced 67,000 tons of refined cane sugar.

Today C&H produces cane sugar and molasses for a vast U.S. market. The Crockett refinery processes over 700 thousand tons of cane sugar annually — more than 70 types, grades and package sizes, including packaged consumer sugars as well as packaged, liquid and bulk granulated industrial-use cane sugars.

As C&H approaches its 100th anniversary, we proudly look back on our rich heritage and many years of successful production of superior sugar products.

C&H is confident we will continue to set the sugar standard for many years to come.

Baker's Sugar Site | Industrial & Foodservice Site
Home | FAQs | Tips & Tools | 7 Varieties of Sugar | What's New | Family Fun
Job Opportunities | Contact Us | Legal Notices | Privacy Policy

C&H Pure Cane Sugar - Contact Us

Help Desk Software by HelpSTAR.com
©2005 C&H Sugar Company, Inc. All Rights Reserved

# washingtonpost.com

PRINT EDITION | Subscribe to
The Washington Post

NEWS   OPINION   SPORTS   ARTS & LIVING   Discussions   Photos & Video   Entertainment Guide   CLASSIFIEDS   JOBS   CARS   REAL ESTATE

SEARCH:  ● News  ○ Web                    go   powered by YAHOO! SEARCH

▼ advertising ▼

## 3.50  America's Highest Savi
Just Got Higher!

## BUSINESS

**NEWS**
Politics
Nation
World
Metro
Style
▶ **Business**
U.S. Economy
Business Policy
Industries
World Business
Workplace
Metro Business
Market News
Personal Finance
Portfolio
Special Reports
Wires
Technology
Health
Education
Real Estate

Portfolio · Quotes and News · Funds · Charts · M
Currencies · Company Look Up · Business News ·

**SEC Filings: ALEXANDER & BALDWIN
(ALEX)**

Quick Quotes:          [Get Quotes]

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

FORM 10-K

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
    THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2004

or

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF
    THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission file number 0-565

ALEXANDER & BALDWIN, INC.
(Exact name of registrant as specified in its charter)

Hawaii                                    99-0032630
(State or other jurisdiction of           (I.R.S. Employer
incorporation or organization)            Identification No.)

822 Bishop Street
Post Office Box 3440, Honolulu, Hawaii 96801
(Address of principal executive offices and zip code)

808-525-6611
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:
None

Securities registered pursuant to Section 12(g) of the Act:
Common Stock, without par value
(Title of Class)

Number of shares of Common Stock outstanding at February 7, 2005:
43,470,917

Aggregate market value of Common Stock held by non-affiliates at June 30, 2004:
$1,356,651,553

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months (or for such shorter period that the registrant was
required to file such reports), and (2) has been subject to such filing
requirements for the past 90 days. Yes |X|  No _____

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulation S-K is not contained herein, and will not be contained, to the
best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. [ ]

Indicate by check mark whether the registrant is an accelerated filer (as
defined in Exchange Act Rule 12b-2).  Yes |X|  No _____

Documents Incorporated By Reference
Portions of Registrant's Proxy Statement dated March 7, 2005 (Part III of
Form 10-K)

---

TABLE OF CONTENTS

PART I

|                                                                          | Page |
| ------------------------------------------------------------------------ | ---- |
| Items 1 & 2. Business and Properties...................................... | 1    |
| A. Transportation......................................................... | 1    |
| (1)     Freight Services.................................................. | 1    |
| (2)     Vessels........................................................... | 1    |
| (3)     Terminals......................................................... | 2    |
| (4)     Logistics and Other Services...................................... | 3    |
| (5)     Competition....................................................... | 3    |
| (6)     Labor Relations................................................... | 3    |
| (7)     Rate Regulation................................................... | 5    |
|                                                                          | 5    |
| B. Real Estate............................................................ | 6    |
| (1)     General........................................................... | 6    |
| (2)     Planning and Zoning............................................... | 6    |
| (3)     Residential Projects.............................................. | 7    |
| (4)     Commercial Properties............................................. | 8    |
| C. Food Products.......................................................... | 11   |
| (1)     Production........................................................ | 11   |
| (2)     Marketing of Sugar and Coffee..................................... | 12   |
| (3)     Competition and Sugar Legislation................................. | 13   |
| (4)     Properties and Water.............................................. | 14   |
| D. Employees and Labor Relations.......................................... | 14   |
| E. Energy................................................................. | 15   |
| F. Available Information.................................................. | 16   |
| Item 3.     Legal Proceedings............................................. | 16   |
| Item 4.     Submission of Matters to a Vote of Security Holders........... | 17   |

washingtonpost.com:

Executive Officers of the Registrant.................................................17

PART II

Item 5.  Market for Registrant's Common Equity, Related Stockholder Matters and
         Issuer Purchases of Equity Securities.............................18

Item 6.  Selected Financial Data.............................................20

Item 7.  Management's Discussion and Analysis of Financial Condition and
         Results of Operations...............................................22

Item 7A. Quantitative and Qualitative Disclosures About Market Risk..........43

Item 8.  Financial Statements and Supplementary Data........................45

Item 9.  Changes in and Disagreements With Accountants on Accounting and
         Financial Disclosure................................................85

Item 9A. Controls and Procedures...........................................85

         A.    Disclosure Controls and Procedures..........................85

         B.    Internal Control over Financial Reporting..................85

Item 9B. Other Information..................................................85

PART III

Item 10. Directors and Executive Officers of the Registrant.................86

         A.    Directors..................................................86

         B.    Executive Officers.........................................86

         C.    Audit Committee Financial Experts..........................87

         D.    Code of Ethics.............................................87

Item 11. Executive Compensation............................................87

Item 12. Security Ownership of Certain Beneficial Owners and Management and
         Related Stockholder Matters.......................................87

Item 13. Certain Relationships and Related Transactions....................87

Item 14. Principal Accountant Fees and Services............................88

PART IV

Item 15. Exhibits, Financial Statement Schedules...........................89

         A.    Financial Statements.......................................89

         B.    Financial Statement Schedules..............................89

         C.    Exhibits Required by Item 601 of Regulation S-K............89

Signatures.................................................................97

Consent of Independent Registered Public Accounting Firm...................99

ALEXANDER & BALDWIN, INC.

FORM 10-K

Annual Report for the Fiscal Year
Ended December 31, 2004

PART I

ITEMS 1 & 2.   BUSINESS AND PROPERTIES

Alexander & Baldwin, Inc. ("A&B") is a diversified corporation with most of its operations centered in Hawaii. It was founded in 1870 and incorporated in 1900. Ocean transportation operations, related shoreside operations in Hawaii, and intermodal, truck brokerage and logistics services are conducted by a wholly-owned subsidiary, Matson Navigation Company, Inc. ("Matson") and two Matson subsidiaries. Property development and food products operations are conducted by A&B and certain other subsidiaries of A&B.

The business industries of A&B are as follows:

A.    Transportation - carrying freight, primarily between various ports on the U.S. Pacific Coast and major Hawaii ports and Guam; chartering vessels to third parties; arranging intermodal and motor carrier services and providing logistics services in North America; and providing terminal, stevedoring and container equipment maintenance services in Hawaii.

B.    Real Estate - purchasing, developing, selling, managing, leasing and investing in commercial (including retail, office and industrial) and residential properties, in Hawaii and on the U.S. mainland.

C.    Food Products - growing sugar cane and coffee in Hawaii; producing bulk raw sugar, specialty food-grade sugars, molasses and green coffee; marketing and distributing roasted coffee and green coffee; providing sugar, petroleum and molasses hauling, general trucking services, mobile equipment maintenance and repair services, and self-service storage in Hawaii; and generating and selling electricity.

For information about the revenue, operating profits and identifiable assets of A&B's industry segments for the three years ended December 31, 2004, see Note 14 ("Industry Segments") to A&B's financial statements in Item 8 of Part II below.

DESCRIPTION OF BUSINESS AND PROPERTIES

A.    Transportation

(1)    Freight Services

Matson's Hawaii Service offers containership freight services between the ports of Long Beach, Oakland, Seattle, and the major ports in Hawaii on the islands of Oahu, Kauai, Maui and Hawaii. Roll-on/roll-off service is provided between California and the major ports in Hawaii.

Matson is the principal carrier of ocean cargo between the U.S. Pacific Coast and Hawaii. In 2004, Matson carried approximately 169,600 containers

(compared with 162,400 in 2003) and 157,000 automobiles (compared with 145,200 in 2003) between those destinations. Principal westbound cargoes carried by Matson to Hawaii include dry containers of mixed commodities, refrigerated commodities, building materials, automobiles and packaged foods. Principal eastbound cargoes carried by Matson from Hawaii include automobiles, household goods, refrigerated containers of fresh pineapple, canned pineapple and dry containers of mixed commodities. The preponderance of Matson's Hawaii Service revenue is derived from the westbound carriage of containerized freight and automobiles.

Matson's Guam Service provides containership freight services between the U.S. Pacific Coast and Guam and Micronesia. Matson's Guam Service is a component of the Pacific Alliance Service, a strategic alliance established by Matson and American President Lines, Ltd. ("APL") to provide freight services between the U.S. Pacific Coast and Hawaii, Guam and several Far East ports. In 2004, Matson carried approximately 17,200 containers (compared with 17,800 in 2003) and 4,580 automobiles (compared with 4,660 in 2003) in the Guam Service. The alliance currently utilizes three Matson vessels and two APL vessels. Matson's agreement with APL is scheduled to expire in February 2006. For additional information about the APL alliance, see "Charter Agreements Related to Guam Service" in Item 7 of Part II below.

In February 2005, Matson announced that it will replace its existing Guam Service at the termination of the APL alliance with an integrated Hawaii/Guam/China service beginning in February 2006. The service will employ three existing Matson containerships along with two new containerships to be purchased from Kvaerner Philadelphia Shipyard, Inc. ("Kvaerner") in a five-ship string that carries cargo from the U.S. West Coast to Honolulu, then to Guam, and eventually to China. In China, the vessels will be loaded with cargo destined for the U.S. West Coast. The Guam service strategy involves re-deploying into the Hawaii service three C-9 class vessels that currently serve Guam at the termination of the APL alliance.

Matson's Mid-Pacific Service offers container and conventional freight services between the U.S. Pacific Coast and the ports of Kwajalein, Ebeye and Majuro in the Republic of the Marshall Islands and Johnston Island, all via Honolulu.

See "Rate Regulation" below for a discussion of Matson's freight rates.

(2)     Vessels

Matson's fleet consists of 11 containerships, three combination container/trailerships, including a combination ship time-chartered from a third party, one roll-on/roll-off barge, two container barges equipped with cranes that serve the neighbor islands of Hawaii, and one container barge equipped with cranes in the Mid-Pacific service. The 17 Matson-owned vessels in the fleet represent an investment of approximately $848 million expended over the past 34 years. The majority of vessels in the Matson fleet have been acquired with the assistance of withdrawals from a Capital Construction Fund established under Section 607 of the Merchant Marine Act, 1936, as amended.

Matson has actively pursued a vessel renewal program. In 2002, Matson contracted with Kvaerner for two new containerships for the Hawaii Service, each at a project cost of approximately $107 million. The first ship was delivered in the third quarter of 2003, and the second was delivered in the third quarter of 2004.

Ships owned by Matson are described on page 4.

As a complement to its fleet, Matson owns approximately 19,100 containers, 11,000 container chassis, 700 auto-frames and miscellaneous other equipment. Capital expenditures incurred by Matson in 2004 for vessels, equipment and systems totaled approximately $128 million.

Matson entered into agreements in February 2005 with Kvaerner to

purchase two containerships at a cost of $144.4 million each. The first ship is expected to be delivered in June 2005, and the second ship is expected to be delivered in May 2006. Also, in February 2005, Matson entered into a right of first refusal agreement with Kvaerner, which provides that, after the second containership is delivered to Matson, Matson has the right of first refusal to purchase each of the next four containerships of similar design built by Kvaerner that are deliverable before June 30, 2010. Matson may either exercise its right of first refusal and purchase the ship at an eight percent discount from a third party's proposed contract price, or decline to exercise its right of first refusal and be paid by Kvaerner eight percent of such price. Notwithstanding the above, if Matson and Kvaerner agree to a construction contract for a vessel to be delivered before June 30, 2010, Matson shall receive an eight percent discount.

      (3)     Terminals

Matson Terminals, Inc. ("Matson Terminals"), a wholly-owned subsidiary of Matson, provides container stevedoring, container equipment maintenance and other terminal services for Matson and other ocean carriers at its 105-acre marine terminal in Honolulu. Matson Terminals owns and operates seven cranes at the terminal, which handled approximately 423,300 containers in 2004 (compared with 419,600 in 2003). The facility can accommodate three vessels at one time. Matson Terminals' lease with the State of Hawaii runs through September 2016. As the result of an acquisition completed on January 31, 2005, Matson Terminals also provides container stevedoring and other terminal services to Matson and other vessel operators at ports on the island of Hawaii.

SSA Terminals, LLC ("SSAT"), a joint venture of Matson and SSA Marine, Inc. ("SSA"), provides terminal and stevedoring services at U.S. Pacific Coast terminal facilities in Long Beach, Oakland and Seattle.

Capital expenditures incurred by Matson Terminals in 2004 for terminals and equipment totaled approximately $1 million.

      (4)     Logistics and Other Services

Matson Integrated Logistics, Inc. ("Matson Integrated Logistics"), a wholly-owned subsidiary of Matson, arranges rail, highway, air and other surface transportation and provides other third-party logistics services for North American shippers. Through volume purchases of rail, motor carrier, air and ocean transportation services, augmented by such services as shipment tracing and single-vendor invoicing, Matson Integrated Logistics is able to reduce transportation costs for its customers. Matson Integrated Logistics operates eight regional operating centers and has 23 sales offices across the U.S. mainland.

      (5)     Competition

Matson's Hawaii Service and Guam Service have one major containership competitor that serves Long Beach, Oakland, Tacoma, Honolulu and Guam. Other competitors in the Hawaii Service include two common carrier barge services, unregulated proprietary and contract carriers of bulk cargoes, and air cargo service providers. Although air freight competition is intense for time-sensitive and perishable cargoes, inroads by such competition in terms of cargo volume are limited by the amount of cargo space available in passenger aircraft and by generally higher air freight rates.

Matson vessels are operated on schedules that make available to shippers and consignees regular day-of-the-week sailings from the U.S. Pacific Coast and day-of-the-week arrivals in Hawaii. Under its current schedule, Matson operates between 190 and 208 Hawaii round-trip voyages per year, double the westbound voyages of its nearest competitor, and arranges additional voyages when cargo volumes require additional capacity. This service is attractive to customers because more frequent arrivals permit customers to reduce inventory costs. Matson also competes by offering a more comprehensive service to customers, supported by the scope of its equipment, its efficiency and

experience in handling containerized cargo, and competitive pricing.

Competition in the Hawaii Service is expected to increase in 2005 due to entry into the Hawaii trade by the operator of a new dedicated automobile and truck carrier, with a stated carrying capacity of 3,000 automobiles every two weeks beginning in the second quarter of 2005. The operator announced that it will target automobiles, buses, trucks and other large and oversize rolling stock, and that it signed a multi-year contract with an automobile manufacturer that is a current Matson customer, for which Matson moved approximately 20,000 westbound automobiles in 2004. Matson is well-positioned to compete with the new entrant. Partially offsetting the loss of business to the new entrant, Matson recently received a multi-year commitment from an automobile manufacturer that previously was the customer of a different competitor. While the new entrant into the Hawaii market is expected to have some adverse effect, its near-term impact cannot be estimated, and the long-term impact will not be

---

MATSON NAVIGATION COMPANY, INC.
FLEET--2/1/05
-------------

| Vessel Name | Official Number | Year Built | Year Recon-structed | Length | Maximum Speed (Knots) | Maximum Deadweight (Long Tons) | 20' |
|---|---|---|---|---|---|---|---|
| **Diesel-Powered Ships** | | | | | | | |
| R.J. PFEIFFER....... | 979814 | 1992 | -- | 713' 6" | 23.0 | 27,100 | 48 |
| MOKIHANA (2)........ | 655397 | 1983 | -- | 860' 2" | 23.0 | 30,167 | 182 |
| MAHIMAHI (2)........ | 653424 | 1982 | -- | 860' 2" | 23.0 | 30,167 | 182 |
| MANOA (2).......... | 651627 | 1982 | -- | 860' 2" | 23.0 | 30,187 | 182 |
| MANUKAI............ | 1141163 | 2003 | -- | 711' 9" | 23.0 | 29,517 | 4 |
| MAUNAWILI.......... | 1153166 | 2004 | -- | 711' 9" | 23.0 | 29,517 | 4 |
| **Steam-Powered Ships** | | | | | | | |
| KAUAI.............. | 621042 | 1980 | 1994 | 720' 5 1/2" | 22.5 | 26,308 | -- |
| MAUI............... | 591709 | 1978 | 1993 | 720' 5 1/2" | 22.5 | 26,623 | -- |
| MATSONIA........... | 553090 | 1973 | 1987 | 760' 0" | 21.5 | 22,501 | 16 |
| LURLINE............ | 549900 | 1973 | 2003 | 826' 6" | 21.5 | 22,213 | 6 |
| EWA (3)............ | 530140 | 1972 | 1978 | 787' 8" | 21.0 | 38,747 | 286 |
| CHIEF GADAO (3)..... | 530138 | 1971 | 1978 | 787' 8" | 21.0 | 37,346 | 230 |
| LIHUE.............. | 530137 | 1971 | 1978 | 787' 8" | 21.0 | 38,656 | 286 |
| **Barges** | | | | | | | |
| WAIALEALE (4)....... | 978516 | 1991 | -- | 345' 0" | -- | 5,621 | -- |
| ISLANDER (5)........ | 933804 | 1988 | -- | 372' 0" | -- | 6,837 | -- |
| MAUNA LOA (5)....... | 676973 | 1984 | -- | 350' 0" | -- | 4,658 | -- |
| HALEAKALA (5)....... | 676972 | 1984 | -- | 350' 0" | -- | 4,658 | -- |

Molasses
----------

```
Vessel Name                 Short Tons
-----------                 ----------

Diesel-Powered Ships
--------------------
R.J. PFEIFFER.......          --
MOKIHANA (2)........          --
MAHIMAHI (2)........          --
MANOA (2)...........          --
MANUKAI.............          --
MAUNAWILI...........          --

Steam-Powered Ships
-------------------
KAUAI...............        2,600
MAUI................        2,600
MATSONIA............        4,300
LURLINE.............        2,100
EWA (3).............          --
CHIEF GADAO (3).....          --
LIHUE ..............          --

Barges
------
WAIALEALE (4).......          --
ISLANDER (5)........          --
MAUNA LOA (5).......        2,100
HALEAKALA (5).......        2,100
```

--------

(1) "Twenty-foot Equivalent Units" (including trailers). TEU is a standard
    measure of cargo volume correlated to the volume of a standard 20-foot dry
    cargo container.
(2) Time-chartered to APL until February 2006.
(3) Reserve Status.
(4) Roll-on/Roll-off Barge.
(5) Container Barge.

known for some time.  The total Hawaii-Mainland auto carriage market is
approximately 190,000 automobiles per year.

The carriage of cargo between the U.S. Pacific Coast and Hawaii on
foreign-built or foreign-documented vessels is prohibited by Section 27 of the
Merchant Marine Act, 1920, commonly referred to as the Jones Act. However,
foreign-flag vessels carrying cargo to Hawaii from non-U.S. locations provide
indirect competition for Matson's Hawaii Service. Far East countries, Australia,
New Zealand and South Pacific islands have direct foreign-flag services to
Hawaii.

In response to coordinated efforts by various interests to convince
Congress to repeal the Jones Act, in 1995 Matson joined other businesses and
organizations to form the Maritime Cabotage Task Force, which supports the
retention of the Jones Act and other cabotage laws. Repeal of the Jones Act
would allow all foreign-flag vessel operators, which do not have to abide by
U.S. laws and regulations, to sail between U.S. ports in direct competition with
Matson and other U.S. operators, which must comply with such laws and
regulations. The Task Force seeks to inform elected officials and the public
about the economic, national security, commercial, safety and environmental
benefits of the Jones Act and similar cabotage laws.

Matson Integrated Logistics competes for freight with a number of large
and small companies that provide surface transportation and third-party
logistics services.

washingtonpost.com:

    (6)      Labor Relations

        The absence of strikes and the availability of labor through hiring halls are important to the maintenance of profitable operations by Matson. Until 2002, when International Longshore and Warehouse Union ("ILWU") workers were locked out for ten days on the U.S. Pacific Coast, Matson's operations had not been disrupted significantly by labor disputes in over 30 years. See "Employees and Labor Relations" below for a description of labor agreements to which Matson and Matson Terminals are parties and information about certain unfunded liabilities for multiemployer pension plans to which Matson and Matson Terminals contribute.

    (7)      Rate Regulation

        Matson is subject to the jurisdiction of the Surface Transportation Board with respect to its domestic rates. A rate in the noncontiguous domestic trade is presumed reasonable and will not be subject to investigation if the aggregate of increases and decreases is not more than 10 percent above, or more than 10 percent below, the rate in effect one year before the effective date of the proposed rate, subject to increase or decrease by the percentage change in the U.S. Producer Price Index. Effective January 11, 2004, Matson increased its rates in its Hawaii Service by $125 per westbound container, $60 per eastbound container, and $25 per vehicle, both westbound and eastbound, and its terminal handling charge by $25 per westbound container, $15 per eastbound container and $5 per vehicle. Effective June 6, 2004, Matson increased its rates in its Guam Service by $125 per container and $5 on items rated per weight or measure and its West Coast terminal handling charge by $25 per container, $5 per vehicle and $1 per revenue ton on items rated per weight or measure, both westbound and eastbound. Due to sustained increases in fuel costs, Matson increased its fuel surcharge in its Hawaii and Guam Services from 7.5 percent to 8.0 percent, effective March 14, 2004; to 8.8 percent, effective June 21, 2004; and to 9.2 percent, effective October 18, 2004.

    B.      Real Estate

    (1)      General

        As of December 31, 2004, A&B and its subsidiaries, including A & B Properties, Inc., owned approximately 90,056 acres, consisting of approximately 89,817 acres in Hawaii and approximately 239 acres elsewhere, as follows:

| Location | No. of Acres |
| --- | --- |
| Oahu | 38 |
| Maui | 68,745 |
| Kauai | 21,034 |
| California | 91 |
| Texas | 47 |
| Washington | 13 |
| Arizona | 35 |
| Nevada | 21 |
| Colorado | 17 |
| Utah | 15 |
| TOTAL | 90,056 |

        As described more fully in the table below, the bulk of this acreage

currently is used for agricultural and related activities, and includes pasture
land, watershed land and conservation reserves. The balance is used or planned
for development or other urban uses. An additional 2,311 acres on Maui and Kauai
are leased from third parties and, in March 2003, title to 846 acres on Kauai
was transferred to a joint venture, consisting of A&B and DMB Associates, Inc.,
an Arizona-based developer, for the development of a master-planned resort
residential community. Such acreage is not included in the table above.

| Current Use | No. of Acres |
|---|---|
| **Hawaii** | |
| Fully entitled Urban (defined below) ............... | 699 |
| Agricultural, pasture and miscellaneous ............ | 59,839 |
| Watershed land/conservation ....................... | 29,279 |
| **U.S. Mainland** | |
| Fully entitled Urban ............................... | 239 |
| | ------ |
| TOTAL ...................................... | 90,056 |
| | ====== |

A&B and its subsidiaries are actively involved in the entire spectrum
of real estate development and ownership, including planning, zoning, financing,
constructing, purchasing, managing and leasing, selling and exchanging, and
investing in real property.

(2)     Planning and Zoning

The entitlement process for development of property in Hawaii is both
time-consuming and costly, involving numerous State and County regulatory
approvals. For example, conversion of an agriculturally-zoned parcel to
residential zoning usually requires the following three approvals:

o   amendment of the County general plan to reflect the desired
    residential use;

o   approval by the State Land Use Commission ("SLUC") to reclassify the
    parcel from the Agricultural district to the Urban district; and

o County approval to rezone the property to the precise residential use
  desired.

The entitlement process is complicated by the conditions, restrictions
and exactions that are placed on these approvals, including, among others, the
construction of infrastructure improvements, payment of impact fees,
restrictions on the permitted uses of the land, provision of affordable housing
and/or mandatory fee sale of portions of the project.

A&B actively works with regulatory agencies, commissions and
legislative bodies at various levels of government to obtain zoning
reclassification of land to its highest and best use. A&B designates a parcel as
"fully entitled" or "fully zoned" when the three land use approvals described
above have been obtained.

(3)     Residential Projects

A&B is pursuing a number of residential projects in Hawaii, including:

(a) Wailea. In October 2003, A&B acquired 270 acres of fully-zoned, undeveloped residential and commercial land at the Wailea Resort on Maui, planned for up to 1,600 homes, for $67.1 million. A&B was the original developer of the Wailea Resort, beginning in the 1970s and continuing until A&B sold the Resort to the Shinwa Golf Group in 1989.

In January 2004, A&B commenced sales of 29 single-family homesites at Wailea's Golf Vistas subdivision. Twenty-six lots were sold in 2004 and, as of February 9, 2005, all 29 lots have closed escrow, at prices ranging from $495,000 to $1.6 million, for an average price of $875,000.

In 2004, three bulk parcels were sold to third parties at an average price of $559,000 per acre: MF-4 (10.5 acres), MF-15 (9.4 acres) and a 20 percent installment sale of MF-9 (30.2 acres). On January 7, 2005, a fourth parcel sale closed at $535,000 per acre (MF-5, 8.4 acres). During 2004, A&B also proceeded with a joint venture development on MF-8 (Kai Malu), as described more fully below.

(b) Kai Malu at Wailea. In April 2004, A&B entered into a joint venture with Armstrong Builders, Ltd. for development of the 25-acre MF-8 parcel at Wailea. The project is planned to consist of 150 duplex units with an average size of 1,800 square feet and an average price of over $1.0 million. In November 2004, the Planning Commission approved the issuance of a County Special Management Area ("SMA") permit for the project and a preliminary public condominium report was approved by the Hawaii Real Estate Commission for the initial 34-unit phase, enabling marketing to commence in December 2004. As of January 31, 2005, all of the 34 units in Phase I were sold under non-binding contracts at an average price of $1.1 million. Final public condominium reports for Phase I (34 units) and Phase II (54 units) were approved in February 2005, enabling binding contracts to be secured.

(c) Haliimaile Subdivision. A&B's application to rezone 63 acres for the development of a 150- to 200-lot subdivision in Haliimaile (Upcountry, Maui) remains pending before the Maui County Council's Land Use Committee. Council action is expected in 2005.

(d) Kukui`ula. Kukui`ula is a 1,000-acre master planned resort residential community located in Poipu, Kauai. In April 2002, an agreement was signed with an affiliate of DMB Associates, Inc., an Arizona-based developer of master planned communities, for the joint development of Kukui`ula. The project will consist of between 1,200 to 1,500 high-end residential units. During 2003, A&B contributed to the venture title to 846 acres, a waste water treatment plant, and other improvements. The balance of the land, approximately 165 acres, is expected to be transferred to the venture in the first quarter of 2005. In July 2003, the SLUC granted Urban designation for the project's remaining acres, which will allow the entire 1,000-acre property to be developed as one integrated project. In July 2004, the Kauai County Council gave final zoning and visitor designation area approvals for the entire project. In August 2004, A&B exercised its option to contribute to the joint venture up to 40 percent of the project's future capital requirements. Design, engineering and construction activity to date include: preparation of construction plans for onsite and offsite infrastructure, preparation and submittal to government agencies of subdivision maps for the initial phases of the project, development of potable water wells, and permitting of a new electrical substation. Design work is progressing on a sales center/model home complex, which will be constructed in 2005. For the initial phase of development, SMA approvals were secured and permit applications were submitted for improvements. Marketing of the initial phase is expected to commence in March 2005 and infrastructure construction is scheduled to commence in mid-2005.

(e) Kai Lani. In September 2001, A&B entered into a joint venture with Armstrong Kai Lani Corporation for the development of 116 townhouse units on an 11-acre parcel in the Ko 'Olina Resort on Oahu. Construction on the first building began in July 2002 and 105 units were sold in 2003. By the first quarter of 2004, the remaining 11 units had been sold. The average price of all 116 units was $495,000.

        (f) Lanikea at Waikiki. In November 2001, A&B acquired a 1.63-acre,
vacant, fee simple development site in Waikiki, Oahu, for approximately $3.6
million. The property, located at the entrance to Waikiki, is zoned for
high-rise residential use and limited commercial uses. The project consists of
100 apartments, averaging 1,000 square feet in size, except for the four
penthouse units, which average 1,600 square feet. The building will be 30
stories tall, with the first five floors devoted to parking. Sales commenced in
April 2003 and, as of January 31, 2005, all 100 residential units were sold
under binding contracts, at an average price of $588,000 ($565 per square foot).
Construction commenced in December 2003 and is scheduled for completion in June
2005. The 13,500-square-foot commercial-zoned parcel along Kuhio Avenue and 31
parking stalls in the Lanikea parking structure were sold on January 14, 2005
for $3.75 million.

        (g) Hokua. In July 2003, A&B entered into a joint venture with MK
Management LLC for the development of a 247-unit high-rise luxury condominium
project across from the Ala Moana Beach Park in Honolulu. The project will be 40
stories tall, with four floors of parking. The first 32 residential floors
include seven units each, with an average unit size of 1,760 square feet. The
next four floors have five units each, with an average unit size of 2,500 square
feet. The Penthouse floor contains three units, averaging 4,330 square feet
each. Sales commenced in December 2002 and, as of January 31, 2005, 242 of the
project's 247 units were sold under binding contracts, at an average price of
$1.1 million per unit ($594 per square foot). Construction commenced in December
2003 and is expected to be completed in December 2005.

        (h) Kakaako Development. In August 2004, A&B acquired a 2.7-acre,
vacant, fee simple development site near downtown Honolulu, Oahu, for $14
million. A conceptual design for a 360-unit condominium project has been
developed, consisting of five floors of parking and 30 floors of residential
units. The average unit size will be approximately 1,100 square feet, and will
include one-, two- and three-bedroom floor plans. As required by the Hawaii
Community Development Authority (HCDA), 20 percent of the units have been
designated for sale to buyers earning no more than 140 percent of the Honolulu
median income. A preliminary public condominium report is expected by March
2005, at which time sales will commence. Construction is expected to commence in
early 2006.

        (i) Mauna Lani. In April 2004, A&B entered into a joint venture with
Brookfield Homes Hawaii Inc. to acquire and develop a 30.5-acre residential
parcel in the Mauna Lani Resort on the island of Hawaii. In May 2004, the
property was acquired by the joint venture for $6.6 million. The conceptual plan
for the project consists of 137 single-family and duplex units. An SMA amendment
was submitted in October 2004 and was approved in November 2004. Site planning
was completed and submitted to the Mauna Lani Design Review Committee in January
2005. Product design, site planning, grading, drainage, utility and roadway
design work are being finalized. Groundbreaking is scheduled to commence in
mid-2005.

        (j) HoloHolo Ku. In October 2001, A&B entered into a joint venture with
Kamuela Associates, LLC for the development of 44 detached single-family homes
under a Condominium Property Regime, on an 8.5-acre parcel in Kamuela on the
island of Hawaii. Construction began in December 2001, and was completed in
October 2003. Five homes were sold in 2002, 36 homes were sold in 2003, and the
remaining three homes were sold in 2004. The average price of the 44 homes was
$395,000.

        (4) Commercial Properties

        An important source of property revenue is the lease rental income A&B
receives from its leased portfolio, currently consisting of approximately 5.1
million leasable square feet of commercial building space, ground leases on 266
acres for commercial use, and leases on 10,719 acres for agricultural/pasture
use.

(a)        Hawaii Commercial Properties

A&B's Hawaii commercial properties portfolio consists primarily of seven retail centers, eight office buildings and three industrial properties, comprising approximately 1.7 million square feet of leasable space. Most of the commercial properties are located on Maui and Oahu, with smaller holdings in the area of Port Allen, on the island of Kauai. The average occupancy for the Hawaii portfolio was 90 percent in 2004, unchanged from 2003. In 2004, A&B sold a 0.9-acre leased fee parcel in Kahului, Maui.

The primary Hawaii commercial properties are as follows:

| Property | Location | Type |
| -------- | -------- | ---- |
| Maui Mall | Kahului, Maui | Retail |
| Mililani Shopping Center | Mililani, Oahu | Retail |
| Pacific Guardian Complex | Honolulu, Oahu | Office |
| Kaneohe Bay Shopping Center | Kaneohe, Oahu | Retail |
| P&L Warehouse | Kahului, Maui | Industrial |
| Kahului Shopping Center | Kahului, Maui | Retail |
| Ocean View Center | Honolulu, Oahu | Office |
| Hawaii Business Park | Pearl City, Oahu | Industrial |
| Haseko Center | Honolulu, Oahu | Office |
| One Main Plaza | Wailuku, Maui | Office |
| Wakea Business Center | Kahului, Maui | Industrial/I |
| Kahului Office Building | Kahului, Maui | Office |
| Napili Plaza | Napili, Maui | Retail |
| Fairway Shops at Kaanapali | Kaanapali, Maui | Retail |
| Kahului Office Center | Kahului, Maui | Office |
| Stangenwald Building | Honolulu, Oahu | Office |
| Port Allen Marina Center | Port Allen, Kauai | Retail |
| Judd Building | Honolulu, Oahu | Office |

Several other commercial projects are being, or have been developed or acquired, on Maui and Oahu, including:

(i) Triangle Square. Previous construction at the 12-acre Triangle Square commercial project in Kahului, Maui includes two retail buildings with a combined leasable area of 42,600 square feet, a BMW car dealership and three other improved commercial properties under long-term ground leases. In January 2004, Hawaii's first Krispy Kreme store opened for business on a 0.9-acre ground leased parcel. During 2004, an SMA permit was processed for a 6,500-square-foot build-to-suit Acura dealership on 1.1 acres and a 4,500-square-foot build-to-suit auto value center on 1.6 acres, and approval was obtained on January 11, 2005.

(ii) Maui Business Park. Located in Kahului, Maui, the initial phase of Maui Business Park, developed between 1995 and 2000, consists of approximately 69.4 saleable acres, subdivided into 41 lots, having an average size of 23,700 square feet, and three bulk parcels. The property is zoned for light industrial/commercial uses.

From 1995 through 1998, a total of 26.4 acres were sold, including 20.3 acres for the development of a 349,300-square-foot retail center, whose anchor tenants are Borders Books & Music, Lowe's, OfficeMax and Old Navy. From 1999 to 2003, a total of 35.6 acres were sold, including a 12.8-acre parcel to Home Depot, which completed a 135,000-square-foot store in May 2001, and a 14-acre parcel to Wal-Mart, which completed a 142,000-square-foot store in October 2001.

During 2004, eight half-acre lots (5.9 acres) were sold at an average price of $27 per square foot. As of January 31, 2005, the last three lots in Maui Business Park (1.8 acres) were sold at an average price of $28 per square foot.

In May 2002, the Maui County Council approved the inclusion of approximately 179 acres in the Wailuku-Kahului Community Plan for the future expansion of Maui Business Park. In May 2003, A&B filed a petition with the SLUC to redesignate 138 acres from Agricultural to Urban. (Seven acres are currently designated Urban, and an additional 34 acres have already received tentative approval for designation as Urban.) In February 2004, the SLUC approved the reclassification of 138 acres to Urban. In April 2004, A&B filed a zoning change application for the 179 acres and an SLUC application for the final Urban approval for the 34 acres. An SLUC hearing on the 34 acres is scheduled in early 2005 and County hearings on the zoning application will commence after the SLUC has granted final urban designation for the 34 acres.

(iii) Mill Town Center. Located in Waipahu, Oahu (approximately 12 miles from Honolulu), the Mill Town Center is a light-industrial subdivision consisting of 27.5 saleable acres, developed between 1999 and 2002. The property was subdivided into 61 lots, having an average size of 29,100 square feet. During 2004, 22 lots were sold, at an average price of $28 per square foot. As of December 31, 2004, a total of 54 lots (24 acres) were sold, at an average price of $25 per square foot. In January 2005, three lots closed at an average price of $32 per square foot, while four lots (2.2 acres) remain unsold.

(iv) Kunia Shopping Center. In November 2002, A&B acquired a 4.6-acre, fee simple vacant parcel for $2.65 million. The parcel, which is zoned for retail use, is located in Kunia, Central Oahu (near the Royal Kunia and Village Park residential communities) and is planned to be developed as a 50,000-square-foot neighborhood retail center, plus three pad sites. As of January 31, 2005, leases were signed for about 52 percent of the space, and letters of intent were signed for an additional 30 percent. In-line tenants include Starbucks, Jamba Juice, T-Mobile, Baskin-Robbins, Fantastic Sam's, Quizno's and various local retailers, restaurateurs and service providers. Construction commenced in August 2004 and is projected to be completed in June 2005, at which time tenant improvements will commence. Opening is scheduled for October 2005.

(v) Alakea Corporate Tower. In March 2003, A&B acquired a Class A 31-story office building in downtown Honolulu (since re-named Alakea Corporate Tower), for $20 million. The building contains approximately 158,300 square feet of office space, and was acquired with the intent of converting the building into, and selling, fee simple office condominium units. In October 2003, a final public condominium report was issued for the project and sales commenced with eight whole floors closing in 2003. In 2004, 17.5 floors were sold. The 25.5 floors have been sold at an average price of $1.1 million per floor. The remaining 5.5 floors are in escrow, at an average sales price of $1.0 million per floor.

(vi) Daiei Retail Parcel. On February 1, 2005, A&B acquired the fee simple interest in a four-acre income-producing parcel located in central Honolulu for $19.3 million. The property is fully leased to The Daiei (USA), Inc. until 2018, which operates the 105,000-square-foot retail store on the premises. The parcel is fully entitled for commercial and high-rise residential use.

(b)    U.S. Mainland Commercial Properties

On the U.S. mainland, A&B owns a portfolio of commercial properties, acquired primarily by way of tax-deferred exchanges under Internal Revenue Code Section 1031. The sale of Ontario Pacific Business Centre, a 246,100-square-foot industrial property located in Ontario, California, was completed on January 12, 2005, and the sale of Northwest Business Center, an 87,000-square-foot industrial/office building located in San Antonio, Texas, was completed on

January 26, 2005. Excluding these two properties, A&B's Mainland portfolio currently includes approximately 3.4 million square feet of leasable area, comprising eight retail centers, four office buildings and six industrial properties, as follows:

| Property | Location | Type |
| --- | --- | --- |
| Ontario Distribution Center | Ontario, CA | Industrial |
| Sparks Business Center | Sparks, NV | Industrial |
| Centennial Plaza | Salt Lake City, UT | Industrial |
| Valley Freeway Corporate Park | Kent, WA | Industrial |
| Boardwalk Shopping Center | Round Rock, TX | Retail |
| San Pedro Plaza | San Antonio, TX | Office |
| 2868 Prospect Park | Sacramento, CA | Office |
| Arbor Park Shopping Center | San Antonio, TX | Retail |
| Mesa South Shopping Center | Phoenix, AZ | Retail |
| San Jose Avenue Warehouse | City of Industry, CA | Industrial |
| Southbank II | Phoenix, AZ | Office |
| Village at Indian Wells | Indian Wells, CA | Retail |
| 2450 Venture Oaks | Sacramento, CA | Office |
| Broadlands Marketplace | Broomfield, CO | Retail |
| Carefree Marketplace | Carefree, AZ | Retail |
| Marina Shores Shopping Center | Long Beach, CA | Retail |
| Vista Controls Building | Valencia, CA | Industrial/( |
| Wilshire Center | Greeley, CO | Retail |

A&B's Mainland commercial properties achieved an average occupancy rate of 95 percent in 2004 (compared with 93 percent in 2003). The increase was due primarily to additions of fully-leased properties to the portfolio.

In 2002, A&B expanded its development activities to Valencia, California, a fast growing region north of Los Angeles with favorable demographics and strong economic growth. A&B will continue its search for Mainland expansion opportunities in other growing markets. The following development projects have been secured to date in Valencia:

(i) Westridge Executive Plaza. In January 2003, A&B signed a joint venture agreement with Westridge Executive Building, LLC, for the development of a 63,000-square-foot office building. Construction commenced in January 2003 and was completed in January 2004. As of January 2005, the building was 95 percent leased. Major tenants include Wells Fargo, Pardee Homes and Realty Executives.

(ii) Crossroads Plaza. In June 2004, A&B signed a joint venture agreement with Intertex Hasley, LLC, to form Crossroads Plaza Development Partners, LLC, for the development of a 62,000-square-foot mixed-use neighborhood retail center on 6.5 acres of commercial-zoned land. The property was acquired in August for $3.5 million. Site planning and design have been completed and pre-leasing has commenced. Groundbreaking is expected to occur in mid-2005.

(iii) Rye Canyon. In October 2004, a joint venture between A&B and Intertex Properties, LLC acquired, for $1.5 million, a 5.4-acre commercial-zoned parcel for the development of an 85,000-square-foot office building. Site planning and design are complete and design approvals are being sought. Marketing and pre-leasing efforts commenced in February 2005. Groundbreaking is expected to occur in mid-2005.

C.        Food Products

(1)        Production

A&B has been engaged in activities relating to the production of cane sugar and molasses in Hawaii since 1870, and production of coffee in Hawaii since 1987. A&B's current food products and related operations consist of: (1) a sugar plantation on the island of Maui, operated by its Hawaiian Commercial & Sugar Company ("HC&S") division, (2) a coffee farm on the island of Kauai, operated by its Kauai Coffee Company, Inc. ("Kauai Coffee") subsidiary, (3) its Kahului Trucking & Storage, Inc. ("KT&S") subsidiary, which provides sugar and molasses hauling and storage, as well as petroleum hauling, mobile equipment maintenance and repair services and self-service storage facilities on Maui and (4) its Kauai Commercial Company, Incorporated subsidiary, which provides services on Kauai similar to those provided by KT&S on Maui, as well as general trucking services.

HC&S is Hawaii's largest producer of raw sugar, having produced approximately 198,800 tons of raw sugar in 2004, or about 77 percent of the raw sugar produced in Hawaii (compared with 205,700 tons, or about 79 percent in 2003). The decrease in production was due primarily to rainy weather early in the year that affected planting, harvesting and milling operations; and to yield losses attributable to a significant drought during the first year of crop growth and the reappearance of leaf scald disease, which had been dormant for years. Total Hawaii sugar production, in turn, amounted to approximately three percent of total U.S. sugar production. HC&S harvested 16,890 acres of sugar cane in 2004 (compared with 15,660 in 2003). More acres were harvested in 2004 to compensate for the yield losses noted above. Yields averaged 11.8 tons of sugar per acre in 2004 (compared with 13.1 in 2003). The average cost per ton of sugar produced at HC&S was $435 in 2004 (compared with $422 in 2003). The increase in cost per ton was attributable to lower sugar production. As a by-product of sugar production, HC&S also produced approximately 65,100 tons of molasses in 2004 (compared with 72,500 in 2003).

In 2004, approximately 15,500 tons of sugar (compared with 12,100 in 2003) produced by HC&S were specialty food-grade raw sugars and sold under HC&S's Maui Brand(R) trademark. A further expansion of the production facilities for these sugars is planned for 2005.

During 2004, Kauai Coffee had approximately 3,200 acres of coffee trees under cultivation. The harvest of the 2004 coffee crop yielded approximately 1.8 million pounds of green coffee (compared with 3.3 million in 2003). The lower production was due primarily to accelerated natural drop (coffee falling off the tree) from heavy rain and wind during harvests.

HC&S and McBryde Sugar Company, Limited ("McBryde"), a subsidiary of A&B and the parent company of Kauai Coffee, produce electricity for internal use and for sale to the local electric utility companies. HC&S's power is produced by burning bagasse, by hydroelectric power generation and, when necessary, by burning fossil fuels, whereas McBryde produces power solely by hydroelectric generation. The price for the power sold by HC&S and McBryde is equal to the utility companies' "avoided cost" of not producing such power themselves. In addition, HC&S receives a capacity payment to provide a guaranteed power generation capacity to the local utility. See "Energy" below for power production and sales data.

(2)        Marketing of Sugar and Coffee

Substantially all of the bulk raw sugar produced in Hawaii is purchased, refined and marketed by C&H Sugar Company, Inc. ("C&H"), of which A&B owns approximately 36 percent of its common voting stock, 40 percent of its junior preferred stock and 100 percent of its senior preferred stock. The results of A&B's equity investment in C&H are reported in A&B's financial statements as an investment in an affiliate. C&H processes the raw cane sugar at its refinery at Crockett, California, and markets the refined products primarily in the western and central United States. HC&S markets its specialty food-grade

raw sugars to food and beverage producers and to retail stores under its Maui Brand(R) label, and to distributors that repackage the sugars under their own labels. HC&S's largest food-grade raw sugar customers are Cumberland Packing Corp. and Sugar Foods Corporation, which repackage HC&S's turbinado sugar for their "Sugar in the Raw" products.

    Hawaiian Sugar & Transportation Cooperative ("HS&TC"), a cooperative consisting of two sugar cane growers in Hawaii (including HC&S), has a supply contract with C&H, ending in December 2008. Pursuant to the supply contract, the growers sell their raw sugar to C&H at a price equal to the New York No. 14 Contract settlement price, less a discount and less costs of sugar vessel discharge and stevedoring. This price, after deducting the marketing, operating, distribution, transportation and interest costs of HS&TC, reflects the gross revenue to the Hawaii sugar growers, including HC&S. Notwithstanding the supply contract, HC&S arranged directly with C&H for the forward pricing of a portion of its 2004 harvest, as described in Item 7A ("Quantitative and Qualitative Disclosures About Market Risk") of Part II below.

    At Kauai Coffee, coffee marketing efforts are directed toward developing a market for premium-priced, estate-grown Kauai green coffee. Most of the coffee crop is being marketed on the U.S. mainland and in Asia as green (unroasted) coffee. In addition to the sale of green coffee, Kauai Coffee produces and sells roasted, packaged coffee under the Kauai Coffee(R) trademark.

    (3)      Competition and Sugar Legislation

    Hawaii sugar growers produce more sugar per acre than most other major producing areas of the world, but that advantage is offset by Hawaii's high labor costs and the distance to the U.S. mainland market. Hawaiian refined sugar is marketed primarily west of Chicago. This is also the largest beet sugar growing and processing area and, as a result, the only market area in the United States that produces more sugar than it consumes. Sugar from sugar beets is the greatest source of competition in the refined sugar market for the Hawaiian sugar industry.

    The overall U.S. caloric sweetener market grew until 2004. Preliminary data indicates a 1.5-percent decrease in 2004. The use of non-caloric (artificial) sweeteners accounts for a relatively small percentage of the domestic sweetener market. The use of high fructose corn syrup and artificial sweeteners is not expected to affect sugar markets significantly in the near future.

    The U.S. Congress historically has sought, through legislation, to assure a reliable domestic supply of sugar at stable and reasonable prices. The current protective legislation is the Farm Security and Rural Investment Act of 2002 ("2002 Farm Bill"). The two main elements of U.S. sugar policy are the tariff-rate quota ("TRQ") import system and the price support loan program. The TRQ system limits imports by allowing only a quota amount to enter the U.S. after payment of a relatively low tariff. A higher, over-quota tariff is imposed for imported quantities above the quota amount.

    The 2002 Farm Bill reauthorized the sugar price support loan program, which supports the U.S. price of sugar by providing for commodity-secured loans to producers. Unlike most other commodity programs, sugar loans are made to processors and not directly to producers. HC&S is both a producer and a processor. To qualify for loans, processors must agree to provide a part of the loan payment to producers. Loans may be repaid either in cash or by forfeiture without penalty. The 2002 Farm Bill eliminated the former loan forfeiture penalty and marketing assessments, which increased the effective support level.

    Under the 2002 Farm Bill, the government is required to administer the loan program at no net cost by avoiding sugar loan forfeitures. This is accomplished by reestablishing marketing allotments, which provides each processor or producer a specific limit on sales for the year, above which penalties would apply. It is also accomplished by adjusting fees and quotas for imported sugar to maintain the domestic price at a level that discourages