# EXHIBIT 26

# REDACTED

# EXHIBIT 27

# REDACTED

# EXHIBIT 28

# REDACTED

# EXHIBIT 29

# REDACTED

# EXHIBIT 30

# REDACTED

# EXHIBIT 31

1

1

2                    UNITED STATES DISTRICT COURT

3                    CENTRAL DISTRICT OF CALIFORNIA

4                              - - -

5          HONORABLE DALE S. FISCHER, JUDGE PRESIDING

6

7

8   The Sugar Association, Inc.,          )

9                    Plaintiff,           )

10                                        )

11  vs.                                   )    Case No.

12                                        )    CV 04-10077-DSF(RZx)

13  McNeil-PPC, Inc., et al.,             )

14                    Defendants.         )

15  _____    )

16

17          REPORTER'S TRANSCRIPT OF PROCEEDINGS

18     Defendant's Motion for Judgment on the Pleadings

19               Los Angeles, California

20               Monday, April 4, 2005

21

22  Pamela A. Seijas, CSR 3593
    Official Reporter
23  Roybal Federal Building
    255 East Temple Street
24  Room 181-I
    Los Angeles, California  90012
25  (213) 687-0446

COPY

```
 1  APPEARANCES:
 2  FOR THE PLAINTIFF:          SQUIRE, SANDERS & DEMPSEY L.L.P.
 3                              BY:  MARK HURVITZ
 4                              801 S. FIGUEROA
 5                              14TH FLOOR
 6                              LOS ANGELES, CA  90017-5554
 7                              (213) 624-2500
 8                                 - AND -
 9                              SQUIRE, SANDERS & DEMPSEY L.L.P.
10                              BY:  JAMES P. MURPHY
11                              1201 PENNSYLVANIA AVENUE, N.W.
12                              P.O. BOX 407
13                              WASHINGTON, D.C.  20044-0407
14                              (202) 626-6600
15  FOR DEFENDANT:              O'MELVENY & MYERS LLP
16                              BY:  DIANA M. TORRES
17                              400 SOUTH HOPE STREET
18                              LOS ANGELES, CA  90071-2899
19                              (213) 430-6000
20                                 -AND-
21                              PATTERSON, BELKNAP, WEBB & TYLER LLP
22                              BY:  STEVEN A. ZALESIN
23                              1133 AVENUE OF THE AMERICAS
24                              NEW YORK, NY  10036-6710
25                              (212) 336-2000
```

3

1          Los Angeles, California, Monday, April 4, 2005

2                          2:30 P.M.

3                           -oOo-

4          THE CLERK:  Item number 7, CV 04-10077-DSF, The Sugar

5   Association, Inc. Vs. McNeil-PPC., Inc., et al.

6          MR. MURPHY:  Your Honor, my name is Jim Murphy.  I am

7   representing the Sugar Association, the plaintiffs in this case.

8   Your Honor, may I say quickly I am being -- I am admitted

9   pro hac vice, and I appreciate Your Honor's courtesy in allowing

10  me to do that.

11         MR. HURVITZ:  Good afternoon, Your Honor.  Mark

12  Hurvitz on behalf of the plaintiff.

13         MS. TORRES:  Good afternoon, Your Honor.  Diana Torres

14  on behalf of McNeil.

15         MR. ZALESIN:  Good afternoon, Your Honor.  Steven

16  Zalesin also appearing pro hac vice on behalf of the defendants.

17         THE COURT:  All right.  Well, this is an interesting

18  case.  My first question is whether the Sugar Association is

19  only asserting that it has associational standing rather than

20  direct or whatever the other choice is.

21         MR. MURPHY:  That's correct, Your Honor.

22         THE COURT:  Okay.  Thank you.  Then my question to the

23  defense is why wouldn't the Sugar Association have associational

24  standing at least to seek injunctive relief?

25         MR. ZALESIN:  Because, Your Honor, in this circuit

1  under the Lanham Act in the Ninth Circuit the case law has come

2  down and said that standing requirements are more rigorous than

3  some of the other circuit courts around the country have

4  interpreted them.

5  　　　　The U.S. Supreme Court has not addressed this, but the

6  Ninth Circuit has been quite explicit that in order to have

7  standing to sue for false advertising under the Lanham Act as

8  opposed to a trademark type injury, that the plaintiff must have

9  a discernibly competitive injury.

10  　　　　And that has been typically construed to be that they

11  have to be a direct competitor of the advertising defendant.

12  　　　　THE COURT:  Well, I agree with you there.  But I

13  didn't see a case where that was applied to an association, and

14  so I'm wondering if that law doesn't simply establish what

15  standing requirements the members of the Association must have.

16  　　　　MR. ZALESIN:  Well, I think there is an absence of law

17  either way on this subject, Your Honor.  I agree with you in the

18  Ninth Circuit.

19  　　　　There are two cases that have been called to the

20  Court's attention from other circuits; one from the First, from

21  the Court of Appeals, and a District Court case from the Seventh

22  Circuit with respect to the issue of associational standing

23  under the Lanham Act.  None in the Ninth.

24  　　　　And I think it can't be disputed that the standing

25  requirements in those other circuits, the First and the Seventh,

5

1    are quite different than they had in the Ninth.

2          I agree with Your Honor, it doesn't ipso facto mean no

3    associational standing.  But I think when you actually come down

4    to the allegations of a complaint in this case and you examine

5    associational standing under the *Hunt* test for the Lanham Act

6    claims that the Association here wants to bring on behalf of its

7    members, it becomes clear that they cannot meet the first prong

8    of the *Hunt* test as applied in this circuit or at least as the

9    Lanham Act is applied.  And let me explain.

10          The allegations of the complaint are that my client,

11   McNeil, which markets Splenda artificial sweetener, the tabletop

12   sweetener that comes in yellow packets and you can also buy it

13   in grocery stores, through its advertising has injured the

14   members of the Sugar Association who aren't selling tabletop

15   sweeteners and packets but rather are sugar growers and refiners

16   and producers and the like.

17          So the competition between the members of the

18   Association on the one hand and the defendant in this case,

19   McNeil, on the other hand, is rather attenuated.  I think the

20   circumstances might be different if this were an association who

21   represented aspartame retailers, people who sell Equal and other

22   products who are competing directly for the same consumers as

23   McNeil is competing.

24          But in this case, Your Honor, what we have here are

25   sugar growers and producers who by their own allegations, at

1    least based on the allegations of the complaint, aren't in that

2    kind of direct kind of competition with McNeil.

3    And so when you apply the rather rigorous standing

4    requirements of the Ninth Circuit to these members under the

5    associational standing test of *Hunt*, we say they haven't

6    established standing.

7    But at a minimum, the third prong of the *Hunt* test

8    which says if you need the members in the case in order to

9    decide an issue in the case such as damages, or in this case

10   injury, standing -- many Lanham Act false advertising cases

11   really rise and fall on the issue of whether the alleged false

12   advertising is going to injure the plaintiff.

13   Here the plaintiff isn't the members.  It's the

14   Association.  But we say -- we have denied in our answer their

15   allegations of injury to these members, and we say that we need

16   those members here to be able to test those allegations.

17   They are absent.  They can't be either the first or

18   the third prong of *Hunt*.  That's why we say they have no

19   associational standing.

20   THE COURT:  I am with you on the third.  So I will

21   look to the plaintiff to explain to me why the third element of

22   the *Hunt* test doesn't preclude the plaintiff from bringing at

23   least its damages type claims.

24   MR. ZALESIN:  Did you want to hear from the plaintiff

25   now on that issue?

1    THE COURT:  Please.

2    MR. MURPHY:  Your Honor, it is true that most of the

3    associational standing cases that have been decided grant

4    associational standing in the context of injunctive relief.

5    There is no question about that.

6    But, Your Honor, the Lanham Act is different.  And

7    the reason why the cases go the way they do is because of the

8    so-called third prong of the *Hunt* case which says that there

9    should be no associational standing if the -- if there is a

10   requirement that each member of the Association participate in

11   the case in order to establish the claim or the relief

12   requested.

13   The Lanham Act is different.  It's a fairly unique

14   statute.  I'm not going to say it's the only statute of this

15   sort, but it's a unique statute because it provides alternative

16   monetary remedies to an aggrieved plaintiff.

17   An aggrieved plaintiff can seek lost damages, that is,

18   its own lost profits, or it can seek disgorgement of profits by

19   the defendant.  Intuitively I think it's pretty plain that it is

20   not necessary for each member of the Sugar Association to

21   participate in the case in order to prove the profits of McNeil,

22   the defendant.

23   And just, Your Honor, why -- I mean, associational

24   standing is perfect for a Lanham Act case because in the

25   liability phase the focus of the Court is on the advertising and

1   the conduct of the defendant.  Well, also in a Lanham Act case,

2   somewhat unusually, so also is the focus on the defendant with

3   respect to the disgorgement of profit, remedy.

4        If I might, Your Honor, I think what the defendant is

5   trying to do is to say we don't have -- we, the plaintiff, we

6   don't have a way of proving damages; that is, of proving their

7   lost profits and our share of those lost profits without

8   involving each and every member of the Sugar Association.

9        That just isn't so, Your Honor.  I can and I would be

10  glad to explain at least one way that we can do that.

11       The starting point are the profits of McNeil.  We

12  don't claim, Your Honor, and obviously you don't need the

13  Association members to know what the profits of McNeil are.  We

14  don't claim that we are entitled to all of those profits.  There

15  has to be an allocation.

16       By way of example, one allocation is McNeil also

17  competes with the artificial sweeteners, the Equals and the

18  Sweet 'N Low's.  They compete with us also.  So we are entitled

19  to a portion, but that portion is a portion of the sugar

20  industry.

21       You don't need the sugar industry -- you don't need

22  the Sugar Association members to know what the sales are of the

23  sugar industry compared to the sales of the artificial

24  sweeteners.  Sales of the U.S. sugar industry are kept by the

25  Department of Agriculture.  They are also kept interestingly by

9

1   the Sugar Association.

2         Indeed even if you need -- and I'm not sure you do and

3   I'm not sure whose burden it is to know the sales of each member

4   of the Sugar Association -- that information is maintained by

5   the Sugar Association itself.

6         And so we don't -- I mean, all I am saying at this

7   stage, Your Honor, is that we believe we can demonstrate

8   monetary loss based on McNeil's profits without necessarily

9   involving and requiring the participation in each and every

10  member of the Sugar Association.

11        The Supreme Court has said that this third prong of

12  *Hunt* is not a requirement of case or controversy, but is what

13  they call prudential.

14        THE COURT:  Jurisprudential.

15        MR. MURPHY:  Jurisprudential.  Thank you, Your Honor.

16        And I think Justice Souter in one of the cases

17  characterized it as a matter of administrative convenience.  So,

18  Your Honor, I think, though, it's the question for you.

19        And I think -- I think I would like to tell you what

20  the answer is, but I think for you is -- the question is are you

21  going to at this point in time say there is no way, given the

22  Lanham Act's particular statutory monetary remedy based on

23  McNeil's lost profits, for us to demonstrate a monetary remedy

24  that you would find appropriate without involving each and every

25  member of the Sugar Association.

1    We think we can do that, and we think we should be

2  allowed to do it.

3    THE COURT:  Well, I think what the Court was saying

4  was that Congress could decide to eliminate the third prong, not

5  that Judge Fischer could decide to eliminate the third prong

6  from the analysis.

7    MR. MURPHY:  Your Honor, I'm not suggesting -- I

8  understand what you are saying in that *United Food* case where in

9  fact Congress did say that -- eliminate the third prong.  I'm

10  not saying the third prong is eliminated here at all.  What I am

11  saying is we can work within the third prong.

12    In order to establish damages, we do not have to

13  involve -- we do not require the participation of each and every

14  member of the Sugar Association.  And the reason is because we

15  are not going to try to show the lost profits of each and every

16  member of the Sugar Association.

17    We are going to base our monetary remedy on McNeil's

18  profits, and that's a remedy that the Lanham Act statutorily

19  provides, and that is different.  It is not normal.

20    THE COURT:  But what do I do with the money when I get

21  it, assuming for the moment that you prevail?

22    MR. MURPHY:  Your Honor, the money that -- we have

23  taken care of that, Your Honor.

24    THE COURT:  Good.  How have you done that?

25    MR. MURPHY:  Well, what we did, Your Honor, and we did

1    this just recently, and I apologize for this.  I didn't quite

2    know how to handle this, frankly.

3            But just a few days ago after some discussion, the

4    members of the Sugar Association and the Sugar Association

5    itself entered into what we call a joint allocation agreement.

6    And it basically is an agreement among the Sugar Association and

7    its members as to how any damage -- damages awarded to the Sugar

8    Association will be allocated among its members.

9            And I can -- I would be delighted to hand this up and

10   give it to opposing counsel.  But essentially the Sugar

11   Association had been in operation since the mid 1940's.  They

12   have a formula for assessing dues on an annual basis.  The

13   formula by which they do that is their relative sales, one

14   against the other.

15           In other words, everybody pays their proportionate

16   sale of the annual cost of the Sugar Association based on their

17   relative shares of sales.  They have effectively agreed to

18   allocate among themselves, and the Sugar Association has agreed

19   to do this as well, that any damages awarded will in fact go to

20   the members in the same proportions.

21           THE COURT:  Are the members of the Sugar Association

22   all of the sugar growers, producers, whatever, in the country

23   or, for that matter, the world?

24           MR. MURPHY:  Let me take the last part first.  Not the

25   world for sure, and we aren't seeking worldwide damages.  We are

1  seeking damages based on U.S. profits.

2          THE COURT:  Well, that doesn't mean sugar growers

3  wouldn't send sugar to the United States.

4          MR. MURPHY:  No.  But the sales -- sales in the U.S.

5  sugar market are maintained by the Department of Agriculture.

6          I'm just drawing a blank.  Your question was -- and I

7  apologize.

8          THE COURT:  Are all of the sugar growers in the

9  United States members of the Association?

10          MR. MURPHY:  Thank you.  They are not.  But 17 of the

11  18 processors of sugar in the United States are members.  There

12  is only one processor of sugar, C & H Sugar Company, which is a

13  substantial entity, is not a member.

14          So we think, once again, based on industry

15  information, we can -- and what you are essentially talking

16  about I think is allocating among the sugar people, what portion

17  should go to the Sugar Association.  And that can be done

18  because the Sugar Association members comprise such a very high

19  percentage of the sugar market in the United States.

20          And once again, all you are talking about, we believe,

21  is sales information, and the Sugar Association itself has that

22  information.  So we don't think, and as we build up our damage

23  case and assuming it satisfies Daubert and all the rest, we

24  don't think that there is a requirement that each -- that the

25  participation of each member of the Association is

1  indispensable.  And that's the standard the Supreme Court has

2  set.

3  　　　　　We are not saying do away with the third prong.  We

4  are saying we can work within that third prong.

5  　　　　　THE COURT:  Well, it's interesting to think of if it's

6  jurisdictional whether the parties can even create -- sort of

7  eliminate the issues by stipulation, much less eliminate one of

8  the 18 sugar producers.  And it seems like there is a whole

9  other industry out there that is maybe the actual competitors

10  that you agree is in this mix somewhere, but not in your

11  lawsuit.

12  　　　　　MR. MURPHY:  Well, we are actual competitors with

13  Splenda.  Their advertising, Your Honor, says they take sales

14  away from the sugar industry.  And the Sugar Association since

15  the 1940's has been the representative of the sugar industry in

16  the United States.

17  　　　　　So, I mean, I heard counsel say that, and frankly I

18  don't think that's in their moving papers, that they are -- that

19  they said they were not competitors of ours.  But they are

20  competitors of ours for sure.

21  　　　　　THE COURT:  All right.  Well, I will have to look at

22  your allegations and see.

23  　　　　　MR. MURPHY:  To address your other point, I don't

24  think that -- I think what the third prong is saying is that as

25  a matter of jurisprudential, you know, or administrative

1  convenience, however you want to put it, the Court's discretion,

2  if the participation of every member of the Association is

3  required, for example, to make a damage claim, then it doesn't

4  make any sense to have associational standing for a damage

5  claim.   It's more a common sense proposition.

6          But if the damage claim can be made out without

7  requiring the participation of every member of the Association,

8  that is all that the third prong requires for us to go forward.

9          And, Your Honor, and I do earnestly suggest to you

10  that because of the Lanham Act alternative damage measurement of

11  McNeil's profits, it really does create a very different

12  paradigm for what you have to know in order to make a

13  monetary -- a successful monetary damage claim, and that's

14  really the essence of what we are trying to say to Your Honor.

15          THE COURT:  Well, it does suggest to me, though, even

16  if you are right, that there are parties missing from this

17  lawsuit.  C&H is missing.

18          MR. MURPHY:  There are parties who could join this

19  lawsuit, to themselves make a claim for damage over and above

20  and separate from ours for sure.  Although I should also say,

21  Your Honor, there is another lawsuit going on in the federal

22  court of Pennsylvania brought by one of the artificial sweetener

23  companies.  But the reason --

24          THE COURT:  I want to get mine there quick before they

25  get theirs here.

1    MR. MURPHY:  Right.  The reason why I was talking

2  about these allocations earlier is because we are not intending

3  to claim that we are entitled to all of McNeil's profits from

4  the sale of Splenda.  The fact that other people could bring

5  lawsuits and claim their share is -- of McNeil's profits is, I

6  suggest, Your Honor, no good reason why we shouldn't be allowed

7  to proceed and try to get our share.

8    THE COURT:  Well, I assume that's true in general for

9  cases where disgorgement is a remedy that one of many potential

10  plaintiffs could bring such a claim.  For all these statutes

11  that you suggest are similar, are there any cases under those

12  statutes where the plaintiff has asserted associational standing

13  and monetary remedies of any kind?

14    MR. MURPHY:  Your Honor, there is certainly no Lanham

15  Act case that talks about the availability of, you know, of an

16  association seeking monetary relief.  No question about that.

17    In fact, I think as opposing counsel said, we've only

18  found -- and I don't think they've found any cases.  We have

19  only found two, and they have found none that talk about

20  associational standing in the context of injunctive relief, and

21  both go our way happily.

22    THE COURT:  Well, injunctive relief?

23    MR. MURPHY:  On injunctive relief; correct.  There is

24  none on the damage side one way or the other.

25    THE COURT:  In this or a similar -- I assumed that was

1    true because you didn't cite them to me.

2         MR. MURPHY:  Right.  And I don't know of others in

3    similar circumstances, but I will have to admit to you in candor

4    I don't think we looked for every conceivable lost profit

5    statute.  There, of course, are not very many statutes that

6    provide that kind of remedy.

7         THE COURT:  Okay.  Tell me about the state statutes

8    after Prop 64 and what I'm supposed to do with those.

9         MR. MURPHY:  It's an interesting -- and I would not

10   suggest to Your Honor that it was an easy question.  There is no

11   question that Proposition 64 created higher standing

12   requirements for the UCL.  No doubt about that.

13        But I think what Your Honor has to focus on, or I hope

14   Your Honor would focus on, was to look at what the language is

15   after the Proposition 64 and then to analyze whether, given that

16   language, associational standing is appropriate, assuming the

17   traditional standards for associational standing can be met.

18        And here is what I mean by that.  Prior to Prop 64,

19   the standing rule for the UCL was so liberal that, you know, the

20   use, for example, of the *Hunt* three prong test, you know, was --

21   I doubt if it was ever considered.

22        But the language you have afterward which is any

23   person who has suffered injury in fact and has lost money or

24   profit, that is language that is very similar to a lot of other

25   statutes, including the Lanham Act and the Maryland Disability

1  Act.

2         So when you look at that new language and you say was

3  the intent of Prop 64 to just obliterate associational standing

4  with respect to the UCL, or was it to require going forward,

5  that the three prong *Hunt* test which the Supreme Court of

6  California adopted in the *Teamster* case was to be applied.

7         In other words, it's tougher to get in on

8  associational standing than it was before, but if you satisfy

9  the three prong *Hunt* test, you can do that.

10         We think that makes sense because of the language of

11  the statute, and also because, Your Honor, I think it's fair to

12  say that California has been receptive and the *Teamster's* case

13  is one of those cases that it has been receptive to

14  associational standing so long as the three prong *Hunt* test, you

15  know, can be satisfied.

16         And so, Your Honor, I'm not saying to Your Honor this

17  is an easy question, because of course Proposition 64 did change

18  things.  And we know of no ruling by a California court, state

19  or federal, on the question that is before Your Honor at this

20  time.

21         But we think if you look at the new language, the

22  traditional standards for associational standing, you will see

23  that associational standing still makes sense so long as the

24  *Hunt* standards can be satisfied.

25         THE COURT:  What would you think of the Court's simply

1  declining to exercise supplemental jurisdiction over the state

2  law claims?

3  　　　　　MR. MURPHY:  Your Honor, we would hope that you would

4  continue to exercise supplemental jurisdiction over those

5  claims.

6  　　　　　THE COURT:  Only if I find in your favor when I

7  interpret them, I assume.

8  　　　　　MR. MURPHY:  Well, yes, I guess I have to agree with

9  that.  But I think if you were going to do anything in this

10  regard, it might make sense to stay your ruling on this

11  question.

12  　　　　　I strongly suspect that the California courts, the

13  state courts, are going to have to address the very question

14  that is before you right now; that is, whether Prop 64

15  obliterated all associational standing for the UCL.

16  　　　　　Having the case go forward now without your ruling on

17  that -- on that specific issue does no harm.  I mean, the

18  discovery in this case is going to be the same.  The process in

19  the case will be the same.

20  　　　　　There will be a time, and I suspect in the not too

21  distant future, when the California courts will enlighten on

22  this issue.  And when that happens, for good or bad for me, I

23  think that would be the appropriate time to rule.

24  　　　　　I mean, I can understand -- I mean, you know, we think

25  we are right in the way the argument is going to play out here,

1    but I would be dishonest if I didn't tell you that, you know,

2    who knows?  I mean for sure.

3          But we think the way to do it rather than just deny

4    supplemental jurisdiction is to stay your ruling because I don't

5    think it's going to change anything going forward.  There will

6    come a time when the ruling will be required, but I don't think

7    it's now.

8          THE COURT:  All right.  In view of the fact that you

9    are only asserting associational standing, is there any reason

10   that I should give you leave to amend if I were to dismiss any

11   of the claims?  Something you think you can assert that you

12   haven't already asserted?

13         MR. MURPHY:  Your Honor, if you were to deny -- I

14   perish the thought -- our ability to go forward based on

15   associational standing with a damage claim, it may be that some

16   of the individual members of the Sugar Association would want to

17   join as plaintiffs.

18         I truly cannot tell you right now whether that would

19   be the case or not.  I simply don't know.  But in our papers, we

20   held out that thought.

21         And so if you do rule against us, we would at least

22   like to have some period of time when I think rather -- I think

23   we characterized it as an amendment to the complaint.  The more

24   I thought about it, I think it's more leave to intervene because

25   it would be a new party and to give us some period of time for

1  the individual members to decide if they want to intervene and

2  assert individual damage claims.

3          THE COURT:  Okay.  Thank you.

4          MR. MURPHY:  Thank you, Your Honor.  I appreciate the

5  time.

6          MR. ZALESIN:  Your Honor, can I make a few brief

7  points?

8          THE COURT:  Please.

9          MR. ZALESIN:  Let me start with the UCL claim, Your

10  Honor.  I will try to work my way backwards.  I think we

11  disagree with the plaintiff in terms of whether this is a

12  difficult question or an easy question.

13          THE COURT:  Don't tell me it's easy because I don't

14  know which way I'm going on it.

15          MR. ZALESIN:  Let me tell you what makes it easy for

16  us.

17          THE COURT:  Okay.

18          MR. ZALESIN:  Mr. Murphy has asked you to look at the

19  language of the statute after the amendment.  He has ignored the

20  language of the statute before the amendment.

21          Before the amendment the statute said a suit can be

22  brought by any person acting for the interests of itself or its

23  members or the general public.  And in enacting Prop 64, the

24  California voters struck out "or its members."

25          If you grant associational standing in this case, I

1   can't imagine what effect we are giving to the statutory change

2   where they struck out the words "or its members."  Prop 64

3   wasn't just about doing away with these private Attorney General

4   suits where a lawyer has no real client who is affected.

5        That was obviously one very important thing, but the

6   actual changes to the statute explicitly did away with

7   associations suing for their members.

8        THE COURT:  Nobody provided me with the voter

9   materials.  Have you looked at them?  Are they not helpful?

10       MR. ZALESIN:  I have, Your Honor, and they do not

11  speak explicitly to this.  But it is useful to look at the

12  proposition itself because it's just a very powerful visual

13  impact that it makes when you see the -- you know, the -- sort

14  of the red line version.

15       THE COURT:  I have seen that, and I understand your

16  point.  And, frankly, at first glance I agreed with you.  And

17  then in fact you look at the phrase before that, and it

18  indicates that government prosecutors can sue based on the

19  complaint of any person, corporation, association, et cetera.

20  And then in the very next clause it says "or the suit can be

21  brought by a person."

22       MR. ZALESIN:  Right.

23       THE COURT:  So you look at it and say, well, they knew

24  how to list all those things.  If they wanted to give all those

25  groups standing, and they didn't -- but then I can't imagine

1  that the statute doesn't allow a corporation which has been

2  directly harmed which is certainly possible not to sue.

3      So I don't think I could interpret "person" to mean

4  literally a human being.

5      MR. ZALESIN:  We would agree with that.  I think the

6  word "person" is typically interpreted to encompass legal

7  entities other than human beings.

8      THE COURT:  Generally including associations, though.

9  That is, I think, the problem.

10     MR. ZALESIN:  Well, an association that was directly

11 competing with the advertiser which was injured in its own right

12 and which had suffered injury and had lost money or property

13 would be a person that could bring a suit.

14     But what an association can't do is bring a suit on

15 behalf of its members because that's exactly the language that

16 the voters struck out of the statute before Prop 64.  In that

17 regard we regard this as a straightforward question.

18     THE COURT:  Do you suggest that I go right to that as

19 opposed to the plaintiff's suggestion which is well, it's not

20 really ambiguous because "person" is defined elsewhere in the

21 law so you don't go anywhere else?

22     MR. ZALESIN:  Your Honor, we think it is appropriate

23 when there has been a change, whether it be a legislative change

24 or a change by virtue of voter initiative.  And I think the law

25 in California is clear that they should be interpreted and

1    analyzed the same way.

2         When legislators or voters strike words out of a

3    statute, a court is in effect bound to give effect to that

4    action on the part of the party that is acting, whether it's the

5    legislature or the voters.  And to just read it back in would be

6    to effectively disregard that aspect of Prop 64.

7         THE COURT:  Do you agree that I should not decline to

8    exercise supplemental jurisdiction?

9         MR. ZALESIN:  Your Honor, either result would be

10   satisfactory to the defendants.  The result that we would

11   discourage is the result that Mr. Murphy just advocated that you

12   simply hold off making a ruling.  He says that we are going to

13   have a decision by the California courts very promptly on this.

14        Let me remind Your Honor that in all the years that

15   the Lanham Act has been around, we found exactly two cases,

16   false advertising cases in federal jurisprudence, where this

17   issue of associational standing to raise a false advertising

18   claim has come up.

19        I don't know what makes anyone think that this issue

20   is going to pop right up out of the California appellate courts.

21   It could be years or decades before that issue is settled.  So a

22   stay doesn't seem appropriate.

23        A ruling on the merits would be appropriate.  A

24   discretionary refusal to exercise supplemental jurisdiction

25   would be appropriate as well.

1    THE COURT:  Then we would know that it would get to

2    the state court and we would have a ruling on it, "we" meaning

3    the State of California because this may be one of the very few

4    cases.

5         I tend to agree with you on that, that cases alleging

6    the kind of associational standing and the kind of association

7    in this case probably will be few and far between.

8         MR. ZALESIN:  I agree, Your Honor.  Although I don't

9    know that we would find the Sugar Association going across the

10   street to -- sorry.  In New York they are across the street.

11   Going to court to file a similar action, depending on what

12   happens in the Lanham Act -- in the Lanham Act claim.

13        Let me turn back to the Lanham Act, if I could, Your

14   Honor.  We haven't seen this allocation agreement, but without

15   seeing it, I am pretty confident I can tell you it doesn't

16   address our concerns.

17        First of all, there are many cases which say that when

18   an association is suing on behalf of its members, it can't get

19   damages or any other form of monetary recovery.  That goes back

20   to the Supreme Court's decision in *Warth vs. Seldin*.

21        There is the *United Union of Roofers* case in the Ninth

22   Circuit.  This is in effect a black letter rule that an

23   association, if it has standing, can only go for injunctive

24   relief, not for monetary relief.

25        And no case from any jurisdiction has been called to

1   your attention to hold otherwise with the exception of the

2   *United Food* case, but that was a situation where Congress

3   explicitly said that the union can sue for the damages of its

4   individual members.  That's not the case here.

5           Now, the plaintiff has suggested to you that the

6   Lanham Act has language in it that operates in a similar way to

7   the language in the statute at issue in *United Food*, and that is

8   the disgorgement section of the Lanham Act which authorizes

9   either damages or disgorgement of the plaintiff's profits.

10          Frankly, we think the plaintiff has read far too much

11  into that section of the Lanham Act.  It is not a section which

12  authorized a punitive type remedy where whoever gets to court

13  first gets a windfall and the plaintiff has to disgorge all of

14  its profits associated with its business or its advertising.

15          In fact, the statute itself explicitly says otherwise.

16  It says that disgorgement shall in all cases be compensation,

17  not a penalty for the injuries allegedly suffered or rather for

18  the wrongful conduct by the defendant and the.injuries allegedly

19  suffered by the plaintiff.

20          THE COURT:  In other words, it would have to be

21  disgorgement of the profits attributable or that otherwise might

22  have gone to that particular entity?

23          MR. ZALESIN:  Exactly right.  It's a compensatory

24  remedy, not a punitive one.

25          And in order to prove that they are entitled to

1  compensation of that sort, just like in every other damages type

2  statute or damages type case, they have to come forward and

3  prove that they suffered actual monetary losses as a result of

4  the alleged false advertising.

5         We don't have the members here.  There is no way to

6  figure out whether in fact that is the case.

7         And in terms of the assertion that the -- there are

8  sales figures for the United States sugar industry available --

9  first of all, those aren't the sales figures that particularly

10  matter.

11         But just to show you why we need the members here, the

12  sugar industry has been losing sales for years, not because of

13  Splenda but because of the Atkins diet and obesity and diabetes,

14  and there are lots of reasons why people want to limit their

15  sugar intake.

16         So to say, "Here are our sales; here is what they were

17  in 1999; here is what they are today.  Pay up."  That doesn't

18  even begin to make any sense.

19         Even if you go beyond that, though, now they say,

20  "Okay, well, here is our declination in sales in sugar so give

21  us the money, and we will decide how we are going to divvy it

22  up."  We haven't seen any law that says that that is

23  appropriate.

24         As Your Honor correctly pointed out, they don't

25  represent the entire United States sugar industry.  C&H, if it's

1    not the largest, it is certainly one of the largest sugar

2    companies.  They don't represent foreign sugar producers who

3    struggle to compete with them while they have all these price

4    protections and tariffs and everything else that makes it

5    difficult.

6         They don't represent manufacturers of artificial

7    sweeteners other than sucralose like aspartame and saccharine

8    and others.  So there is simply no way that by entering into a

9    contract amongst themselves they can cure the clear defect in

10   their damages case.

11        And finally, Your Honor, I would say that it goes even

12   further than that.  As I alluded to a moment ago, we think that

13   the competition, if you will, between McNeil on the one hand and

14   the sugar growers on the other hand is attenuated at best.  They

15   grow sugar.

16        They sell it to Hershey's and Coca-Cola and other

17   companies that put it in their products.  They sell it to other

18   refiners and packagers that then sell it and put it in little

19   white envelopes, and it winds up on your restaurant table.  But

20   it's not the kind of direct competition that the Ninth Circuit

21   has required for standing in Lanham Act false advertising cases.

22        So how do we know not only how much injury but whether

23   any of these individual members has suffered any injury by

24   virtue of the advertising that they challenge.  We dispute that

25   in the complaint.

```
 1        We are entitled to bring them into court and challenge

 2   them on those assertions.  They are not here.  We can't do that.

 3   They shouldn't have associational standing.

 4        THE COURT:  Thank you.  Anything further from

 5   plaintiff?

 6        MR. MURPHY:  Your Honor, may I have a couple of

 7   minutes?

 8        THE COURT:  Yes.

 9        MR. MURPHY:  Just two points, Your Honor.  First with

10   respect to the California statute and the effect of Proposition

11   64, we are not suggesting just reading back in the language that

12   was taken out at all.  What we are suggesting, Your Honor, is

13   that the very liberal standing that did not require satisfying

14   the three prong *Hunt* test that existed prior to Proposition 64

15   has been changed and now associational standing still exists.

16        But it exists in a more stringent environment; that

17   is, the need to satisfy Proposition -- I mean, satisfy the three

18   prong *Hunt* test.  So we are not doing that.

19        I also think, Your Honor, that in terms of -- this is

20   a bit of kibitzing.  In terms of whether and when a case will

21   come up in the California courts, I don't think it's limited to

22   Lanham Act claims.  I think cases will arise fairly promptly, I

23   would expect.

24        Whether under -- whether after Proposition 64 there

25   can be any form of associational standing under the UCL, that is
```

1 really the question that is before you, whether it's been

2 totally obliterated or not.  So whether it's Lanham Act or

3 diddily-do, there is going to be cases of associational

4 standing.

5        Secondly, Your Honor, with respect to the damage

6 claim, what the plaintiff is -- I am sorry.  What the defendant

7 has articulated to you or tried to articulate --

8        THE COURT:  You are usually on the defense side.

9        MR. MURPHY:  I am.  I hate to admit it.  One of my

10 fates in life.

11        Your Honor, is the different kinds of allocation that

12 have to take place.  We are not claiming, and I tried to say

13 this as clearly as I could.  I didn't get it across.  We are not

14 claiming that we are entitled to all of McNeil's profits.

15        We realize there have to be allocations for other

16 artificial sweeteners.  There have to be allocations for people

17 who aren't members.

18        But what you don't have to allocate for is maybe over

19 time the sugar industry has had declining sales.  It's not our

20 sales that count here.  It's their profits.  That's the bedrock

21 base from which the damage calculation proceeds.

22        The purpose of the joint allocation agreement is only

23 to say to Your Honor once you do all the other allocations and

24 you get to the point where the sugar industry and its members

25 are entitled to X dollars, now, of those X dollars, how will

1   those dollars be allocated among the 17 members.  That's what

2   the joint allocation agreement does.

3         And I apologize for not giving it to you, Steve.  I

4   will give it to you right away.

5         MR. ZALESIN:  Appreciate it.

6         MR. MURPHY:  Thank you, Your Honor.

7         THE COURT:  All right.

8         (Proceedings adjourned at 3:12 p.m.)

9

10

11

12                  CERTIFICATE

13   I hereby certify that the foregoing is a true and correct
     transcript of the stenographically recorded proceedings in
14   the above matter.

15   *Pamela A. Seijas*
     Pamela A. Seijas, CSR No. 3593      7-26-05
16   Official Reporter                Date

17

18

19

20

21

22

23

24

25

# EXHIBIT 32

# REDACTED

# EXHIBIT 33

# REDACTED

# EXHIBIT 34

# REDACTED

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of August, 2005, the attached **REDACTED PUBLIC VERSION OF DECLARATION OF STEVEN A. ZALESIN** was served upon the below-named counsel of record at the address and in the manner indicated:

Richard L. Horwitz, Esq.                                    <u>HAND DELIVERY</u>
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19801

James P. Murphy, Esq.                                       <u>VIA ELECTRONIC MAIL</u>
Squire, Sanders & Dempsey LLP
1201 Pennsylvania Avenue, N.W.
Suite 500
Washington, DC  20004

Adam R. Fox, Esq.                                           <u>VIA ELECTRONIC MAIL</u>
Squire, Sanders & Dempsey LLP
801 South Figueroa Street
Suite 1400
Los Angeles, CA  90017

Charles Tobin, Esq.                                         <u>VIA ELECTRONIC MAIL</u>
Leo Rydzewski, Esq.
Holland & Knight LLP
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, DC  20006


*/s/ John G. Day*
_____
John G. Day