# Exhibit A

# ADVERTISING STANDARDS COMPLAINTS BOARD

PO Box 10-675 Wellington
Telephone (04) 472-7852
Facsimile (04) 471-1785
Email asa@asa.co.nz
Website www.asa.co.nz

**05/147**
**AWAP 05/5**

## DECISION

### Special Meeting 20 June 2005

### Convened pursuant to Rule 3 of the

### Constitution of the Advertising Standards Complaints Board

**Complaint 05/147 AWAP 05/5**

Complainant:  New Zealand Sugar
Advertisement: Johnson & Johnson Pacific

**Complaint:** The voice-over in the television advertisement for Splenda  (Key No: 30JJC 1002 R, 15JJC0137) said:

"These are my famous no sugar lemon pancakes - Martin can still eat three! My no sugar custard isn't exactly unpopular either and just watch my no sugar gingerbread men walk.
You see its not sugar in my sugar bowl, it's Splenda.
It's made from sugar and tastes like it, but doesn't have all the calories, so we can still have a little sweetness in our lives.
Splenda -made from sugar, tastes like sugar"

The advertisement ended with a depiction of a packet of the product showing in small lettering under the name of the product, "Low Calorie Sweetener"

## Procedure

**The Panel:**

The Chairman, Mr R. Thompson, ruled to deal with the matter with the attendance of parties pursuant to Rule 3 of the Complaints Procedures of the Advertising Standards Complaints Board. As Mr Rob Thompson would not be available at the time of the hearing he appointed the following panel: Mr E. Abernethy (Chairman of the Appeal Board) – Chairman, and Ms J. Courtney and Mr B. Moffat - co-panelists.

The Complainant, Sugar New Zealand was represented by Ms V. Lenihan – Senior Brand Manager – Chelsea Sugar and Mr. G. Leach – Managing Director - Revo.

The Advertiser, Johnson & Johnson Pacific, was represented by Mr. C. Towers - Managing Director – NZ and Mr D. Lewis – Partner – Kensington Swan Lawyers. Mr S. Wallace – Managing Director, McNeil Nutritionals Asia – Pacific was in attendance.

2

05/147
AWAP 05/5

**The Complainant, New Zealand Sugar, said:**

"**What:** Splenda
**Where:** TVNZ/TV3/Prime
**When:** week commencing April 3/10/17 and May 8 to date

**Description:** Commercial has a 15 sec and 30 sec version
A woman has baked several foods, which she says have all the appeal of sugarbaked goodies but without the sugar and no calories.

**Transcript of 30 second TVC:**
*"These are my famous no sugar lemon pancakes - Martin can still eat three! My no sugar custard isn't exactly unpopular either and just watch my no sugar gingerbread men walk.*
*You see its not sugar in my sugar bowl, it's Splenda.*
*It's made from sugar and tastes like it, but doesn't have all the calories, so we can still have a little sweetness in our lives.*
*Splenda -made from sugar, tastes like sugar"*

**Complaint:**
This complaint is on the basis that Splenda is being compared directly to sugar and misleading and confusing consumers into thinking it's as natural as sugar because it's "made from sugar and tastes like sugar".

This complaint relates to what we believe is a breach of the Code for Comparative Advertising - guidelines a & b, plus Principle 2 and 4, guidelines a, b & c of the Code for Advertising of Food.

This is misleading for consumers as they are lead to believe Splenda is actually sugar, when in fact its an artificial chemical sweetener called sucralose.
While Splenda is originally derived from sugar (sucrose) it gores (sic) through a chemical process that changes its composition to sucralose.
Sucralose is 600 times sweeter than sucrose; it has a disaccharide structure in which three chlorine molecules replace three hydroxyl groups (chemical name trichlorogalactosucrose).
Sucralose provides essentially no energy: it is poorly absorbed (range 11 % to 27%) and excreted unchanged in the faeces. Any absorbed sucralose is excreted in the urine unchanged.

In the USA Johnson & Johnson currently face a federal court case which has been brought by the Sugar Association on the basis of false and misleading advertising and marketing to consumers. This case is yet to be heard.

Detail of relevant codes as the basis for this complaint:

**GUIDELINES FOR COMPARATIVE ADVERTISING**

3

05/147
AWAP 05/5

 a. **Comparative advertising should be factual and informative and should offer a product or service on its positive merits. The intent and connotation of the advertisement should be to inform and not to discredit, disparage or attack competitors, competing products or services directly or by implication.**

This Splenda ad discredits sugar by implication that sugar is bad for you as it contains calories.

 b. **Comparative claims should be unambiguous and clearly understandable so that there is no likelihood of the consumer being misled as a result of the comparison.**

We believe this ad misleads consumers into thinking that Splenda is a natural sugar product.

**GUIDELINES FOR ADVERTISING OF FOOD**

**Principle 2**

**All food advertisements should be prepared with a due sense of social responsibility to consumers and to society. However advertisements containing nutrient, nutrition, health or therapeutic claims, should observe a high standard of social responsibility.**

**Principle 4**

**Advertisements should not by implication, omission, ambiguity or exaggerated claim mislead or deceive or be likely to mislead or deceive consumers, abuse the trust of or exploit the lack of knowledge of consumers, exploit the superstitious or without justifiable reason play on fear.**

**Guidelines**

**(a) All nutrient, nutritional, health and therapeutic claims should be factual, not misleading, and able to be proved. A high standard of substantiation is required, such as authentication by ANZFA and/or appropriate government agencies or significant scientific agreement among experts that the claim or message is supported by publicly available scientific evidence.**

**(b) The nature of the audience should be taken into account particularly when advertisements contain nutrient, nutritional, health and therapeutic claims.**

**(c) Food advertisements can contain exaggerated or humorous depictions. This is acceptable provided it is obviously not misleading**

4

By not stating what Splenda is, consumers are mislead, as is evidenced by the US court case and statements from consumers in NZ. The ad confuses us, as on one hand it states that this is "**not** sugar in my sugar bowl" and then that it is "made from sugar and tastes like sugar". This does not seem logical and therefore confuses and misleads consumers.

**Further support**
We have the video records of a consumer focus group we were conducting at the time, into which we introduced the Splenda 30 second ad. It was played twice and respondents were asked to tell us the message that the ad conveyed about the brand and product.

The unanimous initial impression was one of confusion about whether it was sugar or not and following discussion they wondered if it wasn't sugar what exactly was this product?
This corroborates the misleading nature of this advertising.
Verbatim comments from respondents:
"I was completely confused about whether it was a sugar product or not and found the message contradictory"
"I was confused - they said it was made from sugar, but is that right or wrong?"
"Gives the message that just straight sugar is bad. Tastes like sugar, but isn't, so is much healthier - I was confused, so I thought maybe I should check that out and find out exactly what it is""

**The Chairman ruled that the following provisions were relevant:**

**\* Code for Comparative Advertising: Guidelines (a) and (b)**

**\* Code for Advertising of Food: Principle 2 and Principle 4 – Guidelines (a), (b) and (c).**

**The Advertiser, Johnson & Johnson Pacific, said:**

"We acknowledge receipt of your letter of 3 June 2005 and refer to your telephone conversation with David Lewis of Kensington Swan, our legal representative in New Zealand. In that conversation, you confirmed that the deadline for responding to your letter was extended to 3.30pm Wednesday 15 June 2005. Thank you for granting this extension.

Our response is as follows.

1.      **Complaint**
1.1     The grounds of the complaint are extracted below:

5

(a)    the TVC misleads consumers "into thinking it's as natural as sugar because it's "made from sugar and tastes like sugar"";

(b)    the TVC misleads consumers "as they are lead to believe Splenda is actually sugar";

(c)    the TVC "discredits sugar by implication that sugar is bad for you as it contains calories", ·in breach of Guideline a. of the *Guidelines for Comparative Advertising*;

(d)    the TVC "misleads consumers into thinking that Splenda is a natural sugar product", in breach of Guideline b. of the *Guidelines for Comparative Advertising*; and

(e)    the TVC confuses consumers "as on one hand it states that this is **not sugar** in my sugar bowl" and then that it is "made from sugar and tastes like sugar"". in breach of Principles 2 and 4 and Guidelines a., b. and c. of the *Guidelines for Advertising of Food*.

These grounds can be summarised as follows:
(i)    the TVC misleads consumers into believing that SPLENDA2 in fact is sugar;
(ii)    the TVC misleads consumers into believing that SPLENDA* is as natural as sugar and is a natural sugar product; and
(iii)    the TVC discredits sugar by implying that sugar is bad for consumers as it contains calories.

We will respond to each of these grounds of complaint in turn.

1.2    We strongly deny that the TVC is in breach of the Guidelines for Comparative Advertising or the Guidelines for Advertising of Food. We confirm that all claims made in the TVC are factual, not misleading and able to be proved.

2    **Response**

2.1    **Background**

SPLENDA* is a low calorie sweetener, the sweetener being sucralose. We agree with the Complainant and confirm that SPLENDA*:

- is not sugar (sucrose);
- is "originally derived from sugar (sucrose)"; and
- "goes through a chemical process that changes its composition to sucralose."

In that regard, SPLENDA* is chemically derived from sugar, and thus its chemical structure clearly resembles that of sugar. In this regard, we set out the comparative chemical structures of sucrose, sucralose and competing artificial sweeteners. You will see that sucralose is structurally similar to sucrose, unlike other sweeteners. (a comparative diagram was enclosed)

SPLENDA* has been sold in New Zealand for around 9 years, throughout which time the attributes discussed in this letter have been heavily promoted. We are not aware of any complaints that the SPLENDA* claims are misleading (to verify this, we have reviewed our records back to 2002).

You also will see that on the front of the packaging SPLENDA* clearly is described as a "Low Calorie Sweetener". The front of the packaging is featured in the last frame of the TVC.

There are two relevant TVCs, a 30 second version and a 15 second version. We point out that while the Complainant refers to the 15 second TVC in the "Description" section, it does not refer to the grounds on which the 15 second TVC is misleading or otherwise in breach of the Guidelines. **Attached** is a transcript of the 30 second TVC. If required, an electronic copy of this TVC can be made available to the Board.

The TVC was first broadcast in New Zealand on 3 April 2005. Apart from this complaint, we have not received any consumer or competitor complaints in New Zealand in relation to the TVC, or any claim in the TVC.

## 2.2     Complainant ground 1: SPLENDA* is in fact sugar

The Complainant claims that the TVC is in breach of Principles 2 and 4 and Guidelines a, and c of the Guidelines for Advertising of Food on the basis that the TVC confuses and misleads consumers into believing that SPLENDA in fact is sugar. We strongly deny that this is the case. SPLENDA" has unique and special sugar-like attributes and we have every right to promote the relationship between our product and sugar, just as consumers are entitled to be informed in this regard.
The connections with sugar to which we refer are the following.

- SPLENDA* is derived from sugar- sugar is a principal component in the manufacture of sucralose.

- The chemical structure of SPLENDA* is similar to sugar - see 2.1.

7

- SPLENDA* tastes like sugar - extensive testing has been conducted on this proposition, and the proposition is widely acknowledged as correct.

- The reason SPLENDA* tastes like sugar is because it is derived from sugar - see the attached technical paper (Wiet, S and Miller, G, (1996) Does chemical modification of tastants merely enhance their intrinsic taste qualities? *Food Chemistry* 58(4).305-311) which provides clear support for this and associated propositions.

- Like sugar, SPLENDA* can be used in cooking and baking - this attribute is a significant differentiating factor compared with other artificial sweeteners (which either degrade under heat or do not have a sugar-like taste).

In short, Splenda is not sugar but a sugar substitute that resembles sugar more closely than other artificial sweeteners. This is important information for consumers to know, and it is what differentiates our product from competing low calorie sweeteners.

Contrary to the allegations of the complaint, the statement "made from sugar, tastes like sugar" (the Complainant incorrectly quotes "made from sugar and tastes like sugar") in no way implies to consumers that SPLENDA* actually is sugar. In fact these claims clearly differentiate the SPLENDA* product from sugar in that:

- "made from sugar" expressly conveys to consumers that SPLENDA* is manufactured or derived from sugar (and therefore no longer is sugar); as distinct from "made with sugar" which conveys that sugar is an ingredient;

- "tastes like sugar" compares the taste of the SPLENDA*·product with the taste of sugar, thereby expressly conveying that SPLENDA* is not sugar, but something different. We have difficulty understanding how SPLENDA· could be understood to be sugar if it merely tastes **like** sugar.

Further, in the TVC the claims "made from sugar" and "tastes like sugar" are made in the context of claims such as:

- my famous **no-sugar** lemon pancakes;
- my **no-sugar** custard;
- my **no-sugar** gingerbread men; and
- you see it's **not sugar** in my sugar bowl.

8

05/147
AWAP 05/5

The TVC clearly conveys to consumers that SPLENDA* is not sugar. In fact, the entire thrust of the TVC is that SPLENDA* is not sugar, but rather a low calorie sweetener (that is made from sugar and tastes like sugar) that is an alternative to sugar.

The claims "no-sugar", "not sugar in my sugar bowl", "made from sugar" and "tastes like sugar" therefore are not inconsistent or illogical: they in fact expressly confirm that SPLENDA* is not sugar (it is difficult to think of anything less ambiguous than "no sugar" and "not sugar").

The Complainant seeks to rely on video records of a consumer focus group. However, you will appreciate that typical consumer focus group research inherently is unreliable as a basis for assessing the consumer take-out from an advertisement. The Complainant has not provided any details on the design, implementation, conduct, analysis and integrity of this "consumer survey". For example:

- the method of selection and number of participants;
- the mode of questioning and actual questions (eg. initial response, considered response).

The Complainant has provided no evidence of the reliability or integrity of the results from the group or its ability to provide sound, unbiased technical support for the Complainant's assertion. As you would appreciate, without this evidence there is nothing to suggest that the focus group research is reliable. The Complainant's consumer focus group results in this regard are of no merit and should be set aside.

The Complainant also seeks to rely on current litigation in the US courts relating to our US affiliate and the US Sugar Association. That litigation:

- does not relate to the TVC in question;
- relates to different claims to those referred to in this matter; and
- as the Complainant readily concedes, has not been decided by a US court.

On that basis, it is clear that the US proceedings are irrelevant to the issues at hand.

**2.3    SPLENDA- is as natural as sugar and is a natural sugar product**

The Complainant argues that the TVC misleads consumers into believing that SPLENDA* is "as natural as sugar" because:

9

05/147
AWAP 05/5

- SPLENDA* is being compared directly to sugar; and
- the TVC claims that SPLENDA* is "made from sugar and tastes like sugar".

We strongly deny that consumers are misled in this way.

At no point in the commercial is it claimed that SPLENDA* is a natural product. Further, the claims in the TVC that SPLENDA* is made from sugar or that it tastes like sugar do not in themselves convey to consumers that SPLENDA* is as natural as sugar. In fact, these claims expressly convey that this product is different to sugar, is a substitute for sugar, has been manufactured or derived from sugar and processed to reduce its calories (clearly not through a naturally occurring process) and is lower in calories. Clearly, consumers would understand from the TVC that SPLENDA*, as a low calorie sweetener, is not a natural sweetener like sugar.

Furthermore, as set out in point 2.2, the TVC clearly conveys that SPLENDA* is not sugar. Thus we strongly deny that consumers would understand SPLENDA* to be as natural as sugar or a natural sugar product.

In addition, even if some consumers potentially had further questions about SPLENDA* after viewing the TVC, that does not necessarily mean that they will be **mislead** into thinking that SPLENDA* is sugar or a natural sugar product, or that the TVC violates any applicable advertising Principle or Guideline of the *Guidelines for Food Advertising*. It simply would mean that these particular consumers (whom we certainly would not regard as typical consumers) would seek out further information on how a product can have similar properties to sugar (eg, taste, appearance, cooking performance) without being sugar.

2.4     **The TVC discredits sugar**

The Complainant argues that the TVC is in breach of Guideline a. of the Guidelines for Comparative Advertising. Guideline a. states that:

> *Comparative advertising should be factual and informative and should offer a product or service on its positive merits. The intent and connotation of the advertisement should be to inform and not to discredit, disparage or attack competitors, competing products or services directly or by implication.*

The TVC's intent and connotation clearly is to inform consumers of the fact that:

10

**05/147**
**AWAP 05/5**

- SPLENDA* is made from sugar; it is good to be made from sugar;
- SPLENDA* tastes like sugar; it is good to taste like sugar:
- SPLENDA* can be used in cooking, like sugar;
- SPLENDA* is not sugar; and
- SPLENDA* has lower calories than sugar.

The word "discredit" is not defined in the *Guidelines for Comparative Advertising*. The ordinary meaning of this word is "to damage a reputation; disgrace". Clearly the TVC does not damage or disgrace sugar. Sugar is presented in a positive way. While sugar has more calories than SPLENDA*, the message is that it is favourable to be made from sugar and favourable to taste like sugar.

The fact that sugar contains calories is widely known. It is not disparaging of sugar to state this fact. It also is a fact that some consumers seek sweetness without calories. Informing the market of their choices in this regard is not disparaging of sugar. Nothing in the TVC discredits sugar or gives rise to such a connotation.

For the reasons expressed above, we submit that the Complainant's complaint should be dismissed."


**The Agency, Lowe Hunt, said:**

"We write to acknowledge receipt of your correspondence of 9 June 2005 concerning the complaint made by Revo on behalf of Chelsea Sugar in relation to the Splenda Television Commercials Complaint 05/147 AWAP 05/05. We note that in light of the Queen's Birthday public holiday in New South Wales last Monday, the: Advertising Standards Complaints Board has granted an extension until 3.30pm on Wednesday 15th June to respond to the complaint.

We confirm that Lowe Hunt is an advertising agency for Johnson & Johnson New Zealand Limited trading as Johnson & Johnson Pacific. We have specific responsibility for the Splenda product in New Zealand. We note that Johnson & Johnson has prepared a submission in response to the Advertising Standards Complaints Board, which is being sent to you today. Lowe Hunt has reviewed our client's response and agrees with it. Lowe Hunt does not have anything further to add to the submissions made by our client...."

11

05/147
AWAP 05/5

**Television Commercial Approvals Bureau (TVCAB) said on behalf of the media:**

"The complainant is claiming this advertisement infringes the Code for Comparative Advertising, and the Code for Advertising Food.

TVCAB appraised the commercial and felt it presented the product features of Splenda without denigrating sugar either openly or by implication.

In the mind, eye and general understanding of Joe Public, sugar has two main properties: sweetness and calories. Sweetness is a matter of taste, and the degree of taste can be managed by the quantity. The calorific content is also managed by volume and with some people it is of equal importance to taste, for the quick energy it can supply.

However, with sugar one cannot have sweetness without calories. If one wants to reduce their calorie intake with sugar they have to diminish the sweetness of the food.

The complainant acknowledges that Splenda is originally derived from sugar but then contends that it is an artificial chemical sweetener, whereas it is more accurately described as processed. In much the same way that decaf coffee is processed to eliminate caffeine for those who want coffee without the caffeine, Splenda is processed to give sweetness without calories. There is no suggestion that calories are bad for you, it is simply offering the consumer a personal choice, without saying or suggesting that one option is better than the other.

The entire advertisement is completely lacking in hyperbole, ambiguity and exaggeration. In our opinion it meets the required standard of high social responsibility and the complaint overall lacks merit."

**Oral Submissions**

**The Complainant, New Zealand Sugar, said:**

The desired outcome from the hearing would be an amendment to the advertisement which clearly stated that Splenda was a "low calorie sweetener".

Omission of this phrase made the advertisement misleading to the consumer.

The Food Standards Authority classified Splenda as an "intense sweetener".

Splenda was a different product from sugar.

Spenda was metabolised in a manner which differed from the way in which sugar was metabolised.

12

**05/147**
**AWAP 05/5**

The fact that there was a pending USA Federal Court case brought by the Sugar Association suggested that there was a query to be answered.

As the advertisement stood, it was misleading to the consumer.

The retail market for sugar showed a stable long term decline in sales.

**Johnson & Johnson Ltd, the Advertiser, said:**

The claims, "Made from sugar. Tastes like sugar" had been on the Splenda packaging since 1997.

The advertisement had received pre-screening approval from the Television Commercial Approvals Bureau.

The advertisement (98% similarity) had been shown in the UK, Australia and New Zealand.

This was the first complaint received.

Johnson & Johnson's customer complaint centre for Australasia indicated that no complaints had been received, and was surprised to have received the complaint.

Prime competitors for the product was other low calorie sweeteners.

The chemical structure of Splenda was very close to sugar and this was the point of difference between Spenda and other low calorie sweeteners.

The US Federal case was not relevant to the matter before the Panel, it had not been heard and concerned different claims.

The advertisement was not misleading to the consumer as it clearly stated the product was not sugar.

The consumer was aware that the advertised product was a sugar substitute.

The "pack shot" at the end of the advertisement stated that the product was a "low calorie sweetener".

The advertisement made it clear that the product was not sugar, but was made from sugar.

There were no other low calorie sweeteners made from sugar.

In a thirty second advertisement, there was a limit as to how many messages could be conveyed to the consumer.

13

The "low calorie sweetener" message was clearly available to the consumer on the packaging.

The advertisement was directed at female grocery shoppers aged 25 to 44, who had children.

The point of difference for the product advertised was that it was unaffected by heat, remaining chemically stable when subjected to heat, maintaining its flavour and thereby being suitable for use in baking and for sweetening hot foods, such as custard.

The market for low calories sweeteners was very competitive, with three main players.

The market for Splenda was still developing.

The product was targeted at the market sector making lifestyle choices about health based consumption of food products.

Splenda was different from other artificial sweeteners.

**<u>Deliberation</u>**

The Panel perused the relevant correspondence and viewed the television advertisement. It took into account all visual and oral messages conveyed in the advertisement.

It noted New Zealand Sugar's contention that the advertisement was misleading and confusing to consumers as the product Splenda was compared directly with sugar, thereby implying that it was as natural as sugar, when in fact a chemical process had converted sugar into sucralose, which was "an artificial chemical sweetener".

The relevant provisions were the Code for Comparative Advertising, Guidelines (a) and (b). Also the Code for the Advertising of Food, Principles 2 and 4, and Guidelines 4(a) (b) and (c).

As a preliminary matter the Panel was of the view that the Splenda advertisement which said "You see its not sugar in my sugar bowl, it's Spenda, it's made from sugar and tastes like it but doesn't have all the calories" could not be said to denigrate sugar by implying that it was bad for one, as it contained calories, as asserted by the Complainant. Accordingly, the advertisement could not be said to discredit, disparage or attack competitors, either directly or by implication and as such did not effect a breach of Guideline (a) of the Code for Comparative Advertising.

Addressing the issues raised by the advertiser, the Panel said that the fact that there had been no complaints received to date, did not necessarily mean that consumers

14

were not being confused by the message in the advertisement and despite not having received a consumer complaint an advertiser still had a duty to comply with the self-regulatory Advertising Codes in New Zealand. In line with this, the Panel said the fact that the advertisement had not received complaints in the UK, Australian or New Zealand markets, was not relevant to the matter before it.

Turning to the advertisement before it the Panel noted in particular the repeated reference to sugar. The Panel considered that this identified sugar as the market competitor for the Splenda product, not the "low calorie sweetener" market, in which market Splenda was classified by the Food Standards Authority. The Panel clarified that there were two distinct classes in the market for sweetening products, one being sugar and the other being the "not sugar" category.

The Panel was of the view that the reference to "low calorie sweetener" shown in the pack shot in the advertisement was of insufficient size and dominance to clarify the product category to the average consumer. It particularly noted that this qualification had not been included in the voice-over. On this issue, the Panel's view concurred with that of the Complainant.

Furthermore, there was a long established requirement for advertisements to stand alone as a complete message, and there was no provision for having a consumer consult packaging in a retail environment to clarify a message in an advertisement. The length of a television advertisement did not excuse an advertiser from the requirement to present a clear and unambiguous message to the consumer, and in the Panel's view, clarification of the product category for Splenda could easily have been included in a simple and concise way.

Turning to Guideline (b), which stated the requirement for comparative claims to be "unambiguous and clearly understandable so that there was **no likelihood of the consumer being misled as a result of the comparison**" (emphasis added), the Panel was of the view that the advertisement as it stood, contained an overall ambiguity, through the repeated reference to "sugar", combined in particular with the reference to "not sugar in my sugar bowl", which gave rise to a likelihood of a consumer being confused and mislead as a result of the comparison in the advertisement. Accordingly, the Panel ruled that the advertisement was in breach of Guideline (b) of the Code for Comparative Advertising.

In the Panel's view that advertisement did not meet the threshold to be in breach of Principles 2 and 4 of the Code for the Advertising of Food, or Guidelines (a), (b) and (c).

The Panel ruled to uphold the complaint.


**Decision:** Complaint **Upheld**

Exhibit B

Service: Get by LEXSEE®
Citation: 2004 us dist lexis 19760

*2004 U.S. Dist. LEXIS 19760, ***

eSPEED, INC.; CANTOR FITZGERALD, L.P.; CFPH, L.L.C., and eSPEED GOVERNMENT SECURITIES, INC., Plaintiffs, v. BROKERTEC USA, L.L.C.; BROKERTEC GLOBAL, L.L.C.; GARBAN, LLC; ICAP PLC; OM AB; and OM TECHNOLOGY (U.S.), INC., Defendants.

Civil Action No. 03-612-KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2004 U.S. Dist. LEXIS 19760

September 13, 2004, Decided

**PRIOR HISTORY:** eSpeed, Inc. v. BrokerTec USA, L.L.C., 2004 U.S. Dist. LEXIS 20589 (D. Del., Sept. 9, 2004)

**DISPOSITION: [*1]** Motion of defendant ICAP Plc to dismiss for lack of personal jurisdiction granted. Plaintiffs' contingent cross motion to compel discovery denied.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant, a corporation organized and existing under the laws of the United Kingdom with a principal place of business in New Jersey, moved to dismiss for lack of personal jurisdiction a patent infringement case brought against it and six other corporate defendants by plaintiffs, all corporate entities with principal places of business in New York. Plaintiffs moved to compel discovery.

**OVERVIEW:** Plaintiffs claimed that defendant was subject to specific jurisdiction, under Del. Code Ann. tit. 10, § 3104(c)(1), based on its website activities and its subsidiaries' actions in Delaware, and to general jurisdiction under § 3104(c)(4), based on its continuous and systematic filings in Delaware relating to the formation, operation, and cancellation of its subsidiaries. The court was unpersuaded that it was appropriate to exercise specific jurisdiction over defendant on the basis of its website activity alone. Plaintiffs had not shown that defendant purposefully availed itself of conducting activity in Delaware by directly targeting its websites to Delaware or knowingly interacting with residents of Delaware through its websites. The court was also unpersuaded that the actions of its subsidiaries could be attributed to defendant for the purpose of establishing specific jurisdiction. Filing amended certificates for certain subsidiaries did not constitute continuous or systematic contacts with Delaware. Finally, the exercise of jurisdiction over defendant, pursuant to Fed. R. Civ. P. 4(k)(2), was not proper when defendant admitted that it was subject to jurisdiction in New Jersey.

**OUTCOME:** The court granted defendant's motion to dismiss; the court denied plaintiffs' contingent cross-motion to compel discovery as unwarranted.

**CORE TERMS:** website, subsidiaries, jurisdictional, discovery, forum state, long-arm, general jurisdiction, continuous, systematic, residents, certificates, exercise of personal jurisdiction, particularity, conducting, electronic, customers, exercise personal jurisdiction, federal law, unpersuaded, attributed, summons, pertaining, personal jurisdiction, exercise jurisdiction, patent infringement, burden of proving, course of conduct, conduct business, come forward,

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 19760    Page 2 of 10

Case 1:05-cv-00069-GMS    Document 57-1    Filed 08/12/05    Page 18 of 47 PageID #: 794

interactivity

## LexisNexis(R) Headnotes ◆ Hide Headnotes

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction 🔲
Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss 🔲
**HN1**⚓Pursuant to Fed. R. Civ. P. 12(b)(2), a court may dismiss a suit for lack of jurisdiction over the person. According to the U.S. Supreme Court, before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There must also be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant. This principle is traditionally described as a two-step analysis: First, whether there is amenability to service and, second, whether the exercise of jurisdiction offends the defendant's right to due process. More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction 🔲
Civil Procedure > Pleading & Practice > Service of Process > Methods of Service 🔲
**HN2**⚓Fed. R. Civ. P. 4(e)(1) states that service of a summons may be effected pursuant to the law of the state in which the district court is located. More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction 🔲
**HN3**⚓The Delaware long-arm statute, Del. Code Ann. tit. 10, § 3104(c), has been construed broadly to confer jurisdiction to the maximum extent possible under the due process clause. Nevertheless, a court must determine whether the exercise of personal jurisdiction is compatible with both the specific requirements of the Delaware long-arm statute and with defendant's constitutional rights to due process. More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction 🔲
Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits 🔲
Patent Law > Jurisdiction & Review > Personal Jurisdiction & Venue > General Overview 🔲
**HN4**⚓According to the U.S. Court of Appeals for the Federal Circuit, when the question before the court is the exercise of personal jurisdiction over an out-of-state accused infringer, the law of the Federal Circuit, rather than that of the regional circuit in which the case arose, is applicable. The Federal Circuit has instructed that, in interpreting the meaning of state long-arm statutes, courts defer to the interpretations of the relevant state and federal courts, including their determinations regarding whether or not such statutes are intended to reach to the limit of federal due process. The Delaware Supreme Court has not collapsed the analysis under the Delaware long-arm statute into the constitutional due process analysis, as some courts have done. More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction 🔲
Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss 🔲
**HN5**⚓Once a jurisdictional defense is raised, the burden is on the plaintiff to demonstrate with reasonable particularity that sufficient minimum contacts have occurred between the forum state and defendant to support jurisdiction. The plaintiff may demonstrate either specific or general jurisdiction. Specific jurisdiction arises when the particular cause of action arose from the defendant's activities with the forum state. General jurisdiction does not require that the defendant's contacts be related to the particular cause of action, but that the defendant has continuous or systematic contacts with the forum state. More Like This Headnote

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 19760          Page 3 of 10

Case 1:05-cv-00069-GMS   Document 57-1   Filed 08/12/05   Page 19 of 47 PageID #: 795

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction

*HN6* The Delaware long-arm statute provides that personal jurisdiction is proper over any nonresident who, in person or through an agent: (1) Transacts any business or performs any character of work or service in the State; (2) contracts to supply services or things in the State; (3) causes tortious injury in the State by an act or omission in the State; (4) causes tortious injury in the State or outside of the State by an act or omission outside of the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State; (5) has an interest in, uses or possesses real property in the State; or (6) contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing. Del. Code Ann. tit. 10, § 3104(c). The provisions have been construed liberally so as to provide jurisdiction to the maximum extent possible in order to provide residents a means of redress against those not subject to personal service within the State.  More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction

*HN7* Where a nonresident defendant is clearly doing business through its website in the forum state, and where the claim relates to or arises out of use of the website, it is proper to exercise specific jurisdiction over a defendant. Specific jurisdiction exists if the defendant purposefully availed itself of conducting activity in the forum state, by directly targeting its website to the state, knowingly interacting with residents of the forum state via its website, or through sufficient other related contacts.  More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction

*HN8* It is interactivity and the conducting of business over the Internet that carries jurisdictional consequences.  More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction

*HN9* Under the agency theory only precise conduct known to be instigated by the parent is attributed to the parent for jurisdictional purposes.  More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction

*HN10* The alter ego theory is applicable only when the party asserting jurisdiction has established some fraud, injustice, or inequity in the use of the corporate form.  More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction
Civil Procedure > Pleading & Practice > Service of Process > Methods of Service

*HN11* Personal jurisdiction pursuant to Fed. R. Civ. P. 4(k)(2) may be exercised if (1) ultimately, the plaintiff's claim arises under federal law, (2) the defendant is beyond the jurisdictional reach of any state court of general jurisdiction, and (3) the federal court's exercise of personal jurisdiction over the defendant does not offend the Constitution or other federal law.  More Like This Headnote

Civil Procedure > Pleading & Practice > Service of Process > Methods of Service
Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Action

*HN12* A defendant who wants to preclude use of Fed. R. Civ. P. 4(k)(2) has only to name some other state in which the suit could proceed.  More Like This Headnote

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 19760      Page 4 of 10

Case 1:05-cv-00069-GMS    Document 57-1    Filed 08/12/05    Page 20 of 47 PageID #: 796

**COUNSEL:** Jack B. Blumenfeld, Esquire and Julia Heaney, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, counsel for plaintiffs.

Of counsel: Gary A. Rosen, Esquire, Law Offices of Gary A. Rosen, P.C., Philadelphia, Pennsylvania; David J. Wolfsohn, Esquire, Alan C. Promer, Esquire, and Michele D. Hangley, Esquire, Hangley Aronchick Segal & Pudlin, Philadelphia, Pennsylvania.

Richard L. Horwitz, Esquire and David E. Moore, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, counsel for defendants.

Of counsel: James W. Dabney, Esquire, Peter L. Simmons, Esquire, and Henry C. Lebowitz, Esquire, Fried, Frank, Harris, Shriver & Jacobson LLP, New York, New York.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Kent A. Jordan

**OPINION: MEMORANDUM OPINION**

Wilmington, Delaware

**JORDAN, District Judge**

I. INTRODUCTION

This is a patent infringement case. Jurisdiction is proper under 28 U.S.C. § 1338. The plaintiffs filed their Complaint on June 30, 2004, naming **[*2]** BrokerTec USA L.L.C. ("BrokerTec"), BrokerTec Global, L.L.C., Garban, L.L.C. ("Garban"), OM Technology (U.S.), Inc., OM AB, and ICAP Plc ("ICAP") as defendants. (Docket Item ["D.I."] 1.) Presently before me is ICAP's Motion to Dismiss for Lack of Personal Jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2). (D.I. 161; the "Motion".) For the reasons that follow, ICAP's Motion will be granted.

II. BACKGROUND

A. The Parties

The plaintiffs are all corporate entities recognized under the laws of the State of Delaware and have their principal places of business in New York, New York. (D.I. 1, PP 2-4; *see also* D.I. 512.) Defendants BrokerTec, BrokerTec Global, L.L.C., and Garban are all limited liability companies organized under Delaware law and have their principal places of business in Jersey City, New Jersey. (*Id.,* PP 5-7.) ICAP is a corporation organized and existing under the laws of the United Kingdom and has a principal place of business in the United States in Jersey City, New Jersey. (*Id.,* P 8.)

B. Factual Background

Shortly after ICAP filed its Motion, the parties stipulated to and engaged in **[*3]** jurisdictional discovery. (*See* D.I. 185.) Because the plaintiffs have the burden of proving that it is proper for me to exercise personal jurisdiction over ICAP in this District, *see Provident Nat'l Bank v. California Federal Sav. & Loan Asso.,* 819 F.2d 434, 437 (3d Cir. 1987), the following is taken largely from the plaintiffs' recitation of the facts (*see* D.I. 271 at 3-10), unless noted otherwise.

The plaintiffs allege that all of the defendants are willfully and intentionally infringing U.S.

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 19760            Page 5 of 10

Case 1:05-cv-00069-GMS   Document 57-1   Filed 08/12/05   Page 21 of 47 PageID #: 797

Patent No. 6,560,580 B1 (issued May 6, 2003), which is entitled "Automated Auction Protocol Processor". (*See* D.I. 1, Ex. A.) ICAP, one of the six named defendants, is a public limited company incorporated in England and listed on the London Stock Exchange. (D.I. 162 at 2; D.I. 271 at 3.) n1 ICAP claims that it is not registered to conduct business in Delaware and that it has no registered agent for service of process in Delaware or any other state within the United States. (*Id.*) ICAP also asserts that it does not transact business, perform any work or services, or engage in any persistent course of conduct in Delaware. (*Id.*) ICAP characterizes itself as a "holding **[\*4]** company" that is the "ultimate parent of a group of companies whose principal business is that of a worldwide voice and electronic interdealer broker of a variety of financial instruments in the wholesale markets." (D.I. 162 at 2.)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n1 In support of its factual assertions pertaining to jurisdiction, ICAP cites the Declaration of Helen Broomfield, the Company Secretary of ICAP (attached to D.I. 162 as Ex. 1).


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In its 2003 Annual Report, ICAP described itself as the "world's largest voice and electronic interdealer broker" with "more than 2,800 staff, operating from 21 offices worldwide." (D.I. 271 at 3-4.) Further, ICAP defines itself as the parent company of an array of entities that are members of the "ICAP Group" (hereinafter the "ICAP Group" or the "Group"). (*Id.* at 4.) ICAP owns 100% of the twelve American subsidiaries that are a part of the Group. n2 (*Id.* at 4.) The Group is managed, as a whole, by the ICAP Board of Directors (the "Board"). (*Id.*) The Board approves the ICAP Group's budget and makes **[\*5]** regular internal audit visits to the Group's operating companies in the United States. (*Id.* at 5, 9.) ICAP earns about 35 percent of its profits from its operations in the United States. (*Id.* at 9.)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n2 BrokerTec and Garban are two of ICAP's subsidiaries. (D.I. 271 at 6.) Furthermore, the following members of the ICAP Group have filed certificates of amendment or correction in Delaware between 1999 and 2003: First Brokers Securities LLC, Garban Capital Markets LLC, Garban Corporates LLC, Garban Futures LLC, Garban Information Systems (Americas) LLC, Garban Securities LLC, Garban LLC, ICAP Services North America LLC, Wembley Asset Management LLC, and Wrightson ICAP LLC. (*Id.* at 8 (citing D.I. 275, Ex. 30).)


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

ICAP, together with its BrokerTec n3 and Garban subsidiaries, maintains two websites, namely, www.icap.com and www.brokertec.com. (*Id.* at 6.) These websites allow users to access and use the ICAP Group's accused electronic trading platforms n4 from anywhere in the world. (*Id.*)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n3 ICAP acquired BrokerTec, a Delaware company, on May 7, 2003. (*Id.* at 7.) **[\*6]**


n4 BrokerTec's Electronic Trading Network ("ETN") and Garban's Electronic Trading

Community ("ETC"). (D.I. 271 at 6.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

III. STANDARD OF REVIEW

*HN1*⚓Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, a court may dismiss a suit for lack of jurisdiction over the person. According to the United States Supreme Court,

> before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There must also be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant.

*Omni Capital Int'l v. Rudolf Wolff & Co.,* 484 U.S. 97, 104, 98 L. Ed. 2d 415, 108 S. Ct. 404 (1987). This principle is traditionally described as a two-step analysis: First, whether there is amenability to service and, second, whether the exercise of jurisdiction offends the defendant's right to due process.

*HN2*⚓Rule 4(e)(1) of the Federal Rules of Civil Procedure **[*7]** states that service of a summons may be effected "pursuant to the law of the state in which the district court is located." *HN3*⚓The Delaware long-arm statute, 10 Del. C. § 3104(c), has been construed broadly to confer jurisdiction to the maximum extent possible under the due process clause. n5 *La Nuova D&B S.p.A. v. Bowe Co. Inc.,* 513 A.2d 764, 768 (Del. 1986). I must nevertheless determine whether the exercise of personal jurisdiction is compatible with both the specific requirements of the Delaware long-arm statute and with defendant's constitutional rights to due process. *Intel Corp. v. Silicon Storage Tech., Inc.,* 20 F. Supp. 2d 690, 694 (D. Del. 1998); *see generally, Int'l Shoe Co. v. Washington,* 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945).

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n5 *HN4*⚓According to the Federal Circuit, when the question before the court is the exercise of personal jurisdiction over an out-of-state accused infringer, the law of the Federal Circuit, "rather than that of the regional circuit in which the case arose," is applicable. *Akro Corp. v. Luker,* 45 F.3d 1541, 1543 (Fed. Cir. 1995). The Federal Circuit has instructed that, "in interpreting the meaning of state long-arm statutes, we defer to the interpretations of the relevant state and federal courts, including their determinations regarding whether or not such statutes are intended to reach to the limit of federal due process." *Graphic Controls Corp. v. Utah Med. Prods., Inc.,* 149 F.3d 1382, 1386 (Fed. Cir. 1998). The Delaware Supreme Court has not collapsed the analysis under the Delaware long-arm statute into the constitutional due process analysis, as some courts have done.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*8]**

As noted previously, *HN5*⚓once a jurisdictional defense is raised, the burden is on the plaintiff

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 19760    Page 7 of 10

Case 1:05-cv-00069-GMS   Document 57-1   Filed 08/12/05   Page 23 of 47 PageID #: 799

to demonstrate with reasonable particularity that sufficient minimum contacts have occurred between the forum state and defendant to support jurisdiction. n6 *Provident Nat'l Bank,* 819 F.2d at 437; *see also Ace & Co., Inc. v. Balfour Beatty PLC,* 148 F. Supp. 2d 418, 422 (D. Del. 2001) (plaintiff must present facts that "establish with reasonable particularity" that the defendant is subject to personal jurisdiction). The plaintiff may demonstrate either specific or general jurisdiction. Specific jurisdiction arises when the particular cause of action arose from the defendant's activities with the forum state. *American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc.,* 1999 U.S. Dist. LEXIS 12455, 1999 WL 615175 (D. Del. Aug. 3, 1999). General jurisdiction does not require that the defendant's contacts be related to the particular cause of action, but that the defendant has continuous or systematic contacts with the forum state. *Id.*

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


N6 In this case, the parties agreed to conduct jurisdictional discovery shortly after ICAP filed its Motion (*see supra* at p. 2). The plaintiffs have filed a Contingent Cross Motion to Compel Discovery on the Issue of Personal Jurisdiction (D.I. 272) asking me to order ICAP to more fully respond to certain of the plaintiffs' jurisdictional discovery requests. The parties had an ample opportunity to conduct jurisdictional discovery, and the plaintiffs have not persuaded me that ICAP improperly obstructed the course of that discovery. Furthermore, as discussed more fully *infra* at n.7, the discovery that the plaintiffs seek to compel is immaterial to the disposition of ICAP's Motion. Therefore, I will decide ICAP's Motion on the basis of the record currently before me, and the plaintiffs' Motion to Compel (D.I. 272) will be denied.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*9]**

*HN6*🔺The Delaware long-arm statute provides that personal jurisdiction is proper over any nonresident who, in person or through an agent:


      (1) Transacts any business or performs any character of work or service in the State;
      (2) Contracts to supply services or things in this State;
      (3) Causes tortious injury in the State by an act or omission in this State;

      (4) Causes tortious injury in the State or outside of the State by an act or omission outside of the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State;
      (5) Has an interest in, uses or possesses real property in the State; or
      (6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.


10 Del. C. § 3104(c). The above provisions have been construed "liberally so as to provide jurisdiction to the maximum extent possible" in order "to provide residents **[\*10]** a means of redress against those not subject to personal service within the State." *Boone v. Oy Partek Ab,* 724 A.2d 1150, 1156-57 (Del. Super. 1997).

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 19760    Page 8 of 10

Case 1:05-cv-00069-GMS    Document 57-1    Filed 08/12/05    Page 24 of 47 PageID #: 800

## IV. DISCUSSION

ICAP asserts that it is not subject to jurisdiction in Delaware under any section of the Delaware long-arm statute. (D.I. 162 at 4-5.) The plaintiffs say that ICAP is subject to specific jurisdiction, under 10 Del C. § 3104(c)(1), on the basis of its website activities and its subsidiaries' actions in Delaware. (D.I. 271 at 11-16, 20.) The plaintiffs also argue that ICAP is subject to general jurisdiction under 10 Del. C. § 3104(c)(4) because it has "made continuous and systematic filings in Delaware relating to the formation, operation and cancellation" of its subsidiaries in Delaware (*see supra* at n.2). (*Id.* at 19.)

First, I am unpersuaded that it is appropriate to exercise specific jurisdiction over ICAP in Delaware on the basis of its website activity alone. *HN7*  "Where the defendant is clearly doing business through its website in the forum state, and where the claim relates to or arises out of use of the website," it is proper to exercise **[*11]** specific jurisdiction over a defendant. *See Toys 'R' Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 452-54 (3d Cir. 2003) (specific jurisdiction exists if "the defendant 'purposefully availed' itself of conducting activity in the forum state, by directly targeting its website to the state, knowingly interacting with residents of the forum state via its website, or through sufficient other related contacts."). In this case, the plaintiffs have come forward with evidence showing that ICAP's websites are accessible to computer users anywhere in the world. Mere accessibility of a website, though, is not a matter of much moment. *HN8* It is interactivity and the conducting of business over the Internet that carries jurisdictional consequences. *Toys 'R' Us,* 318 F.3d at 452 (exercise of personal jurisdiction proper where commercial website's interactivity reflected specifically intended interaction with residents of the forum state) (citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)). There is no evidence here that ICAP has any customers in Delaware, let alone customers who accessed ICAP's websites, downloaded the **[*12]** BrokerTec ETN or the Garban ETC, and then conducted trades from Delaware. n7 (*See* D.I. 271 at 20, 23.) Not only have the plaintiffs failed to show that ICAP specifically intended to interact with Delaware residents through its website, they have failed to show that there were any ICAP customers in Delaware who were actually capable of conducting electronic trading via ICAP's websites. Therefore, the plaintiffs have failed to prove that ICAP purposefully availed itself of conducting activity in Delaware by directly targeting its websites to Delaware or knowingly interacting with residents of Delaware through its websites, *see Toys 'R' Us,* 318 F.3d at 453, and I decline to exercise personal jurisdiction over ICAP on the basis of its website alone.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n7 For that matter, there is no evidence that people in Delaware accessed ICAP's websites at all, *i.e.,* while surfing the Internet. I am aware of the plaintiffs' request to compel further discovery from ICAP pertaining to the "ICAP Website Report" compiled by a company called Webtrends (*see* D.I. 273 at 7); however, that information is immaterial, since the plaintiffs haven't even shown, in the first instance, that ICAP has customers in Delaware who are able to actually conduct business through any ICAP websites. For this reason, and for the reasons stated *supra* at n.6, the plaintiffs' request to compel further discovery pertaining to Webtrends will be denied.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*13]**

I am also unpersuaded by the plaintiffs' second argument that the actions of ICAP's subsidiaries may be attributed to ICAP for the purpose of establishing specific jurisdiction. (*Id.* at 16.) As ICAP points out, *HN9*  "under the agency theory only precise conduct known to

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 19760                                    Page 9 of 10

Case 1:05-cv-00069-GMS    Document 57-1    Filed 08/12/05    Page 25 of 47 PageID #: 801

be instigated by the parent is attributed to the parent" for jurisdictional purposes. (D.I. 296 at 4-5 (citing _C.R. Bard v. Guidant Corp._, 997 F. Supp. 556, 558-59 (D. Del. 1998)).) The record shows that ICAP owns twelve American subsidiaries that are a part of the ICAP Group, and that ICAP's Board manages the ICAP Group as a whole. However, there is no evidence that ICAP's Board exerted some particular control over BrokerTec, Garban, or other American subsidiaries, such that the conduct of those subsidiaries in Delaware would be attributed to ICAP. n8 Thus, the plaintiffs have failed to meet their burden of proving with reasonable particularity that exercising specific jurisdiction over ICAP is appropriate in this case.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 To the extent that the plaintiffs are attempting to assert jurisdiction over ICAP under an alter ego theory, _HN10_ that theory is applicable only when "the party asserting jurisdiction [has established] some fraud, injustice, or inequity in the use of the corporate form." _Ace & Co., Inc. v. Balfour Beatty PLC_, 148 F. Supp. 2d 418, 425 (D. Del. 2001) (quoting _C.R Bard_, 997 F. Supp. at 559). The plaintiffs have not come forward with any evidence to establish those things in this case.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*14]**

In order for me to exercise general jurisdiction over ICAP, the plaintiffs must prove that ICAP has continuous or systematic contacts with Delaware. _American Bio Medica Corp._, 1999 U.S. Dist. LEXIS 12455, 1999 WL 615175 at *2. The plaintiffs say that ICAP "regularly transacts business within Delaware through the repeated formation, purchase, and operation of business entities" in Delaware. (D.I. 271 at 7.) The plaintiffs also argue that the ICAP Group has "merged and amended the articles and certificates for Delaware companies on numerous occasions." (_Id._ at 7-8.)

I am unpersuaded by the plaintiffs' argument that, because ICAP bought BrokerTec and the ICAP Group filed amended certificates for certain subsidiaries in Delaware, ICAP has continuous or systematic contacts with Delaware. First, when ICAP bought BrokerTec, BrokerTec was already an established Delaware corporation. ICAP did not take any steps to form or incorporate BrokerTec in Delaware. Second, there is no evidence on the record before me that ICAP, through its Board or otherwise, has done anything to disregard the separate corporate status and management that its subsidiaries have. There is evidence on the record that members **[*15]** of the Board occasionally travel to the United States on business; however, there is no evidence that they travel to Delaware. Furthermore, the fact that certain subsidiaries filed certificates of amendment in Delaware does not mean that ICAP filed those certificates, or even knew that they were being filed. The plaintiffs have not set forth any reason why the activities, in Delaware, of ICAP's subsidiaries should be imputed to ICAP itself. Because I find that the plaintiffs have not demonstrated with reasonably particularity that ICAP has continuous or systematic contacts with Delaware, I will not exercise general jurisdiction over ICAP.

Finally, the plaintiffs ask that I exercise jurisdiction over ICAP pursuant to Federal Rule of Civil Procedure 4(k)(2), on the basis that ICAP has sufficient minimum contacts with the United States as a whole. (D.I. 271 at 29.) _HN11_ Personal jurisdiction pursuant to Rule 4(k) (2) may be exercised if (1) ultimately, the plaintiff's claim arises under federal law, (2) the defendant is beyond the jurisdictional reach of any state court of general jurisdiction, and (3) the federal court's exercise of personal jurisdiction **[*16]** over the defendant does not offend the Constitution or other federal law. _BP Chems. Ltd. v. Formosa Chem. & Fibre Corp._, 229 F.3d 254, 258 (3d Cir. 2000).

In this case, the plaintiffs' patent infringement claims arise under federal law. However, ICAP

Case 1:05-cv-00069-GMS   Document 57-1   Filed 08/12/05   Page 26 of 47 PageID #: 802

asserts that it would properly be subject to jurisdiction in New Jersey, because that is where BrokerTec and Garban are headquartered. (D.I. 296 at 20.) Because ICAP is admittedly within the jurisdictional reach of New Jersey, I decline to exercise jurisdiction over ICAP under Rule 4(k)(2). *See ISI Int'l, Inc. v. Borden Ladner Gervais LLP,* 256 F.3d 548, 552 (7th Cir. 2001) (*HN12* "A defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed.")

## V. CONCLUSION

For these reasons, ICAP's Motion (D.I. 161) will be granted and the plaintiffs' Contingent Cross Motion to Compel Discovery (D.I. 272) will be denied. An appropriate order will follow.

## ORDER

For the reasons set forth in the Memorandum Opinion issued today, it is hereby ORDERED that defendant ICAP Plc's Motion to Dismiss for Lack of Personal Jurisdiction (D.I. 161) is GRANTED and **[*17]** the plaintiffs' Contingent Cross Motion to Compel Discovery (D.I. 272) is DENIED.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

September 13, 2004
Wilmington, Delaware

       Service: **Get by LEXSEE®**
      Citation: **2004 us dist lexis 19760**
         View: Full
  Date/Time: Friday, August 12, 2005 - 4:27 PM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
🅀 - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
🅐 - Citing Refs. With Analysis Available
🅘 - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Exhibit C

Service: **Get by LEXSEE®**
Citation: **2003 us dist lexis 7715**

*2003 U.S. Dist. LEXIS 7715, \**

IN RE: ELONEX PHASE II POWER MANAGEMENT LITIGATION

C.A. Nos.: 01-082 GMS; 01-083 GMS, 01-084 GMS; 01-085 GMS, 01-086 GMS; 01-087 GMS, 01-088 GMS; 01-089 GMS, 01-090 GMS; 01-091 GMS, 01-092 GMS; 01-093 GMS, 01-095 GMS; 01-096 GMS, 01-097 GMS; 01-098 GMS, 01-099 GMS; 01-100 GMS, 01-101 GMS; 01-102 GMS, 01-103 GMS; 01-104 GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2003 U.S. Dist. LEXIS 7715

May 6, 2003, Decided

**SUBSEQUENT HISTORY:** Motion granted by, Motion denied by In re Elonex Phase II Power Mgmt. Litig., 2003 U.S. Dist. LEXIS 10717 (D. Del., June 23, 2003)

**PRIOR HISTORY:** In re Elonex Phase II Power Mgmt. Litig., 2002 U.S. Dist. LEXIS 19552 (D. Del., Oct. 15, 2002)

**DISPOSITION:** [\*1] Defendant's motion to dismiss for lack of personal jurisdiction denied.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiffs, two companies, sued defendants, certain companies that manufactured and sold computer systems or computer monitors, for alleged patent infringement. The lawsuit related to technology that concerned power management in computer monitors. One of the defendants, a foreign company, moved to dismiss for lack of personal jurisdiction.

**OVERVIEW:** The court held that the foreign company had, for many years, been the first link in precisely the kind of indirect distribution chain that had been found sufficient to establish personal jurisdiction. Specifically, the company sold it monitors to two United States monitor companies with nationwide re-seller networks, who in turn distributed the foreign company's monitors to retailers with Delaware operations. Furthermore, the foreign company maintained a website through which customers in Delaware could obtain customer support. Thus, the foreign company had the requisite minimum contacts, as required by the Due Process Clause for exercising personal jurisdiction. Furthermore, the knowing and purposeful shipment of monitors satisfied Delaware's long-arm statute, specifically Del. Code Ann. tit. 10 § 3104(c)(4). Because the foreign company undeniably derived substantial revenue from these activities, it was subject to jurisdiction under Delaware's long-arm statute. As the court had already found that the exercise of personal jurisdiction was proper and complied with both due process and the Delaware long-arm statute, venue in the forum district was also proper.

**OUTCOME:** Defendant's motion to dismiss was denied.

**CORE TERMS:** monitor, personal jurisdiction, venue, website, networks, purposeful, patent, channel, lawsuit, worldwide, download, long-arm, customer, patent infringement, stream of

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 7715     Page 2 of 8

Case 1:05-cv-00069-GMS   Document 57-1   Filed 08/12/05   Page 29 of 47 PageID #: 805

commerce, purposefully, subjecting, well-known, indirect, shipment, entry of default, well-established, nationwide, undeniably, internet, software, retailers, shipped, driver, retail

**LexisNexis(R) Headnotes** ♦ Hide Headnotes

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction
Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits
*HN1* The Due Process Clause requires that, in order to subject a defendant who is not present within the territory of the forum to personal jurisdiction, a court must first make sure that the party has certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. In order to give non-residents "fair warning" that a particular activity may subject them to litigation within the forum, these "minimum contacts" must be purposeful. In other words, the defendant's contacts must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. Finally, even if the requisite minimum contacts have been found through an application of the stream of commerce theory or otherwise, if it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances, then due process requires that jurisdiction be denied.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits
*HN2* Notwithstanding the existence of a defendant's purposeful minimum contacts with the forum, a court must consider whether the minimum requirements inherent in the concept of "fair play and substantial justice" defeat the reasonableness of the assertion of jurisdiction, even if the defendant has purposefully engaged in forum activities. This question will only be answered affirmatively if the state's and the plaintiff's interest in having the dispute adjudicated in the forum are so minimal as to be outweighed by the burden imposed by subjecting the defendant to litigation within the forum.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction
*HN3* In the context of the exercise of personal jurisdiction, progress in communications and transportation have made the defense of a lawsuit in a foreign tribunal less burdensome.  More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction
*HN4* Under Del. Code Ann. tit. 10, § 3104(c)(4), a court may exercise personal jurisdiction over anyone who causes injury either inside or outside of the State "by an act or omission outside of the State" if that individual "regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services or things used or consumed in the State." The United States District Court for the District of Delaware interprets this language broadly, as reaching the maximum parameters of the due process clause.  More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction
Civil Procedure > Venue > Individual Defendants
*HN5* Venue lies ipso facto if a district court has personal jurisdiction over the defendant.  More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction
Civil Procedure > Venue > Corporations
*HN6* Venue is proper in a judicial district where the defendant corporation is subject to

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 7715    Page 3 of 8

Case 1:05-cv-00069-GMS   Document 57-1   Filed 08/12/05   Page 30 of 47 PageID #: 806

personal jurisdiction at the time the action is commenced. 28 U.S.C.S. § 1391(b)(1), (c). More Like This Headnote

**COUNSEL:** For Elonex IP Holdings, Ltd, Eip Licensing BV, Elonex Phase II Power Management Litigation, PLAINTIFFS (01cv82): Andre G Bouchard, Bouchard, Margules & Friedlander, Wilmington, DE USA.

For Elonex Phase II Power Management Litigation, PLAINTIFF (01cv82): Donald F Parsons, Jr, Julia Heaney, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA.

For Compaq Computer Corp, Proview International Holdings Ltd, DEFENDANTS (01cv82): William J Wade, Richards, Layton & Finger, Wilmington, DE USA.

For LG Electronics Inc, DEFENDANT (01cv82): Richard K Herrmann, Blank Rome LLP, Wilmington, DE USA.

For Delta Electronics Inc, Amtran Technology Co, Ltd, Daewoo Electronics Co, Ltd, Compal Electronics, Inc, DEFENDANTS (01cv82): Richard L Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE USA.

For Delta Electronics Inc, DEFENDANT (01cv82): John T Meli, Jr, Fish & Richardson, PC, Wilmington, DE USA.

For NEC Corp, DEFENDANT (01cv82): Steven J Balick, Ashby & Geddes, Wilmington, DE USA.

For Gateway Inc, Acer Communications & Multimedia, Inc, DEFENDANTS (01cv82): Allen M Terrell, Jr, Richards, **[*2]** Layton & Finger, Wilmington, DE USA.

For Gateway Inc, Necx Direct LLC, DEFENDANTS (01cv82): Dominick T Gattuso, Richards, Layton & Finger, Wilmington, DE USA.

For Lite-on Technology Corp, DEFENDANT (01cv82): Robert W Whetzel, Richards, Layton & Finger, Wilmington, DE USA.

For ADI Corp, DEFENDANT (01cv82): Josy W Ingersoll, John W Shaw, Young, Conaway, Stargatt & Taylor, Wilmington, DE USA.

For ADI Corp, Daewoo Electronics Co, Ltd, DEFENDANTS (01cv82): David L Finger, David L Finger, Esq, Wilmington, DE USA.

For Chuntex Electronics Co, Ltd, CTX International Inc, DEFENDANTS (01cv82): Rudolf E Hutz, Connolly, Bove, Lodge & Hutz, Wilmington, DE USA.

For Acer Communications & Multimedia, Inc, CTX International Inc, DEFENDANTS (01cv82): Gerard M O'Rourke, Connolly, Bove, Lodge & Hutz, Wilmington, DE USA.

For Acer Communications & Multimedia, Inc, DEFENDANT (01cv82): John C Andrade, Basil C Kollias, Parkowski & Guerke, PA, Dover, DE USA.

For Jean Co Ltd, DEFENDANT (01cv82): Donald W Huntley, Donald W Huntley, Esq, Wilmington, DE USA.

For Tatung Corp, DEFENDANT (01cv82): James C Strum, Stradley, Ronon, Stevens & Young, Wilmington, DE USA.

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 7715                    Page 4 of 8

Case 1:05-cv-00069-GMS   Document 57-1   Filed 08/12/05   Page 31 of 47 PageID #: 807

For **[\*3]** Apple Computer, DEFENDANT (01cv82): Frederick L Cottrell, III, Richards, Layton & Finger, Wilmington, DE USA.

For Korea Data Systems Co, Ltd, DEFENDANT (01cv82): Richard H Morse, Young, Conaway, Stargatt & Taylor, Wilmington, DE USA.

For Envision Peripherals Inc, Top Victory Electronics (Taiwan) Co, Ltd, Aoc International, DEFENDANTS (01cv82): Richard D Kirk, Morris, James, Hitchens & Williams, Wilmington, DE USA.

For Necx Direct LLC, DEFENDANT (01cv82): Allen M Terrell, Jr, Richards, Layton & Finger, Wilmington, USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION: MEMORANDUM AND ORDER**

## I. INTRODUCTION

On February 13, 2001, the plaintiffs, Elonex I.P. Holdings, Ltd. and EIP Licensing, B.V. (collectively "Elonex"), filed this action against certain companies that manufacture and sell computer systems or computer monitors. n1 The complaint alleges infringement of U.S. Patent Numbers 5,389,952 ("the '952 patent"), 5,648,799 ("the '799 patent"), and 5,649,719 ("the '719 patent"). The lawsuit relates to technology that concerns power management in computer monitors.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n1 In December 1998, Elonex I.P. Holdings Ltd. and Elonex plc filed a related lawsuit against another group of defendants on substantially the same grounds ("Elonex Phase I litigation").


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*4]**

On May 21, 2001, Elonex requested entry of default against the defendant Jean Co., Ltd. ("Jean"). The Clerk of the Court entered default against Jean on June 18, 2001. On January 31, 2003, Elonex then moved for entry of default judgment against Jean. On February 20, 2002, counsel entered an appearance on behalf of Jean.

Presently before the court is Jean's motion to dismiss for lack of personal jurisdiction. For the following reasons, the court will deny this motion.

## II. BACKGROUND

Jean is an international monitor and electronics manufacturer, with its principle place of business in Taipei, Taiwan. In 2001, Jean had more than $ 316 million in worldwide sales.

From March 1995 until April 1996, Elonex alleges that Jean shipped 404,855 monitors to the United States. Since 1998, ViewSonic Corporation and eMachines, Inc. -- two United States monitor companies with nationwide re-seller networks--have been among Jean's biggest customers. According to Jean's 1999 Annual Report, ViewSonic alone accounted for 22.91% of Jean's worldwide monitor sales in 1998. In 1999, ViewSonic purchased 30.4% of Jean's total 1999 monitor sales. In 2001, ViewSonic purchased 39.7% of Jean's total **[\*5]** monitor

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 7715      Page 5 of 8

Case 1:05-cv-00069-GMS   Document 57-1   Filed 08/12/05   Page 32 of 47 PageID #: 808

sales. Likewise, in 1999, eMachines purchased 12.94% of Jean's worldwide monitor sales.

Additionally, both ViewSonic and eMachines have well-established retail distribution networks. ViewSonic monitors are available from retailers such as Best Buy, Office Depot, and CompUSA. Likewise, eMachines monitors are sold in Delaware at Best Buy, Office Depot, and Circuit City. Both ViewSonic and eMachines also sell monitors directly to consumers via their own internet websites. Thus, the Jean monitors sold to ViewSonic and eMachines are resold in Delaware and throughout the United States.

Furthermore, Delaware purchasers of Jean monitors can download monitor software and obtain customer service via Jean's website. Visitors to the website can also download drivers for Jean monitors and obtain technical support via e-mail. Finally, Jean's website lists an "East Coast" service facility located in New Jersey.

## III. DISCUSSION

### A. Due Process

**HN1** The Due Process Clause requires that, in order to subject a defendant who is "not present within the territory of the forum" to personal jurisdiction, the court must first make sure that the party "has certain minimum contacts with [the **[*6]** forum] state such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe*, 326 U.S. 310, 316, 90 L. Ed 95, 66 S. Ct. 154 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 85 L. Ed. 278, 61 S. Ct. 339 (1940)). In order to give non-residents "fair warning" that a particular activity may subject them to litigation within the forum, these "minimum contacts" must be purposeful. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985). In other words, the defendant's contacts must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980). Finally, "even if the requisite minimum contacts have been found through an application of the stream of commerce theory or otherwise, if it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances, then due process requires that jurisdiction be denied." *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1568 (Fed. Cir. 1994). **[*7]**

In *Beverly Hills Fan*, the Federal Circuit addressed the question of whether Ultec, a People's Republic of China corporation with a manufacturing facility in Taiwan, was subject to personal jurisdiction in Virginia. 21 F.3d at 1560. Ultec claimed that it was not subject to personal jurisdiction in Virginia because it did not have any Virginia assets, employees, or a license to do business in that state. *Id*. Acknowledging that Ultec's sole contact with the forum resulted from indirect shipments through the stream of commerce, the Federal Circuit held that Ultec "purposefully shipped the accused fans into Virginia through an established distribution channel The cause of action for patent infringement is alleged to rise out of these activities. No more is usually required to establish specific jurisdiction." *Id*. at 1560, 1564-65.

The court's decision in *Motorola Inc. v. PC-Tel, Inc.* is likewise instructive in resolving the present issue. 58 F. Supp. 2d 349 (D. Del. 1999). In that case, the court described the accused infringer's sales activities as follows:

Altocom does not (and, it seems, cannot) contest the fact that its **[*8]** softmodems are integrated into a variety of consumer electronic products which are manufactured by well-known multi-national corporations like Compaq,

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 7715                Page 6 of 8

Case 1:05-cv-00069-GMS   Document 57-1   Filed 08/12/05   Page 33 of 47 PageID #: 809

Phillips, Samsung, Sharp, Song, and the like. These goods are then put into the world-wide distribution networks which place them for sale in equally well-known retail stores such as Caldor, Circuit City, CompUSA, Office-Max, Sears, Service Merchandise, and others -- all of which have outlets in Delaware.

58 F. Supp. 2d at 352. Relying on *Beverly Hills Fan,* the court rejected AltoCom's arguments and held that exercising personal jurisdiction comported with due process. *See id.* at 355-56.

In the present case, as in *Beverly Hills Fan,* Jean's president states in his declaration that Jean makes no direct sales to the United States. He further states that Jean has no United States offices or subsidiaries. However, the court concludes that Jean has, for many years, been the first link in precisely the kind of indirect distribution chain that the Federal Circuit found sufficient to establish personal jurisdiction. Specifically, Jean sells it monitors to ViewSonic and eMachines, who in turn distribute **[*9]** Jean's monitors to retailers with Delaware operations. Given ViewSonic's and eMachines' extensive re-reseller networks in Delaware and on the Internet, Jean cannot credibly claim it had no inkling that some of its monitors would make their way into Delaware via well-established distribution channels.

Jean further maintains an interactive website through which customers in Delaware, and elsewhere, can download driver software, as well as obtain customer support. On its website, it also lists "Global Service Centers," including an "East Coast" service facility in New Jersey. These facts further support the court's conclusion that Jean's undeniably substantial and regular monitor sales into ViewSonic's and eMachines' national distribution networks constitute "purposeful minimum contacts" with Delaware.

*HN2* Notwithstanding the existence of Jean's purposeful minimum contacts with this forum, the court must consider whether the "minimum requirements inherent in the concept of 'fair play and substantial justice ...' defeat the reasonableness of [the assertion of] jurisdiction, even [if] the defendant has purposefully engaged in forum activities." *Asahi Metal Indust. Co. v. Superior Court,* 480 U.S. 102, 116, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987). **[*10]** This question will only be answered affirmatively if the state's and the plaintiff's interest in having the dispute adjudicated in the forum are so minimal as to be outweighed by the burden imposed by subjecting the defendants to litigation within the forum. *See Beverly Hills Fan,* 21 F.3d at 1568.

In the present case, Delaware clearly has a substantial interest in discouraging injuries in the state, including patent infringement injury. It has also been the sole forum for the Elonex Power Management Litigation for several years. Finally, and as the *Beverly Hills Fan* court noted, *HN3* "progress in communications and transportation" have made "the defense of a lawsuit in a foreign tribunal less burdensome." 21 F.3d at 1569 (internal quotation and citation omitted). Thus, the court concludes that any burden on Jean "is not sufficiently compelling to outweigh" Elonex's and Delaware's interests. *Id.*

## B. Delaware's Long-Arm Statute

The second step in the court's analysis into the propriety of subjecting Jean to personal jurisdiction in this forum is the determination of whether any of the provisions of Delaware's long-arm statute apply. *See* DEL. **[*11]** CODE. ANN. tit. 10 § 3104. While Jean contends that it does not fall within the grasp of any of Section 3104's provisions, Elonex contends that at least two of the provisions apply here. For purposes of this order, the court need only discuss one.

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 7715          Page 7 of 8

Case 1:05-cv-00069-GMS   Document 57-1   Filed 08/12/05   Page 34 of 47 PageID #: 810

*HN4* Under subsection (c)(4), the court may exercise personal jurisdiction over anyone who causes injury either inside or outside of this State "by an act or omission outside of the State" if that individual "regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services or things used or consumed in the State." DEL. CODE. ANN. tit. 10, § 3104(c) (2001). n2 The court will interpret this language broadly, as reaching the "maximum parameters of the due process clause." *See Jeffreys v. Exten,* 784 F. Supp. 146, 151 (D. Del. 1992).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 This subsection provides general jurisdiction over the nonresident defendant. *See Mendelson v. Delaware River and Bay Auth.,* 56 F. Supp. 2d 436, 439 (D. Del. 1999). Accordingly, it is immaterial whether the jurisdictional contact is related to the claim. *See id.*

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*12]**

As discussed above in Section III A, Jean has intentionally sold monitors using nationwide distribution channels. This knowing and purposeful shipment of monitors satisfies the act requirement of Section 3104(c)(4). *See Beverly Hills Fan,* 21 F.3d at 1571. Because Jean undeniably derives substantial revenue from these activities, it is subject to jurisdiction under Delaware's long-arm statute. *See* Chang Decl. at PP 3-7 (discussing Jean's revenue from sales to ViewSonic and eMachines).

## C. Venue

Jean finally asserts that, pursuant to 28 U.S.C. § 1391(c), venue is improper in this district. Jean's argument is meritless, however, because "the venue issue is subsumed in the personal jurisdiction issue. *HN5* Venue lies ipso facto if ... the district court has personal jurisdiction over [the defendant]." *North American Philips Corp. v. American Vending Sales, Inc.,* 35 F.3d 1576, 1577 n.1 (Fed. Cir. 1994); *see also* 28 U.S.C. § 1391(b)(1) & (c) (stating that *HN6* venue is proper in a judicial district where the defendant corporation is subject to personal jurisdiction at the time the action is commenced). **[*13]** As the court has already found that the exercise of personal jurisdiction is proper and complies with both due process and the Delaware long-arm statute, venue in this district is also proper.

## IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Jean's Motion to Dismiss (D.I. 856) is DENIED.

Dated: May 6, 2003

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

Service:   **Get by LEXSEE®**
Citation:  **2003 us dist lexis 7715**
View:      Full
Date/Time: Friday, August 12, 2005 - 4:26 PM EDT

* Signal Legend:

http://www.lexis.com/research/retrieve?_m=99dd63cbd4d7c043aaf4f7bb6565c2e5&csvc=...   8/12/2005

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 7715          Page 8 of 8

Case 1:05-cv-00069-GMS   Document 57-1   Filed 08/12/05   Page 35 of 47 PageID #: 811

- ⬣ - Warning: Negative treatment is indicated
- 🅀 - Questioned: Validity questioned by citing refs
- ⚠ - Caution: Possible negative treatment
- ◆ - Positive treatment is indicated
- Ⓐ - Citing Refs. With Analysis Available
- ⓘ - Citation information available

\* Click on any *Shepard's* signal to *Shepardize*® that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Exhibit D

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 1726     Page 1 of 11

Case 1:05-cv-00069-GMS   Document 57-1   Filed 08/12/05   Page 37 of 47 PageID #: 813

Service: **Get by LEXSEE®**
Citation: **2005 us dist lexis 1726**

*2005 U.S. Dist. LEXIS 1726, \**

M&M TECHNOLOGIES, INC., Plaintiff, v. GURTLER CHEMICALS, INC., Defendant/Third-Party Plaintiff, v. BURLINGTON CHEMICAL CO., INC., Third-Party Defendant.

Civil Action No. 03-994 GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2005 U.S. Dist. LEXIS 1726

February 8, 2005, Decided

**DISPOSITION:** Motion to dismiss for lack of personal jurisdiction was granted.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff company filed a patent infringement action against defendant company. Before the court was third-party defendant company's motion to dismiss for lack of personal jurisdiction.

**OVERVIEW:** Defendant argued that third-party defendant's actions were directed at Delaware because it engaged defendant as a nationwide distributor of a product it sold to defendant. There was no evidence in the record that defendant was acting as third-party defendant's distributor of the product. Indeed, defendant purchased the product from third-party defendant, diluted it with water, and sold it under defendant's trademark. Thus, Del. Code Ann. tit. 10, § 3104(c)(1), was not a basis for the exercise of jurisdiction. Defendant also did not make a prima facie showing of personal jurisdiction under § 3104 (c)(4). Third-party defendant's sales of products to customers in Delaware in 2001, 2002, and 2003 were about $ 1,000 each year, representing 0.0007 percent of annual sales revenues. In 2004, it had sales to three customers in Delaware that totaled approximately $ 20,070. While sales of products to Delaware customers grew in 2004, Delaware revenue only comprised approximately 0.14 percent of its total annual sales. Because the Delaware revenue was less than one percent of total annual revenue, it was not substantial enough to warrant an exercise of general jurisdiction.

**OUTCOME:** The motion to dismiss was granted.

**CORE TERMS:** customer, distributor, website, third-party, regularly, long-arm, personal jurisdiction, stream of commerce, nationwide, solicit, water, user, shipped, annual, exercise of jurisdiction, exercise jurisdiction, general jurisdiction, purposefully, distributed, availed, diluted, softmodem, false representation, directed toward, breach of duty, forum state, distinguishable, integrated, well-known, resident

### LexisNexis(R) Headnotes ◆ Hide Headnotes

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss

**HN1** Fed. R. Civ. P. 12(b)(2) requires a court to dismiss a case when the court lacks personal jurisdiction over the defendant. More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 1726                Page 2 of 11

Case 1:05-cv-00069-GMS   Document 57-1   Filed 08/12/05   Page 38 of 47 PageID #: 814

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction
Constitutional Law > Procedural Due Process > Scope of Protection

**HN2** In determining whether personal jurisdiction exists, courts engage in a two step analysis. First, the court must decide whether jurisdiction is authorized by the long-arm statute of the state in which the court sits. If jurisdiction is proper per the long-arm statute, the court must then determine whether exercising jurisdiction comports with the requirements of the Due Process Clause of the Fourteenth Amendment. To satisfy the second prong of this analysis, the court must find the existence of minimum contacts between the defendant and the forum state, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. Specifically, the plaintiff must show that the defendant purposefully availed itself of the privilege of conducting activities within the forum state. Unless the contacts are continuous and systematic, they must be related to the present cause of action. More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction
Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss

**HN3** In determining the jurisdictional question, the court must accept as true the allegations in the complaint, but the plaintiff bears the burden of alleging facts sufficient to make a prima facie showing of personal jurisdiction over the defendant. To meet this burden, the plaintiff must adduce facts which establish with reasonable particularity that jurisdiction over the defendant exists. More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction

**HN4** Under Del. Code Ann. tit. 10, § 3104(c)(1), the court may exercise jurisdiction over a nonresident who transacts any business or performs any character of work or service in the state. More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction

**HN5** Delaware courts construe the Del. Code Ann. tit. 10, § 3104, broadly to confer jurisdiction to the maximum extent possible so as to provide residents a means of redress against those not subject to personal service within the state. More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction

**HN6** The Delaware Supreme Court has interpreted Del. Code Ann. tit. 10, § 3104(c)(1), as a specific jurisdiction provision that requires a nexus between the plaintiff's cause of action and the conduct of the defendant that is used as a basis for jurisdiction. In order to meet the requirements of § 3104(c)(1), the defendant's actions must be directed at residents of Delaware and the protection of Delaware laws. However, when a manufacturer passes title to goods to a third party outside of Delaware, it has not performed an act in Delaware. More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction

**HN7** Under Del. Code Ann. tit. 10, § 3104(c)(4), the court may exercise personal jurisdiction over anyone who causes tortious injury in the state or outside of the state by an act or omission outside the state if the person regularly does or solicits business, engages in any other persistent course of conduct or derives substantial revenue from services, or things used or consumed in the state. More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction

**HN8** Delaware courts have interpreted Del. Code Ann. tit. 10, § 3104(c)(4), as a general jurisdiction provision. This general jurisdiction provision allows the court to exercise

jurisdiction when the defendant's contacts with the forum state are unrelated to the cause of action.  More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction

**HN9** A tortious act under Del. Code Ann. tit. 10, § 3104(c)(4), is an act which involves a breach of duty to another and makes the one committing the act liable in damages.  More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction

**HN10** Delaware courts have broadly construed the term "substantial revenue" to mean that two to three percent of total revenue is sufficient to confer jurisdiction. However, when a defendant's sales to customers in Delaware constitute less than one percent of total revenue, it is not substantial enough to warrant an exercise of jurisdiction.  More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits
Constitutional Law > Procedural Due Process > Scope of Protection

**HN11** The Due Process Clause requires that, in order to subject a defendant who is not present within the territory of the forum to personal jurisdiction, the court must first make sure that the party has certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of justice and fair play. In order to give non-residents fair warning that a particular activity may subject them to litigation within the forum, these minimum contacts must be purposeful. In other words, the defendant's contact must be of the nature that would cause it to reasonably foresee that it might be haled before a court in the forum as a result of its conduct. Finally, even if the requisite minimum contacts have been found through an application of the stream of commerce theory or otherwise, if it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances, then due process requires that jurisdiction be denied.  More Like This Headnote

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits
Constitutional Law > Procedural Due Process > Scope of Protection

**HN12** The substantial connection between the defendant and the forum state necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum state. The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum state. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum state, for example, designing the product for the market in the forum state, advertising in the forum state, establishing channels for providing regular advice to customers in the forum state, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum state. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum state.  More Like This Headnote

**COUNSEL:**  [*1]  For M&M TECHNOLOGIES INC, Plaintiff: George Pazuniak, Gerard M. O'Rourke, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For GURTLER CHEMICALS INC., Defendant: William J. Wade, Steven J. Fineman, Richards, Layton & Finger, Wilmington, DE; Rex A. Donnelly, IV, Ratner & Prestia, Wilmington, DE; Kevin W. Goldstein, Stradley Ronon Stevens & Young, LLP, Malvern, PA.

For GURTLER CHEMICALS INC., Counter-Claimant: William J. Wade, Steven J. Fineman, Richards, Layton & Finger, Wilmington, DE; Rex A. Donnelly, IV, Ratner & Prestia, Wilmington, DE.

For M&M TECHNOLOGIES INC, Counter-Defendant: George Pazuniak, Gerard M. O'Rourke, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For BURLINGTON CHEMICAL, Defendant: Rex A. Donnelly, IV, Ratner & Prestia, Wilmington, DE.

For GURTLER CHEMICALS INC., Third-Party Plaintiff: William J. Wade, Steven J. Fineman, Richards, Layton & Finger, Wilmington, DE; Rex A. Donnelly, IV, Ratner & Prestia, Wilmington, DE; Kevin W. Goldstein, Stradley Ronon Stevens & Young, LLP, Malvern, PA.

For GURTLER CHEMICALS INC., Counter-Claimant: William J. Wade, Steven J. Fineman, Richards, Layton & Finger, Wilmington, DE; Rex A. Donnelly, IV, Ratner & **[*2]** Prestia, Wilmington, DE; Kevin W. Goldstein, Stradley Ronon Stevens & Young, LLP, Malvern, PA.

For M&M TECHNOLOGIES INC, Counter-Defendant: George Pazuniak, Gerard M. O'Rourke, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION: MEMORANDUM**

### I. INTRODUCTION

On October 30, 2003, the plaintiff, M&M Technologies, Inc. ("M&M"), filed this patent infringement action against Gurtler Chemicals, Inc. ("Gurtler"). Presently before the court is a motion to dismiss for lack of personal jurisdiction filed by third-party defendant Burlington Chemical Company, Inc. ("Burlington"). For the following reasons, the court will grant the motion.

### II. BACKGROUND

The patent-in-suit, U.S. Patent No. 6,159,548 (the "'548 patent"), allegedly is owned by M&M. The patented invention is a method for oilproofing and waterproofing previously manufactured fabric with an aerosol spray containing a diluted fluoroacrylate emulsion. The complaint alleges that Gurtler has infringed, induced infringement of, or contributorily infringed the method claims of the '548 patent.

On July 12, 2004, Gurtler filed a motion **[*3]** to file a second amended answer, counterclaim, and third-party complaint. The court granted Gurtler's motion on September 22, 2004. Gurtler named Burlington as a third-party defendant and brought claims against Burlington for negligent misrepresentation and violation of the Uniform Commercial Code, Section 2-312, *i.e.* breach of warranty. The third-party complaint alleges in Count I that: (1) Gurtler makes its allegedly infringing product merely by adding water to Burcopel CAT, a product sold to it by Burlington; (2) at the time Burlington began selling Burcopel CAT to Gurtler, Burlington orally represented and warranted that Gurtler's use of the product would not infringe, induce infringement of, or contributorily infringe the '548 patent; and (3) Burlington breached its warranty against infringement. Count II alleges that: (1) Burlington's representation that Burcopel CAT was not infringing was a false representation of fact; (2) Burlington made the false representation because of its lack of reasonable care in

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 1726        Page 5 of 11

Case 1:05-cv-00069-GMS    Document 57-1    Filed 08/12/05    Page 41 of 47 PageID #: 817

ascertaining the facts; (3) Burlington made the false representation with an intention to induce Gurtler to act; (4) Gurtler justifiably relied on the false representation; **[*4]** and (5) Burlington's actions caused Gurtler to incur damages.

Burlington is a North Carolina corporation, with no place of business in Delaware. It neither owns nor leases any property in Delaware. Burlington is not registered with the Secretary of State to do business in Delaware. It maintains no office, local telephone listing, or bank accounts in Delaware, and similarly, has no employees in Delaware. It has not paid taxes or franchise fees in Delaware. Burlington has never commenced any legal action or proceeding in the State of Delaware and has never been named as defendant in any action in Delaware, except in the current litigation.

Burlington entered into an agreement with Gurtler for the sale of Burcopel CAT, a chemical that adheres to fabric causing it to become water resistant. Pursuant to the terms of the Memorandum of Sale, the product was shipped collect to Gurtler in South Holland, Illinois. n1 After receiving the Burcopel CAT, Gurtler dilutes it with water, and distributes and sells the product to its United States and international customers under its "Pulse Shield" trademark.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Gurtler is an Illinois Corporation with an established place of business in Sought Holland, Illinois.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*5]**

Burlington does not sell Burcopel CAT to any customers in Delaware. Burlington's sales of products to Delaware customers in 2001, 2002, and 2003 were less than $ 1,000.00 each year, and comprised approximately 0.0007% of Burlington's annual sales revenues. In 2004, Burlington directly sold products to three customers in Delaware. Burlington had sales of $ 4,000.00 to one Delaware customer, $ 70.00 to a second Delaware customer, and $ 16,000.00 to a Delaware distributor. These sales comprised approximately 0.14% of Burlington's 2004 sales revenues.

## III. STANDARD OF REVIEW

Burlington moves to dismiss the third-party complaint for lack of personal jurisdiction over the defendant.*HN1* "Rule 12(b)(2) of the Federal Rules of Civil Procedure requires a court to dismiss a case when the court lacks personal jurisdiction over the defendant[]." *E.I. DuPont de Nemours & Co. v. Rhodia Fiber & Resin Intermediates,* 197 F.R.D. 112, 119 (D. Del. 2000). *HN2* In determining whether personal jurisdiction exists, courts engage in a two step analysis. First, the court must decide whether jurisdiction is authorized by the long-arm statute of the state in which the court sits. *Transportes Aeros de Angola v. Ronair, Inc.,* 544 F. Supp. 858, 864-65 (D. Del. 1982). **[*6]** If jurisdiction is proper per the long-arm statute, the court must then determine whether exercising jurisdiction comports with the requirements of the Due Process Clause of the Fourteenth Amendment. *Id.* (noting, however, "intent of the legislature to exercise jurisdiction over non-residents whenever feasible"); *Compaq Computer Corp. v. Packard Bell Elecs.,* 948 F. Supp. 338, 342 (D. Del. 1996) (citation omitted). To satisfy the second prong of this analysis, the court must find the existence of "minimum contacts" between the defendant and the forum state, "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154(1945) (citation omitted). Specifically, Gurtler must show that Burlington "purposefully availed itself of the privilege of conducting activities within the forum State." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985) (quoting

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 1726                    Page 6 of 11

Case 1:05-cv-00069-GMS   Document 57-1   Filed 08/12/05   Page 42 of 47 PageID #: 818

*Hanson v. Denckla,* 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958)); *see also Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 108-09, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987). Unless the **[*7]** contacts are continuous and systematic, they must be related to the present cause of action. *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414-15 (1984).

**HN3** In determining the jurisdictional question, the court must accept as true the allegations in the complaint, *Altech Indus., Inc. v. Al Tech Specialty Steel Corp.,* 542 F. Supp. 53, 55 (D. Del. 1982), but Gurtler bears the burden of alleging facts sufficient to make a *prima facie* showing of personal jurisdiction over Burlington. *ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.,* 147 F. Supp. 2d 268, 270-71 (D. Del. 2001). To meet this burden, Gurtler must adduce facts which 'establish with reasonable particularity' that jurisdiction over the movant exists. *Id.* (quoting *Joint Stock Soc'y v. Heublein, Inc.,* 936 F. Supp. 177, 193 (D. Del. 1996)).

## IV. DISCUSSION

### A. Delaware's Long-Arm Statute

The first step in the court's analysis is to determine whether any of the provisions of Delaware's long-arm statute, Del. Code Ann. tit. 10 § 3104, warrant the exercise of jurisdiction over Burlington. Burlington contends that the **[*8]** court has no basis to assert jurisdiction, while Gurtler maintains that the conduct of Burlington satisfies the requirements of subsections (c)(1) and (c)(4) of the long-arm statute. The court will address each of these sections below.

### 1. Delaware Long-Arm Statute § 3104(c)(1)

**HN4** Under subsection (c)(1), the court may exercise jurisdiction over a nonresident who transacts any business or performs any character of work or service in the State. DEL. CODE ANN. tit. 10 § 3104(c)(1). Gurtler asserts that Burlington has acted in consort with Gurtler to place Burcopel CAT into a nationwide distribution network and, as a result, Burcopel CAT may have found its way to Delaware. Thus, Burlington has availed itself of the benefits of the State of Delaware. The court disagrees.

**HN5** Delaware courts construe the long-arm statute broadly to confer jurisdiction to the maximum extent possible so as to "provide residents a means of redress against those not subject to personal service within the state." *Boone v. Oy Partek Ab,* 724 A.2d 1150, 1156-57 (Del. Super. 1997). **HN6** The Delaware Supreme Court has interpreted subsection (c)(1) as a specific jurisdiction provision that requires a "nexus" **[*9]** between the plaintiff's cause of action and the conduct of the defendant that is used as a basis for jurisdiction. *See LaNuova D&B, S.p.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del. 1986). In order to meet the requirements of subsection (c)(1), Burlington's actions must be directed at residents of Delaware and the protection of Delaware laws. *Thorn EMI N. Am. v. Micron Technology,* 821 F. Supp. 272, 274 (D. Del. 1993). However, when a manufacturer passes title to goods to a third party outside of Delaware, it has not performed an act in Delaware. *Boone,* 724 A.2d at 1156. In the present case, Burlington did not pass title to Gurtler in Delaware. Rather, Burlington passed title to the Burcopel CAT in South Holland, Illinois. (D.I. 52 P 4). In addition, Burlington's sales of products in Delaware are unrelated to Gurtler's claims and, therefore, cannot give rise to specific jurisdiction. *See ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.,* 147 F. Supp. 2d 268 (D. Del. 2001).

Gurtler maintains that Burlington's actions were directed at Delaware because it engaged Gurtler as a nationwide distributor of **[*10]** Burcopel CAT. Gurtler further asserts that where a party contracts to have its product distributed by another throughout the United States, it

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 1726                Page 7 of 11

Case 1:05-cv-00069-GMS   Document 57-1   Filed 08/12/05   Page 43 of 47 PageID #: 819

contracts to have its product distributed to each state as an individual forum. *See Boone,* 724 A.2d at 1160. The court agrees that a party who contracts to have its product distributed throughout the United States is subject to jurisdiction in any state. There is no evidence in the record, however, that Gurtler was acting as Burlington's distributor of Burcopel CAT. Indeed, Gurtler purchased Burcopel CAT from Burlington, diluted it with water and sold it under Gurtler's "Pulse Shield" trademark. Moreover, the Burcopel CAT does not maintain a separate identity in Gurtler's product and Burlington is not identified to the end user. As such, subsection (c)(1) is not a basis for the exercise of jurisdiction over Burlington.

2. Delaware Long-Arm Statute § 3104(c)(4)

Additionally, Gurtler asserts that Burlington has, within the meaning of subsection (c)(4), availed itself of the general jurisdiction of Delaware. *HN7* Under subsection (c)(4), the court may exercise personal jurisdiction over anyone who "causes tortious injury in the State **[*11]** or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State. DEL. CODE ANN. tit. 10 § 3104(c)(1). Gurtler contends that jurisdiction is proper under subsection (c)(4) because Burlington's actions with respect Burcopel CAT have caused tortious injury in Delaware, Burlington maintains significant contacts with the District of Delaware, and Burlington receives substantial revenue from the sale of Burcopel CAT to Gurtler.

*HN8* Delaware courts have interpreted § 3104(c)(4) as a general jurisdiction provision. *See Bell Helicopter Textron, Inc. v. C&C Helicopter Sales, Inc.,* 295 F. Supp. 2d 400, 405 (D. Del. 2002); *Boone,* 724 A.2d at 1155 (citing *Outokumpu Engineering Enterprises, Inc. v. Kvaerner Enviropower, Inc.,* 685 A.2d 724, 727-28 (Del. Super. 1996)). This general jurisdiction provision allows the court to exercise jurisdiction when the defendant's contacts with the forum state are unrelated to the cause of action. *Bell Helicopter,* 295 F. Supp. 2d at 405. **[*12]**

First, the court must determine if the alleged acts set forth in the third-party complaint constitute a tortious injury for the purposes of jurisdiction. *HN9* A tortious act under § 3104 (c)(4) is an act "which involves a breach of duty to another and makes the one committing the act liable in damages." *Magid v. Marcal Paper Mills, Inc.,* 517 F. Supp. 1125, 1130 (D. Del. 1981). Applying Delaware law, the court finds that the alleged breach of warranty and negligent misrepresentation by Burlington each constitute a breach of duty owed to Gurtler.

Next, the court must determine if Burlington regularly does or solicits business in Delaware. The court concludes that Burlington does not regularly do business in Delaware. As previously discussed, Burlington is a North Carolina corporation, with no office or place of business in Delaware. (D.I. 52 P 2). Burlington has not appointed any agent for service of process in Delaware and is not registered to do business in Delaware. (*Id.*) It has no local telephone listing, bank accounts, real estate or employees in Delaware. (*Id.*) It has not paid any taxes or franchise fees in Delaware. (*Id.*). It has never commenced **[*13]** any legal action or proceeding in the State of Delaware and has never been named as defendant in any action in Delaware, except for the current litigation. (*Id.*) The court also concludes that Burlington does not regularly solicit business or advertise in Delaware. Further, while Burlington does maintain an Internet website that it can use to solicit business from Delaware, the mere existence of its website does not rise to the level of regularly soliciting business in Delaware. *See Motorola Inc. v. PC-Tel,* 58 F. Supp. 2d 349, 352 (D. Del. 1999) (discussing extensive advertising by the defendant, both nationwide and in Delaware through newspapers, magazines, and catalogs). Thus, the court concludes that Burlington does not regularly do or solicit business in Delaware.

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 1726                  Page 8 of 11

Case 1:05-cv-00069-GMS   Document 57-1   Filed 08/12/05   Page 44 of 47 PageID #: 820

Lastly, the court must determine whether Burlington derives substantial revenue from services or things used or consumed in Delaware. *HN10* Delaware courts have broadly construed the term "substantial revenue" to mean that two to three percent of total revenue is sufficient to confer jurisdiction. *See United States v. Consolidated Rail Corp.,* 674 F. Supp. 138, 144 (D. Del. 1987). However, **[*14]** when a defendant's sales to customers in Delaware constitute less than one percent of total revenue, it is not substantial enough to warrant an exercise of jurisdiction. *Bell Helicopter,* 295 F. Supp. 2d at 405. In the present case, Burlington's sales of products to customers in Delaware in 2001, 2002, and 2003 were about $ 1,000.00 each year, representing 0.0007% of Burlington's annual sales revenues. (D.I. 53, at 2-3). In 2004, Burlington had sales to three customers in Delaware that totaled approximately $ 20,070.00. (*Id.* at 3). While Burlington's sales of products to Delaware customers grew in 2004, its Delaware revenue only comprised approximately 0.14% of its total annual sales. (*Id.*) Because Burlington's Delaware revenue was less than 1% of its total annual revenue, it is not substantial enough to warrant an exercise of general jurisdiction. The court, therefore, finds that even though the acts alleged in the third-party complaint, if proved, might constitute a breach of duty owed by Burlington, Gurtler has not made a *prima facie* showing of personal jurisdiction over Burlington under § 3104(c)(4) of the Delaware long-arm statute.

## B. Due Process [*15]

The second step in the court's analysis is to determine whether exercising jurisdiction comports with the requirements of the Due Process Clause. *HN11* The Due Process Clause requires that, in order to subject a defendant who is "not present within the territory of the forum" to personal jurisdiction, the court must first make sure that the party "has certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of justice and fair play."' *See International Shoe Co. v. Washington,* 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945). In order to give non-residents "fair warning" that a particular activity may subject them to litigation within the forum, these "minimum contacts" must be purposeful. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985). In other words, the defendant's contact must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980). n2 Finally, "even if the requisite minimum contacts have been found through an application of the stream **[*16]** of commerce theory or otherwise, if it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances, then due process requires that jurisdiction be denied." *See Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1568 (Fed. Cir. 1994).

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 The United States Supreme Court has explained that:

> *HN12* the "substantial connection" . . . between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State. . . . The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 1726          Page 9 of 11

Case 1:05-cv-00069-GMS   Document 57-1   Filed 08/12/05   Page 45 of 47 PageID #: 821

defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum state.

*ICT Pharms.,* 147 F. Supp. 2d at 272 (quoting *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 112, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987)).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*17]**

Gurtler first asserts that the court should exercise jurisdiction over Burlington because Burlington has purposeful minimum contacts with the State of Delaware of the quantity and type to cause it to reasonably foresee that it would be "haled before a court" located in Delaware. Jurisdiction is proper, according to Gurtler, because it informed Burlington that it diluted Burcopel CAT with water to produce Pulse Shield, which, in turn, it placed into a distribution chain that consisted of laundering facilities across the United States. (D.I. 56, at 4). Burlington, therefore, knew that its Burcopel CAT was shipped nationally as the sole compositional ingredient in Pulse Shield. (*Id.*) Thus, Burlington has minimum contacts to satisfy due process requirements by contracting for the sale of Burcopel CAT to Gurtler, thereby directing its product into the stream of commerce of the United States and Delaware. Gurtler further asserts that, at the time this litigation was brought, Gurtler and Burlington were involved in significant business negotiations involving Burcopel CAT, which included a proposal by Gurtler that Burlington dilute the Burcopel CAT, affix Gurtler's labeling, and ship **[*18]** it directly to Gurtler's clients. (*Id.* at 5). However, as Gurtler points out, a final contract was never entered. Gurtler contends that these negotiations put Burlington on notice that by providing Burcopel CAT to Gurtler, Burlington would be submitting to the jurisdiction of the districts to which the Gurtler product was shipped. Gurtler relies on *Boone* and *Motorola* to support its stream of commerce theory. Gurtler argues that, as in *Boone* and *Motorola,* the defendant seeking to be dismissed, *i.e.* Burlington, engaged a distributor, *i.e.* Gurtler, who shipped the defendant's product across the country. Thus, not only did Burlington anticipate the fact that its product would be distributed in all states including Delaware, it took affirmative steps to direct its product to Delaware by and through its agreement with Gurtler. (D.I. 56, at 5).

After reviewing the record, the court finds that Gurtler's reliance on *Boone* and *Motorola* is misplaced because both cases are distinguishable from the present case. First, there is no evidence in the record that Burlington engaged Gurtler to be its exclusive distributor of Burcopel CAT in the United States, which **[*19]** was a critical factor in *Boone.* The court in *Boone* found that the defendant had exhibited an intent to serve the Delaware market because it engaged a resident company as the exclusive distributor of its product in the United States and directly benefitted from the distribution. *Boone,* 724 A.2d at 1160. As previously discussed, Gurtler purchased Burcopel CAT from Burlington, diluted it with water and sold it as Pulse Shield. These actions are not consistent with a distributor/distributee relationship. In addition, the record shows that Burlington does not benefit directly from Gurtler's "distribution." Gurtler asserts that Burlington has received approximately $ 66,770.00 for purchases of Burcopel CAT. However, Gurtler does not assert that the money was a direct benefit from its distribution of Pulse Shield. Rather, it was money that Burlington received from the sale of Burcopel CAT to Gurtler alone. This situation is distinguishable from *Boone,* where the defendant earned $ 270,000 from sales of its product by its distributor in Delaware. *See id.* at 1158.

Likewise, *Motorola* is distinguishable. First, the *Motorola* defendant's product **[*20]** was integrated into a variety of consumer products manufactured by well-known multi-national

Get a Document - by Citation - 2005 U.S. Dist. LEXIS 1726                     Page 10 of 11

Case 1:05-cv-00069-GMS   Document 57-1   Filed 08/12/05   Page 46 of 47 PageID #: 822

corporations. n3 The goods produced by the corporations were then placed for sale in well-known retail stores, including Caldor and Circuit City, which all had outlets in Delaware. Further, the products were advertised extensively, both nationwide and in Delaware through newspapers, magazines, and catalogs. *Motorola,* 58 F. Supp. 2d at 352. While Burcopel CAT is integrated into Gurtler's Pulse Shield, there is no evidence in the record that Gurtler places the Pulse Shield for sale in well-known retail stores with outlets in Delaware. The record is also devoid of evidence that Gurtler advertises the Pulse Shield, either nationwide or in Delaware.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n3 The *Motorola* defendant's product was a softmodem that was integrated into Compaq, Phillips, Samsung, Sharp, and Sony consumer electronic products.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

More important, the *Motorola* court found that the licensing fees and royalties from which the defendant **[*21]** derived its revenues "appeared to be based upon the sale to *end users* of products containing its softmodems." *Id.* Indeed, the court noted that the "End User distribution channel" of the defendant's licensing agreement "contemplated sale to retail consumers including consumers in Delaware of 'Shipped End User Product[s]' through retail outlets." *Id.* In the present case, Gurtler does not assert that Burlington derives revenue based on the sale of the Pulse Shield to end users. Conversely, Gurtler asserts that Burlington derives revenue based on its sale of Burcopel CAT to Gurtler.

Another important distinction between *Motorola* and the present case is that the *Motorola* defendant maintained an interactive website from which end users could download modem control commands to their computers to enable them to perform certain functions with the defendant's softmodems. In addition, the customers could order products to test their softmodems and obtain customer support directly from the defendant by telephone and Internet. The record also indicated that Delaware customers had utilized the features of the defendant's support network. *Id.* In the present case, Burlington **[*22]** does not offer the same type of customer support network. According to Gurtler, Burlington maintains an Internet website that allows potential clients in Delaware to access certain advertisements. The website also provides a toll free phone number for client communication and order solicitation. Burlington's website offerings are not nearly as extensive as those offered by the defendant in *Motorola.* Moreover, Gurtler has not asserted that end users of its Pulse Shield can obtain customer support from Burlington's website or toll free number.

Finally, Gurtler asserts that Burlington has admitted that it transacts certain business in Delaware and, therefore, has not only availed itself to Delaware by implicitly soliciting business in the state, but also it has derived substantial revenue from Delaware. The court disagrees. As previously discussed, Burlington's Delaware revenue for the years 2001 through 2004 was less than 1% of its total annual revenue for each year and, therefore, not substantial enough to warrant an exercise of jurisdiction. Thus, Burlington does not have sufficient contacts with this forum to compel its appearance here without offending the Due Process Clause. **[*23]** n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n4 The court need not address whether jurisdiction in Delaware comports with the "minimum requirements inherent in the concept of 'fair play and substantial justice'" because Burlington's contacts with Delaware are insufficient to cause it to reasonably foresee being



Get a Document - by Citation - 2005 U.S. Dist. LEXIS 1726                    Page 11 of 11

Case 1:05-cv-00069-GMS   Document 57-1   Filed 08/12/05   Page 47 of 47 PageID #: 823

haled before a Delaware court.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -


Dated: February 8, 2005

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY
ORDERED that:

1. Burlington Chemical Company's Motion to Dismiss for Lack of Personal Jurisdiction (D.I.
51) is GRANTED.

Dated: February 8, 2005

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE